

RECEIVED
FEB 15 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JUDGE KEENAN

------------------------------------------------------------------X

380544 CANADA, INC., WAYNE SIM
and SALVADOR CLAVÉ,

    Plaintiffs,

    - against -

ASPEN TECHNOLOGY, INC., DAVID L.
McQUILLIN, LAWRENCE B. EVANS and LISA
ZAPPALA

    Defendants.

------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

**07 CV 1204**

**COMPLAINT**

**JURY TRIAL DEMAND**

Plaintiffs 380544 Canada, Inc. ("Canada, Inc."), Wayne Sim ("Sim") and Salvador Clavé ("Clavé") (collectively, "Plaintiffs"), by their undersigned counsel, bring this action against defendants Aspen Technology Inc. ("Aspen," "AspenTech" or the "Company"), David L. McQuillin ("McQuillin"), Lawrence A. Evans ("Evans") and Lisa Zappala ("Zappala") (collectively, "Defendants") based upon actual knowledge with respect to the allegations related to Plaintiffs' purchases and holdings of the common stock and warrants of Aspen and in reliance upon the actions of the Defendants. Plaintiffs bring the remaining allegations upon information and belief, based upon, *inter alia*, the investigation of Plaintiffs' counsel, which included, among other things, review of Aspen's public filings with the Securities and Exchange Commission ("SEC"), press releases, publicly available trading information, articles in the press, analyst reports, information from a criminal indictment of McQuillin, No. 07-CR-17 (S.D.N.Y.) (McKenna, Judge), the Consolidated Class Action Complaint filed in *In re Aspen Technology, Inc. Securities Litigation*, No, 04-12375-JLT (D. Mass.) (hereinafter the "Class Action

Complaint"), a Securities Exchange Commission complaint against Lawrence B. Evans, David L. McQuillin and Lisa W. Zappala, No. 07-cv-10027 (D. Mass.) (hereinafter the "SEC Complaint") and in support of this Complaint, alleges the following:

## I. OVERVIEW OF THE ACTION

1.     Plaintiffs, former Aspen executives and shareholders, bring this action against defendants for their violations of federal statutory and New York common law in relation to their purchase of Aspen common stock and warrants under a private placement Securities Purchase Agreement dated May 9, 2002 ("Securities Purchase Agreement," "SPA" or the "Purchase Agreement"). As described in further detail below, Defendants made materially misleading and false statements to Plaintiffs that induced them to purchase Aspen's stock in connection with Aspen's acquisition of the Hyprotech group of companies (the "Acquisition").

2.     At all relevant times, numerous securities analysts and investors relied on the financial information and revenue targets provided by Defendants to gauge Aspen's performance and to disseminate estimates of Aspen's expected performance to the larger investing public and, in some cases, such as with Plaintiffs, to determine how to value stock acquired in private placements. Defendants knew that the investing public closely followed such "earnings estimates" or "analysts' expectations" because, historically, when a company's financial performance fails to meet such estimates, that company's stock price typically declines, and when a company's financial performance exceeds such estimates, the company's stock price typically rises.

3.     As set forth more fully below, Defendants engaged in a scheme to deceive members of the investing public, including Plaintiffs, Aspen shareholders, Aspen's Board of Directors, securities analysts, Aspen's outside auditors, the SEC and others concerning Aspen's

2

true financial results and software license revenues by claiming that certain software license agreements had been reached in certain financial periods, when in fact they had not. Through this scheme, Defendants and their co-conspirators made it appear as though Aspen's financial performance was better in various quarters than it actually was, thereby making it appear that Aspen had either met, exceeded, or came closer to its financial targets and analysts' expectations than it actually had.

4.     Defendants made materially false and misleading statements to Plaintiffs in presentations, correspondence, conversations, the Securities Purchase Agreement and public filings that breached the SPA and induced Plaintiffs to enter the Purchase Agreement, induced them to acquire Aspen shares. Among other things, Defendants misrepresented Aspen's process engineering division's revenue and cash flow over several years, Aspen's revenue recognition practices, Aspen's long-term revenue commitments from customers, Aspen's internal accounting controls and Aspen's revenue and earnings in specific quarters.

5.     At all relevant times, Aspen's revenues came primarily from two sources: a) the sale of licenses for computer software that Aspen developed and b) the sale of services that Aspen provided to customers in connection with the use of that software. Because Aspen's profit margins were significantly higher for software license sales, and because software license sales often determined future service revenues, many securities analysts and investors considered the size and growth of Aspen's software license revenue to be one of the most important measures of Aspen's financial performance.

6.     As discussed below, Aspen has admitted that its financial statements for fiscal years 2000-2004, including for the nearly three years directly leading up to the SPA, were materially false and misleading when issued and has restated those financial statements. The

3

Company has further admitted that it engaged in the following improper accounting practices which served to artificially inflate and/or distort its reported financial results:

> **Side Agreements:** Aspen entered into side agreements which changed the terms of sales agreements so that it could prematurely recognize revenue.

> **Consignment Sales:** Aspen improperly recognized software license revenue on consignment sales. In this regard Aspen prematurely recorded revenue on the delivery of software licenses that were nothing more than consignment arrangements.

> **Recognizing Revenue Before It Was Earned:** Aspen recognized unearned software license revenue. Aspen recognized revenue of software licenses before it had substantially performed its sales arrangement obligations entitling it to the benefits represented by the revenues.

> **Improperly Recognizing Maintenance Revenue:** Aspen improperly recognized maintenance revenue through a variety of manipulations designed to allow it to prematurely record revenue.

7.     Aspen's improper accounting was orchestrated at the highest levels of the Company and included, among others, Defendants Lawrence B. Evans, Lisa Zappala and David McQuillin (collectively the "Individual Defendants"). Indeed, as detailed herein, according to former employees of Aspen, defendant Evans, a co-founder of Aspen and its CEO until October 2003 referred to certain of Aspen's improper earnings management practices as keeping revenues "in the freezer." Defendant McQuillin, who prior to serving as Aspen's President and CEO served as Aspen's head of sales, inquired of the Company's sales forces "how do I orchestrate the deals to get the stock price up?"

8.     As discussed in detail below, Aspen's accounting fraud was made public in a series of announcements starting in October 2004. On October 27, 2004, Aspen announced that its Audit Committee had undertaken a "detailed review" of the accounting for certain software and licensing service agreements and that as a result of that review it would not be able to release its financial results for its first quarter. Two days later, on October 29, 2004, Aspen announced

4

that federal prosecutors had launched a probe of the Company's accounting practices. On November 18, 2004, Aspen announced that due to the delay in filing its Form 10-Q for the period ending September 30, 2004, it had received a letter from The NASDAQ Stock market indicating that the Company's common stock was subject to delisting. Then, on November 24, 2004, Aspen issued a press release announcing that its Audit Committee believed that the Company would have to restate its financial statements for fiscal years 2000 through 2004 and, accordingly, those financial statements should not be relied on. Aspen also announced that its Board of Directors asked McQuillin to resign his positions with the Company immediately. On January 31, 2005, Aspen announced that its Audit Committee had completed its work and had identified sixteen separate transactions that were entered into during fiscal years 2000 through 2002 which were improperly accounted for and material.

9.     Finally, on March 15, 2005, Aspen filed an amended Form 10-K for the year ended June 30, 2004, with the SEC (the "Amended 2004 10-K"). In the Amended 2004 10-K, Aspen detailed the full extent of its improper accounting and set forth restated financial figures. In response to these announcements, the price of Aspen stock further declined.

10.     Plaintiffs would not have entered into the Securities Purchase Agreement or purchased over $6.6 million worth of Aspen stock and warrants had Plaintiffs known that Aspen misrepresented its finances and business operations. Defendants' representations included misrepresentations regarding Aspen's revenue recognition practices, internal accounting controls and principles and long term customer commitments. Plaintiffs seek damages for the injuries caused by Aspen's breaches of the SPA and Defendants' fraudulent misrepresentations and concealments, including rescission of the SPA.

## II. JURISDICTION AND VENUE

11.     This Court has jurisdiction to hear this case, and venue is proper, pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated under the Exchange Act by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5, and 28 U.S.C. §§ 1331, 1332(a)(2) and 1367.

12.     There is complete diversity of citizenship between Plaintiffs and Defendants and, as more fully explained herein, more than $75,000.00 is in dispute.

13.     Venue is proper in this Court under 28 U.S.C. § 1391 and by agreement in the SPA.

14.     Aspen and Plaintiffs are parties to the Securities Purchase Agreement.  Section 6.9 of the Securities Purchase Agreement provides:

> INTERPRETATION OF THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.  EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR WITH ANY TRANSACTION CONTEMPLATED HEREBY OR DISCUSSED HEREIN[.]

## III. THE PARTIES

15.     Plaintiff Wayne Sim is a citizen of Canada residing in Canada.  Sim was Director of Hyprotech prior to it being acquired by Aspen.  From June 2000 until the Acquisition, Sim was the Chief Executive Officer of Hyprotech.  From June 2002 to September 2002, Sim was Chief Product Officer at Aspen; from September 2002 to August 2004, Sim was the Senior Vice President of Sales and he was also Chief Product Officer from September 2003 to August 2004, when he voluntarily resigned.

16.     Plaintiff Salvador Clavé is a citizen of Spain residing in Canada.  Clavé worked for

Hyprotech from 1994 until the Acquisition. From July 2001 to the Acquisition, Clavé was Hyprotech's Chief Operating Officer. From June 2002 to September 2002 Clavé was Aspen's VP Sales for the Engineering Business Unit and from September 2002 to October 2004 Clavé was Sr. VP of Sales Operations.

17. Plaintiff 380544 Canada, Inc. is a Canadian company wholly owned by Wayne Sim.

18. Defendant Aspen is a Delaware corporation with its principal place of business located at Ten Canal Park Cambridge, Massachusetts, 02141. The Company supplies software products and services for the analysis, design and automation of process manufacturing facilities. The Company's software and services are used by companies in the chemical, petroleum, pharmaceuticals, pulp and paper, and metal industries. Aspen trades on the NASDAQ under the symbol AZPN.

19. Defendant McQuillin served as Defendant Aspen's Executive Vice President, Worldwide Sales and Marketing from May 1997 to September 2002; from January 2001 to September 2002, McQuillin also served as the Co-Chief Operating Officer at Aspen. Defendant McQuillin then served as Defendant Aspen's President and CEO from October 1, 2002 to November 24, 2004, when he was forced out of his positions by Aspen's Board of Directors. Defendant McQuillin is a resident of Massachusetts. In January 2007, the Southern District of New York U.S. Attorney's Office charged McQuillin with conspiracy to commit securities fraud and securities fraud in connection with the scheme to falsify the revenue that Aspen reported during the period from December 2000 to September 2002. See No. 07-CR-17 (S.D.N.Y.) (McKenna, Judge).

20. Defendant Evans is Aspen's founder, Chairman of the Board ("Chairman") and CEO until his resignation in or about October 2002. From 2002 to January 2005, he was Aspen's

7

Chairman. Defendant Evans continues to serve as a senior advisor to Aspen. Evans is a resident of Massachusetts.

21. Defendant Zappala served as Aspen's Senior Vice President and the Chief Financial Officer ("CFO") between in or about September 1998 until she resigned as CFO in or about July 2003. After her resignation as CFO, defendant Zappala took on an advisory role at Aspen as its Senior Vice President of Finance. Zappala completely resigned from Aspen in or about December 2004. Zappala is a resident of Massachusetts.

22. In January 2007, the SEC brought civil securities fraud charges against Defendants McQuillin, Evans and Zappala in connection with the scheme to falsify the revenue that Aspen reported during the period from January 2001 through 2004.

## IV. BACKGROUND

23. Wayne Sim is a chemical engineer and business executive. Sim holds a Bachelor of Sciences degree in chemical engineering and completed course work for a Doctor of Philosophy degree in chemical engineering from the University of Calgary. As a doctoral candidate, Sim and several fellow graduate students and professors became part of Hyprotech Limited, a company that created and sold process engineering software and related services. Hyprotech Limited was incorporated on January 7, 1976.

24. Hyprotech Limited was extremely successful. By 2001, Hyprotech reported annual license and services revenues of over $50 million based on Generally Accepted Accounting Principles in the United Kingdom.

25. Salvador Clavé is an electrical engineer. Clavé has a Bachelor's degree in electrical engineering from the Politechnic University of Catalonia in Barcelona, Spain and a Masters of Business Administration degree from ESADE Barcelona in Barcelona, Spain.

A.   **The Acquisition, Meetings and Securities Purchase Agreement**

26. Since its founding in 1976, Hyprotech was a developer and worldwide supplier of engineering simulation software.  In late 1996, Hyprotech Limited became a fully-owned subsidiary of AEAT, a company with headquarters in the United Kingdom.

27. In fiscal year 2002, Hyprotech had revenues of approximately $68.5 million. Hyprotech delivered software and support services to customers in the field of process engineering.

28. Aspen licenses software and provides related services such as consulting, maintenance and training.  One of Aspen's core businesses is to provide process engineering software and related consulting services to manufacturing companies in the petroleum, chemical, pharmaceutical and air separation industries.  Aspen's revenues are based on the sale of the software and the provision of services.  As discussed *infra*, Generally Accepted Accounting Principles ("GAAP") are specific about when revenue on such sales can be recognized.

29. Beginning in 2001, Defendants began discussions with AEAT regarding Aspen's potential purchase of Hyprotech.  Because of Sim's position and influence with Hyprotech (as someone who had built the business since 1976),any  potential acquisition of Hyprotech required Sim's involvement and approval.   AEAT specifically sought Sim's recommendation and approval of a merger partner.

30. To raise money for the Acquisition, AspenTech recruited investors, including Plaintiffs, for a private placement of Aspen stock at approximately the market value of Aspen stock at the time.  After a series of meetings and presentations by Defendants to Plaintiffs (and others) about the Acquisition, including meetings during which Defendants made multiple misrepresentations about Aspen's financial health and accounting controls, Plaintiffs were

9

induced to enter the SPA with Aspen on May 9, 2002.

31.  The meetings that led up the Acquisition and SPA involved various presentations by Aspen executives, including the Defendants, on various issues, including Aspen's financial accounting.  The meetings (that were both in person and by telephone) took place on various dates, including May 30, August 29, and September 21, 2001 and January, March 22 and April 2, 2002.  During the meetings, Defendants misrepresented Aspen's finances including Aspen's process engineering software revenues; internal accounting controls and process; operations including the number of Aspen employees; and Aspen's intentions to incorporate Hyprotech's products, employees and software development projects such as AXSYS into Aspen.

32.  Under the SPA, the Purchasers, including Plaintiffs, agreed to purchase a total of 4,166,665 shares of Stock in consideration of $49,999,980.00 in cash.  Under the Agreement, Sim (through Canada, Inc.), agreed to purchase 550,000 shares of AspenTech common stock and warrants for $6,600,000.00, which Sim paid to Aspen on May 30, 2002.

33.  In the SPA, Clavé agreed to purchase 16,665 shares of AspenTech common stock and warrants for $199,980.00, which Clavé paid in May 2002.

34.  In Paragraph 3.1(n) of the SPA, Aspen represented that:

> (n)    Internal Accounting Controls.    The Company and the Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements *in conformity with generally accepted accounting principles* and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. (Emphasis added).

It further stated in Paragraph 3.1(h) that Aspen's SEC Reports and Financial Statements were "prepared in accordance with United States generally accepted accounting principles applied on

a consistent basis during the periods involved ("GAAP")...."

35. It was important to Aspen to retain Sim and Clavé after the Acquisition as executives in charge of Hyprotech's business to generate good publicity for the Acquisition and to provide continuity in operations. AspenTech's dependence on Sim and Clavé's employment with AspenTech is evidenced by a press release dated May 10, 2002, included in the Investor Questionnaire circulated to the Purchasers, that expressly stated that "Mr. Sim will become Chief Product Officer at AspenTech when the transaction closes."

36. Plaintiffs relied upon Aspen's financial statements and the Defendants' representations regarding Aspen's revenues and profit that Defendants provided them during negotiations of the purchase of Hyprotech and in the SPA.

37. On or about early May 2002, AEAT's common shareholders voted unanimously in favor of the Acquisition. On May 10, 2002, AspenTech announced it was acquiring Hyprotech from AEAT for £67.5 million in an all-cash transaction. That same day, AspenTech and AEAT executed the Acquisition Purchase and Sale Agreement (the "Acquisition Purchase and Sale Agreement").

## V. ASPEN'S ADMITTED FINANCIAL MISREPRESENTATIONS FROM 2000 TO 2004

38. On March 15, 2005, the Company filed the Amended 2004 10-K with the SEC. In the Amended 2004 10-K, Aspen advised that its previous SEC filings for the years 1999, 2000, 2001, 2002, 2003 and 2004, as well as the quarterly reports in these years filed on Form 10-Q, could not be relied upon. The Form 10-K stated in pertinent part as follows.

> This Amendment . . . is being filed for the purpose of restating our consolidated balance sheets as of June 30, 2003 and 2004 and consolidated statements of operations, statements of stockholders' equity and comprehensive income (loss), statements of cash flows and related disclosures for the years ended June 30, 2002, 2003 and 2004.

> We have not amended our Annual Reports on Form 10—K for the fiscal years

ended June 30, 1999, 2000, 2001, 2002, or 2003, or our Quarterly Reports on Form 1 0—Q for the quarterly periods included in these fiscal years, that reflect the effects of the restatement. *The information that has been previously filed or otherwise reported for these periods...should not be relied upon.* (Emphasis added).

39. Defendants represented in the SPA that the financial statements for 1999-2002 were reliable and fully knew that Plaintiffs relied upon them in deciding to enter into the SPA and buy shares of Aspen. The following chart illustrates the magnitude of the restatement on Aspen's operating (pre-tax) earnings and net (after-tax) earnings:

| Net Income (Loss) Applicable To Common Shareholders | As Reported ($1,000s) | s Restated ($1,000s) | % Overstated (Understated) |
|---|---|---|---|
| Fiscal 1999 | ($ 20,795) | ($ 27,595) | (24.6)% |
| Fiscal 2000 | $ 5,428 | ($ 3,226) | nm* |
| Fiscal 2001 | ($ 20,375) | ($ 36,809) | (44.7)% |
| Fiscal 2002 | ($ 83,466) | ($ 82,298) | 1.4% |
| Fiscal 2003 | ($ 170,017) | ($ 148,398) | 14.6% |
| Fiscal 2004 | ($ 35,048) | ($ 28,164) | 24.4% |

| Operating Income (Loss) | As Reported ($1,000s) | As Restated ($1,000s) | % Overstated (Understated) |
|---|---|---|---|
| Fiscal 1999 | N/A** | N/A | N/A |
| Fiscal 2000 | $3,5832 | ($4,218) | Nm |
| Fiscal 2001 | ($ 29,575) | ($ 44,347) | (33.3)% |
| Fiscal 2002 | ($ 66,122) | ($ 62,503) | 5.8% |
| Fiscal 2003 | ($ 161,590) | ($ 138,488) | 16.7% |
| Fiscal 2004 | ($11,918) | ($ 4,167) | 186.0% |
| * represented by Aspen to not be | | | |

| meaningful<br>** Aspen has not made this<br>information available. | | |
| --- | --- | --- |

40. In the Amended 2004 10-K, Aspen admitted that the restatement was the result of a

variety of improper accounting practices including:

(a)     **Aspen improperly recognized revenue on software license revenue that was "outside of contractual terms"**

Aspen's employees entered into side agreements *(i.e.,* verbal, written, letter, and/or electronic correspondence) which altered the terms of its sales arrangements so that Aspen could prematurely recognize revenue. As noted in the SEC's SAB No. 101, companies need to create and maintain internal controls sufficient to ensure that any agreements or alterations to sales contracts by "side agreements" are properly recognized.

(b)     **Aspen improperly recognized software license revenue on consignment sales**

As noted in SAB No. 101, consignment arrangements are not sales and do not qualify for revenue recognition because the seller retains the risks and rewards of ownership of the product shipped. Nonetheless, Aspen prematurely recorded revenue on the delivery of software licenses that were nothing more than consignment arrangements.

(c)     **Aspen recognized unearned software license revenue**

In violation of GAAP and its stated accounting policies, Aspen recognized revenue of software licenses before it had substantially performed its sales arrangement obligations entitling it to the benefits represented by the revenues *(i.e.,* Aspen's software required significant production, modification or customization at the time revenue was recognized).

(d)     **Aspen improperly recognized maintenance revenue**

In violation of GAAP and its own policies, Aspen improperly recognized revenue of maintenance services when: (a) it assigned an unfair value to the service component of a software arrangement; (b) its employees entered into side agreements to prematurely recognize maintenance revenue; and (c) it recognized maintenance revenue before Aspen assessed a customer's creditworthiness and/or the customer accepted sales agreement with Aspen.

41. Aspen restated its financial statements for each of the six consecutive years ending

13

June 30, 2004. In so doing, Aspen has admitted that such financial statements, including financial statements relied upon by Plaintiffs, were materially misstated because GAAP provides that only previously issued financial statements which are materially misstated are to be retroactively restated. *See* Accounting Principles Board ("APB") Opinion No. 20.

## VI. THE SETTLED CLASS ACTION ALLEGATIONS

42. A Consolidated Class Action complaint for securities fraud was filed against Aspen and other defendants on or about November 9, 2004 in the United States District Court for the District of Massachusetts. Aspen settled that case. Plaintiffs opted out of the class settlement.

43. The Class Action Complaint detailed information from confidential informants who were represented to have provided information to counsel in that case. The Aspen Class Action compliant provided:

> CI 1,[1] a former Aspen sales manager, "there were certainly more than sixteen deals that were shady." CI 1 specifically identified three licensing transactions — Aeris Tech Chemicals, Star Enterprises and Union Carbide — as examples where Defendants' intentionally delayed the recognition of revenue on transactions so that Aspen could report sales as needed to stabilize Aspen's quarterly earnings and meet Wall Street estimates. With respect to the Union Carbide transaction, CI 1 recalled that in a December 1999 sales meeting *defendant McQuillin stated that "we are going to keep this [Union Carbide revenue] in the freezer" in order to "smooth out the numbers."* Aspen publicly announced the Union Carbide license transaction on December 7, 1999, the first day of the Class Period. *See* ¶__. CI 1 further stated that defendant McQuillin stated in several sales meetings that "my stock options are getting too low and we need to get them up," and *"how do I orchestrate the deals to get the stock price up?"*

---

[1]     [According to the Consolidated Class Action Complaint:] CI 1 was employed by Aspen from March 1998 until April 2001. CI 1 was based in Aspen's Houston, TX office and reported directly to Lance Edwards, Vice President of the Oil & Gas Sales Division. Edwards in turn reported to John Heg. CI 1 also had reporting responsibilities to Ron Chandler, who also was a sales manager. Chandler reported to Jack Leahy who in turn reported to defendant McQuillin. During CI 1's tenure McQuillin was Aspen's Executive Vice President of Worldwide Sales and Marketing and Co-Chief Operating Officer. The Class Action Complaint represented that its allegations were based upon CI 1's personal knowledge of the subjects discussed at regularly scheduled sales department meetings attended by CI 1 and defendant McQuillin.

CI 2,[2] a former director of business development, confirmed that Defendants improperly managed Aspen's reported earnings. CI 2 stated that both defendants Evans and McQuillin euphemistically referred to this practice as keeping revenues "in the freezer."

CI 1 also stated that, in most instances during his tenure with the Company (from 1998 through 2001), Aspen's senior management pressured its sales personnel to meet quarterly sales targets "at any cost," encouraging sales personnel to agree to almost any term or contingency in order to get a sale recorded. The pressure asserted by Defendants to meet unrealistic sales targets was so high that it created a great deal of strife within the ranks, including fist-fights between team members in the hallways. For example, senior level management told its sales force to persuade the customer NOT to complete the order or contract date so that Aspen could prematurely record the sales, or, in certain situations, to ask the customer to back-date an order so that it could meet sales targets. CI 1 stated that Aspen was also notorious for "hanging its books open a couple days" if a deal was not completed on time so that it could be posted and recognized in the previous quarter.

In addition CI 1 stated that, in other instances, Aspen recognized revenue when it sold "tokens" to customers which provided the customers access to Aspen's online library of software. Aspen's recognition of revenue at the time it sold such "tokens" violated GAAP's criteria of revenue recognition because at such time: (1) the revenue was not earned; (2) persuasive evidence of a software arrangement did not exist; (3) the software had not been delivered; and (4) and the fee arrangement was not fixed determinable. In particular CI 1 stated that Aspen's former Chief Operating Officer, David Mushin, approved a "token" sales transaction with Occidental Chemical that resulted in the overstatement of at least $250,000 in license fees during Aspen's second quarter of fiscal 2000, ended December 31, 1999.

*   *   *

According to CI 2, a former director of business development, beginning in late 2000 Aspen was attempting to sell $4 million worth of software licenses and services to Equate Petrochemical Company ("Equate"), which is based in Kuwait and is a joint venture affiliate of Union Carbide Corp. ("UCC"). According to CI 2 the $4 million sale with Equate was for about $2 million in license revenues and $2 million in services revenues. Equate was not involved in the negotiations

---

[2]    [According to the Consolidated Class Action Complaint:] CI 2 worked at Aspen from January 1997 to October 2002. CI 2 was employed as a senior account executive and commercial manager and during fiscal 2001, as the director of business development for Aspen's polymer business. CI 2 was based in Aspen's Houston, Texas office and since at least 1999 was the commercial manager for Aspen's alliance with Union Carbide, a leading manufacturer of polymer products.

directly with Aspen, but instead acted through an intermediary, Petroleum Services Company, W.L.L. ("PSC") and PSC's general manager, Edmond Chammas ("Chammas"). Aspen, through CI 2 and Aspen's sales account manager for Europe, Paul Davis ("Davis"), as well as Aspen's senior vice president of international sales, Michael Boettcher ("Boettcher"), directly interacted with PSC and Chammas on the Equate transaction. CI 2 as the commercial manager for Aspen's alliance with UCC, also had direct interaction with certain of UCC's sales representatives. It was CI 2's understanding that PSC would purchase software from Aspen if and only if PSC had a firm purchase commitment from Equate, the end-user of the software.

According to CI 2, as the end of March 2001 approached, Equate through PSC told Aspen's sales representatives that it "doesn't look like the deal can happen." This potential cancellation greatly impacted the sales team, as they were trying to get the deal finalized before fiscal 3Q01, ended March 31, 2001. CI 2 stated, based on his personal knowledge, that in an attempt to 'save' the sale, Davis and Boettcher gave a letter to Chammas, PSC's representative, which stated that *if PSC will buy the software on paper by March 31, 2001, Aspen will accept PSC 's return of the software to Aspen if Equate does not purchase the software by the end of June 2001*. Armed with knowledge of the questionable terms of this agreement, CI 2 notified defendant McQuillin about what had been taking place. McQuillin told CI 2 that he was "going to look into it." However, CI 2 never heard anything from McQuillin again, and Petroleum Services ended up agreeing to this side arrangement by March 31, 2001 (last day of 3Q01) and took delivery of the software shipment shortly thereafter.

According to CI 2, Equate eventually closed the deal sometime in 4Q01, but Aspen did not receive payment until approximately July-August 2001 [fiscal 2002]. CI 2 said that PSC "started getting nervous" when Aspen began sending invoices to PSC for the $4 million at the end of April 2001. PSC repeatedly asked the sales team how the invoices and requests for payment should be handled. CI 2 confirmed that Equate eventually closed the deal and Aspen received its money in approximately July-August 2001. CI 2 also stated that this was highly questionable because the Company booked the revenue in the quarter ending March 31, 2001, but did not receive payment until sometime in fiscal 1Q02.

(Emphasis added).

## VII. SPECIFIC TRANSACTIONS

As stated above, the SPA represented that Aspen's 10-Ks and 10-Qs did not contain any untrue statements of material fact or material omissions. The SPA, however, was materially false and misleading because it failed to disclose and misrepresented adverse facts, some of

which are discussed below. In truth, at the time Defendants induced Plaintiffs to enter into the SPA, these financials were false and misleading. The transactions that are at the center of the false and misleading statements include the following transactions.

A. **4th Q: 1999 and 1st Q: 2000; Lyondell-Equistar Transaction**

44.     Defendants and others were responsible for Aspen improperly recognizing a total of $9.9 million of software license revenue in its fiscal quarters that ended June 30, 1999 and September 30, 1999 on a sale of software to a  group of Houston, Texas-based related entities (Equistar Chemicals, LP, Lyondell Chemical Company, Lyondell Chemical Worldwide and Lyondell Methanol Company LP (collectively, "Lyondell-Equistar")).  The revenue should not have been recognized because there was a side agreement to the contract whereby Aspen promised Lyondell-Equistar that it would deliver an undetermined amount of software in the future at no additional cost.

45.     On or about August 5, 1999, Aspen issued a press release that falsely and inaccurately summarized its financial results for the fiscal results for the fiscal fourth quarter and the fiscal year ended June 30, 1999.  The press release stated that "AspenTech's most significant fourth quarter transaction was an agreement with [Lyondell-Equistar]..."  The press release also quoted defendant Evans as stating that: "AspenTech achieved a number of important operational goals in the fourth quarter, along with improved execution and financial results in line with our expectations...."  The press release also quoted defendant Zappala as stating that: "[O]ur balance sheet remains strong and will be an important asset as we leverage the benefits from implementing our new organizational structure and strategy."  Defendant Zappala was listed as one of the two contact persons on the August 5, 1999 press release.

46.     On or about October 26, 1999, Aspen issued a press release that falsely and

17

inaccurately summarized its financial results for the fiscal first quarter ended September 30, 1999. Both Defendants Evans and Zappala were quoted in the October 26, 1999 press release. Defendant Zappala was listed as one of the two contact persons on the October 26, 1999 press release.

47.     Defendants knew that the recognition of license revenue from the Lyondell-Equistar transaction in the fiscal quarters and fiscal year in which it was recognized was improper and that Aspen lacked accounting controls to prevent such wrongful recognition of revenue.

48.     The misstatements caused by the improper revenue recognition were material to Plaintiffs. The approximately $4.5 million from the Lyondell-Equistar transaction recorded by Aspen in the quarter ended June 30, 1999 constituted approximately 18% of the total license revenue recorded that quarter. The approximately $5.4 million from the Lyondell-Equistar transaction recorded by Aspen in the quarter ended September 30, 1999 constituted approximately 25% of the total license revenues recorded that quarter.

49.     In or about March 2005, Aspen restated the Lyondell-Equistar transaction.

50.     The effect of the improper accounting for the Lyondell-Equistar transaction was to overstate net income in the fiscal years ended June 30, 1999 and 2000 by $4.5 million ($0.18 per share) and $3.6 million ($0.12 per share) respectively and to understate net income in the years ended June 30, 2001, 2002, 2003 and 2004 by $2 million each year, or between $0.05 and $0.07.

### B.     2nd Q: 2000; Union Carbide Corporation Transaction

51.     On or about December 7, 1999, Aspen issued a press release announcing that it had entered into a licensing agreement with Union Carbide Corporation ("UCC") for certain

enterprise optimization software that would be implemented throughout UCC's worldwide operations. Aspen reported that a only a portion of the licensing revenue would be recognized in the current quarter, the press release stated in pertinent part as follows:

> [Aspen], the leading supplier of manufacturing enterprise optimization solutions for the process industries, today announced that [UCC] has licensed its Enterprise Optimization software, which combines Aspen's Plantelligence(TM) manufacturing software with its Aspen Supply Chain Suite(TM), for all of [UCC]'s operations worldwide. The software will link real-time manufacturing operations and processes with the Enterprise Resource Planning (ERP) systems implemented by Union Carbide during the past two years.
>
> *A portion of the license revenue is recognizable by Aspen Tech in the present quarter ending December 31, 1999, with the remainder to be recognized in subsequent quarters.*
>
> The companies also announced that they plan to create a strategic alliance to offer a configured software solution, including manufacturing and work- process best practices, to licensees of Carbide's proprietary chemical processes and other process industries.
>
> * * *
>
> "By deploying our Enterprise Optimization software at all of its facilities, Union Carbide will be able to link ERP, supply chain and plant manufacturing systems to optimize its key business processes," said Larry Evans, Chairman and CEO of Aspen. "We are looking forward to leveraging the strengths of both companies." Mr. Evans added that Aspen's Plantelligence solution is uniquely able to generate accurate computer models of process manufacturing plant performance, and then continually optimize plants in real time.

(Emphasis added).

52. On or about January 25, 2000, Aspen issued a press release announcing its financial results for the second quarter fiscal 2000, ended December 31, 1999. For the quarter, Aspen reported total revenues of $61.8 million compared to $61.7 million in the second quarter 1999 and net income of $1.6 million or $0.06 per diluted share, compared with net income of $0.5 million or $0.02 per diluted share in the prior year. According to analysts (SG Cowen dtd Jan. 26, 2000), *Aspen's reported earnings exceeded consensus Wall Street estimates.* Aspen also reported that license revenue grew to $29.0 million, a 35 percent increase from license fees

reported in same period last year, while services revenues totaled $32.8 million for the quarter. The Company also reported that the "most significant license transaction" of the quarter was an agreement with Union Carbide.   Defendants Evans and Zappala commented on Aspen's seemingly robust financial results, stating in pertinent part, as follows:

*Evans*

We saw our core markets rebound significantly in the second quarter, evidenced by sharp growth in our license revenues and a return to profitable operations. We are experiencing strong momentum in the marketplace due to improved demand in our core vertical markets, continued gains beyond the refining and petrochemicals industries, and incremental market penetration with our supply chain solutions. We achieved a number of strategic objectives in the quarter, including . . . the establishment of a relationship with Union Carbide.

\*       \*       \*

*Zappala*

Strong demand for our technology and solid execution helped us to exceed expectations for revenues and profitability in the second quarter. Year-over-year earnings per share tripled in the second quarter in spite of a significant increase in the number of weighted average shares outstanding.

53.    On or about February 14, 2000, Aspen filed with SEC Form 10-Q for the quarter ended December 31, 1999. The 10-Q, signed by defendant Zappala, reaffirmed the Company's previously announced financial results and included the following representations concerning Aspen's accounting policies and operating results:

License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence exists to allocate the total fee to all delivered and undelivered elements of the arrangement. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is

provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated condensed balance sheets.[3]

Revenues from service and other for the three months ended December 31, 1999 were $32.8 million, a slight decrease of $0.2 million, or 1.0%, from $33.0 million in the comparable period in fiscal 1999. Revenues from service and other for the six months ended December 31, 1999 were $64.2 million, an increase of $0.5 million, or 1.0%, from $63.7 million in the comparable period in fiscal 1999.

\*   \*   \*

In the opinion of management, the accompanying consolidated condensed financial statements have been prepared in conformity with generally accepted accounting principles and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation.

(Emphasis added).

54.    Immediately following the Company's earnings press release, certain market analysts issued highly positive reports concerning Aspen's current and future prospects:

(a) On or about January 25, 2000, Jeffries and Co., Inc. (analysts Richard T. Williams and Patrick J. McElroy), published a report reiterating its "BUY" recommendation on Aspen common stock and raising the 12-18 month share price target to $56 from $37 – an increase of more than 51 percent based on a "5X" multiplier of Aspen's estimated fiscal 2001 revenues of $295.5 million. According to the report, defendant Zappala "guided the Street to expect improving results on the top line," including "25% license [revenue] growth." The report also included summaries of Aspen management's comments concerning significant product sales

---

[3]    Substantially identical representations, except as noted herein, concerning the Company's accounting policies for software license sales, maintenance and service revenues were made in the following Aspen SEC filings on Form 10-Q (see filing on or about May 15, 2000; November 14, 2000; February 14, 2001: May 15, 2001; November 14, 2001; February 14,2002; May 15, 2002; November 14, 2002; February 14, 2003; May 15, 2003: November 14, 2003;February 17, 2004; and May 17. 2004) and Form 10-K (see filing on or about September 28, 2000; 2001; September 30, 2002; September 29,2003; and September 13, 2004). For the purpose of brevity, these subsequent representations are hereby incorporated by reference.

during the second quarter fiscal 2000, including the agreement with Union Carbide, the report stated in pertinent part as follows:

> [Aspen's] win with Union Carbide is particularly significant as it provides a high visibility endorsement and creates a unique 'private label' integrated product with Carbide's name to automate process plants. There are more than 100 plants like the plymer line implementation at Union Carbide. Not only will [Aspen] deploy across Carbides' entire enterprise, but each of the other 100 plants become high probability prospects...

(b) Similarly, on or about January 26, 2000, SG Cowen Securities Corporation (analysts Rob Schwartz and David Gremmels), published a report maintaining its "BUY rating on Aspen common stock and raising its share price target to $50 based on guidance of "25% license [revenue] growth going forward."

55.    Aspen's fraudulent scheme had its intended effect as the price of Aspen common stock closed at $50.00 per share on or about February 4, 2000, representing a price increase of more than 25 percent.

56.    The statements referenced above in ¶¶51-54, which were represented in the SPA as accurate and in compliance with GAAP, were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)    that Aspen's representations concerning its revenues and earnings in press releases and periodic SEC filings were materially false and misleading as they overstated the Company's reported financial results. Aspen has now admitted that the Company's financial statements were materially false and misleading as it has restated those financial statements and attributed the restatement to numerous improper accounting practices as detailed herein;

(b)    that the Company's internal controls and procedures were materially deficient in a number of respects, including but not limited to: (i) the inability to identify

22

multiple element contractual arrangements to properly recognize license and service fee components in accordance with the Company's publicly stated accounting policies, GAAP and SEC reporting requirements; (ii) the failure to maintain controls that could detect and/or prevent side agreements with customers, through which sales of the Company's products and services were artificially inflated; (iii) the failure to identify and track 'consignment' sales to resellers; (iv) the failure to maintain sufficient and qualified financial accounting and reporting staff; and (v) the failure to monitor and asses the creditworthiness of Aspen's new and existing customers; in fact, Aspen has now admitted to material deficiencies in its internal controls and procedures during 1999 to 2004 and has represented its undertaken steps to mollify the adverse effects such deficiencies continue to have on the Company's ability to provide meaningful information to investors;

   (c) that the Company's financial statements did not include all material adjustments in conformity with generally accepted accounting principles ("GAAP"), Aspen's violations of the Company's own accounting policies, GAAP and SEC reporting requirements are set forth in detail at ¶¶121-134 below;

   (d) that Aspen's reported revenues were materially overstated due to the Company's undisclosed practice of executing 'side agreements' contemporaneously with sales of license and/or services and/or maintenance agreements. These side agreements frequently allowed the customer the right to terminate its sales agreement and/or granted the customer variable pricing terms, among other consideration; Defendants knowingly or recklessly ignored the terms of the side agreements (which rendered the underlying license or service agreement conditional or contingent) when recognizing and reporting licensing, services and maintenance revenues to Aspen's shareholders; Aspen has now admitted that its license, services and

maintenance revenues were materially overstated due to these undisclosed and improper practices and has restated its historical financial results for the past six years — 1999 through 2004, inclusive;

(e)     that Aspen was prematurely and improperly recognizing revenue on consignment sales to resellers. Aspen has now admitted that the Company's sales to resellers during the fiscal years 1999, 2000, 2001 and 2002 were subject to rights of return and price concessions; Defendants knowingly or recklessly ignored these contractual terms when they caused the Company to recognize revenues prior to expiration of the right of return and/or the determination of a fixed sales price; Aspen has now admitted that its license, services and maintenance revenues were materially overstated due to these undisclosed and improper practices and has restated its historical financial results for the past six years — 1999 through 2004, inclusive;

(f)     that Aspen's reported revenues were materially misstated due to Defendants' improper practice of keeping certain revenues "in the freezer" (as detailed in ¶43 above) which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; therefore the statement in Aspen's second quarter 2000 Form 10-Q that license revenues would be recognized over several quarters was misleading because it failed to disclose Aspen's improper earnings management practices;

(g)     that Aspen's originally reported fiscal 2000 and fiscal 1999 revenues were materially overstated by at least $7.0 million and $6.8 million, respectively, due to improper recognition of license, service and maintenance revenues on contingent and/or consignment sales to resellers and other customers; and

(h)     as a result of the foregoing (i) defendant Evans' statement concerning the

24

"sharp growth in [Aspen's second quarter 2000] license revenues" due to a "significant rebound" in Aspen's 'core markets," (ii) defendant Zappala's statement that "[s]trong demand" and "solid execution" allowed the Company to "exceed expectations for revenues and profitability in the second quarter [fiscal 2000]," and (iii) defendant Zappala's statements to analysts concerning Aspen's fiscal 2001 revenue and earnings guidance, were not true.

### C.    3rd Q: 2000

57.    On or about April 24, 2000, Aspen issued a press release announcing its financial results for the third quarter fiscal 2000, ended March 31, 2000. Under the banner headline "Aspen Technology Reports 54 Percent Increase in . . . License Revenue," the Company reported total revenues of $67.8 million compared with $54.2 million in the same period last year, an increase of 25 percent year-over-year. According to the press release, license revenue grew 54 percent to $34.2 million, from $22.2 million in the third quarter of fiscal 1999 and services revenues totaled $33.6 million. The Company also reported that net income for the third quarter was $2.9 million or $0.10 per diluted share, an 87 percent sequential increase from net income in the second quarter 1999. Defendants Evans and Zappala commented on Aspen's seemingly robust financial results, in pertinent part, as follows:

*Evans*

In the third quarter, our focus on integrated solutions contributed significantly to our growth. License revenues included a number of Plantelligence(TM) solution sales, where our offerings are combined to optimize performance of a single manufacturing plant. . . our solutions that extend optimization across the entire supply chain were an important contributor to our performance this quarter. Of particular note was continued customer interest in and our first signed contract for the Aspen eBusiness product, powered by Extricity Software.

* * *

*Zappala*

We are particularly gratified with the growth of our license revenues during the third quarter, which allowed us to significantly improve our profitability. Demand

was strong across all of our core markets and we saw customers returning to capital investments that had been deferred in a more difficult economic environment.

58.    On or about May 15, 2000, Aspen filed with SEC Form 10-Q for the quarter ended March 31, 2000.  The 10-Q, signed by defendant Zappala, reaffirmed the Company's previously announced financial results and included the following representations concerning its operations:

> Software license revenue represented 50.4% of total revenue for the three months ended March 31, as compared to 40.9% in fiscal 1999. Revenues from software licenses for the three months ended March 31, 2000 were $34.2 million, an increase of $12.0 million, or 53.9%, from $22.2 million in fiscal 1999. Software license revenue represented 46.4% of total revenue for the nine months ended March 31, as compared to 41.1% in fiscal 1999. Revenues from software licenses for the nine months ended March 31, 2000 were $84.6 million, an increase of $17.8 million, or 26.6%, from $66.9 million in the comparable period of fiscal 1999. During the second quarter of fiscal 2000, we entered into a significant license contract with a customer to license certain of our software for the customer's worldwide operations. *A portion of this license revenue was recognized in the second and third quarters of fiscal 2000 based on requested delivery dates.*
>
> *   *   *
>
> Revenues from service and other for the three months ended March 31, 2000 were $33.6 million, an increase of $1.6 million, or 5.0%, from $32.0 million in the comparable period in fiscal 1999. Revenues from service and other for the nine months ended March 31, 2000 were $97.8 million, an increase of $2.1 million, or 2.2%, from $95.7 million in the comparable period in fiscal 1999.
>
> *   *   *
>
> In the opinion of management, the accompanying consolidated condensed financial statements have been prepared in conformity with generally accepted accounting principles and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation.

(Emphasis added).

59.    The statements referenced above in ¶¶57-58, which were represented in the SPA as accurate and in compliance with GAAP, were each materially false and misleading for the reasons stated in ¶56(a)-(e). In addition the statements in ¶¶57-58 failed to disclose and misrepresented the following adverse facts:

26

(a)      that Aspen's reported revenues were materially misstated due to the Company's improper practice of recognizing revenue on contingent and/or consignment sales to resellers and other customers. In fact, Defendants have now admitted that Aspen's originally reported fiscal 2000 and fiscal 1999 revenues were materially overstated by at least $7.0 million and $6.8 million, respectively, due to improper recognition of license, service and maintenance fees on contingent and/or consignment sales to resellers and other customers;

(b)      that Aspen's reported revenues were materially misstated due to Defendants' improper practice of keeping certain revenues "in the freezer," which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; the statement in Aspen's third quarter 2000 Form 10-Q that license revenues would be recognized over several quarters due to customer "requested delivery dates" was misleading because it failed to disclose Aspen's improper earnings management practices. *See, e.g.,* ¶43 *supra;* and

(c)      as a result of the foregoing, Defendants Evans' and Zappala's statements concerning the significant growth in Aspen's second quarter 2000 license revenues and Aspen's continued "profitability" was not true.

### D.      4Q: 2000

60.      On or about August 8, 2000, Aspen issued a press release announcing its financial results for the fourth quarter and fiscal year ended June 30, 2000. For fiscal 2000, Aspen reported total revenues of $268.1 million and net income of $6.5 million or $0.21 per diluted share, compared with total revenues of $226.5 and a net loss of $10.6 million or $0.39 per diluted share in fiscal 1999, excluding restructuring and other charges. The Company also reported fiscal 2000 license revenues of $132.8 million, compared with $97.1 million in fiscal

27

1999. Defendant Evans commented on the Company's performance, stating in pertinent part, as

follows:

> We are pleased to have *exceeded our goals for both growth and profitability in the fourth quarter and fiscal year.* The rapid growth in our license revenues continued to be driven by strong demand for our integrated Enterprise Optimization(TM) and supply chain solutions, as process manufacturers increasingly invest in technology to improve their manufacturing productivity and optimize their supply chains.
>
> We are pleased with the performance of our supply chain solutions this past year, where license revenue more than doubled, and we are excited about our prospects for the year ahead.

(Emphasis added).

61.     On or about August 9, 2000, following the Company's highly positive earnings

announcement, Aspen common stock recorded a single-day price rise of more than 27 percent to

close at $46.25 per share on heavy trading volume.

62.     On or about September 28, 2000, Aspen filed with the SEC Form 10-K for the

fiscal year ended June 30, 2000. The 10-K, signed by Defendants Evans and Zappala, among

others, reaffirmed the Company's previously announced financial results and included the

following representations concerning Aspen's fiscal 2000 and fiscal 1999 operating results,

stating in pertinent part, as follows:

> Software license revenues represented 49.6% and 42.9% of total revenues for fiscal 2000 and 1999, respectively. Revenues from software licenses in fiscal 2000 increased 36.8% to $132.8 million from $97.1 million in fiscal 1999. Software license revenues are attributable to software license renewals covering existing users, the expansion of existing customer relationships through licenses covering additional users, licenses of additional software products, and, to a lesser extent, to the addition of new customers. The lower license revenues in fiscal 1999 resulted primarily from delayed decision making driven by economic difficulties among customers in our core vertical markets of refining, chemicals and petrochemicals.
>
> *   *   *
>
> Software license revenues represented 42.9% and 55.3% of total revenues for fiscal 1999 and 1998, respectively. Revenues from software licenses in fiscal 1999 decreased 31.1% to $97.1 million from $140.9 million in fiscal 1998. The

28

decrease in fiscal 1999 license revenues resulted primarily from delayed decision making driven by economic difficulties among customers in our core vertical markets of refining, chemicals, and petrochemicals.

\* \* \*

Revenues from service and other for fiscal 2000 increased 4.5% to $135.3 million from $129.4 million for fiscal 1999. This increase reflected a continued focus during fiscal 2000 on providing high value—added consulting and training services to existing customers. Revenues from service and other for both fiscal 2000 and 1999 were adversely affected by lower—than—planned levels of consultant utilization. The lower utilization was attributable to the delay of project starts by clients. Growth in the services business was slower than our license business as a result of (1) our decision to utilize partners to help deploy our solutions and (2) the effect on post—contract support revenues of slower license revenue growth in prior periods.

\* \* \*

Revenues from service and other for fiscal 1999 increased 13.6% to $129.4 million from $113.9 million for fiscal 1998. This increase reflected a continued focus during fiscal 1999 on providing high value-added consulting and training services to existing customers. The lower fiscal 1999 utilization was attributable to the delay of project starts by clients.

\* \* \*

[The] quarterly consolidated statement of operations. . . for fiscal 1999 and 2000... in our opinion, reflect all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of these data in accordance with generally accepted accounting principles.

63.    The statements referenced above in ¶¶60 and 62, which were represented in the SPA as accurate and in compliance with GAAP, were each materially false and misleading for the reasons stated in ¶56(a)-(e). In addition the statements in ¶¶60 and 62 failed to disclose and misrepresented the following adverse facts:

(a)    that Aspen's reported revenue was materially overstated due to Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers and other customers, among other things; Aspen's routine violations of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶121-134 below; in fact, Defendants have now admitted: (i) that the Company's fiscal 2000

29

revenues were actually $261.1 million and not $268.1 million as originally reported; (ii) that the Company's fiscal 1999 revenues were actually $219.7 million and not $226.5 million as originally reported; (iii) that the Company's fiscal 2000 net loss was actually $3.2 million and not earnings of $6.5 million as originally reported; and (iv) that the Company's fiscal 1999 net loss was actually $17.4 million and not $10.6 million as originally reported;

        (b)     that Aspen's reported revenues were materially misstated due to Defendants' improper practice of keeping certain revenues "in the freezer" which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; the statement in Aspen's fiscal 2000 Form 10-K that revenue increases were attributable to "higher fiscal 2000 license revenues" was misleading because it failed to disclose Aspen's improper earnings management practices; and

        (c)     as a result of the foregoing, defendant Evans' statement that Aspen "exceeded [its] goals for both growth and profitability" during fiscal 2000 was not true.

        E.     1st Q: 2001; Petrolsoft Corporation and ICARUS Corporation and ICARUS Services Limited Transactions

     64.     On or about October 24, 2000, Aspen issued a press release announcing its financial results for the first quarter fiscal 2001, ended September 30, 2000. For the quarter, the Company reported total revenues of $69.5 million and *pro forma net earnings of $0.5 million, or $0.02 per share. The Company's reported pro forma earnings exceeded Wall Street consensus estimates by approximately $0.02 per share.*[4]  The Company also reported that

---

[4]    During fiscal 2001 Aspen began to report 'pro forma' operating results (*i.e.*, non-GAAP results excluding certain loss items) prominently in the Company's quarterly earnings announcements, usually in the first paragraph of the first page of such announcement. By contrast Aspen's *GAAP net loss,* which in the current quarter was more than $3.7 million, was much less accessible to investors — merely appearing as a line item in the Company's "Consolidated Statement of Operations" on a following page of the earnings release.

software license revenues for the quarter grew 52 percent to $32.6 million, while services revenues rose 16 percent to $36.9 million. In the press release, defendant Evans attributed the "primary driver of the [purported] growth" in Aspen's revenues to sales of Aspen's "supply chain solutions."

65.     On or about October 25, 2000, Jefferies & Company, Inc. (analyst Richard T. Williams) published a report maintaining its "BUY" rating and raising its share price target for Aspen common stock to $77. Jeffries' analysts stated that the Company's first quarter 2001 reported revenues exceeded estimates by approximately $3.5 million. Based on guidance provided by Defendants, Jeffries raised their estimates of the Company's fiscal 2001 earnings by more than 17% to approximately $0.40 per share.

66.     On or about October 31, 2000, Aspen registered for sale to the public more than 660,000 shares of its common stock previously issued in connection with its acquisition of Petrolsoft Corporation ("Petrolsoft") at an aggregate offering price of $24.2 million. On or about June 1, 2000, Aspen acquired Petrolsoft by issuing 2,641,101 shares of common stock in a private placement transaction, valued on the date of the acquisition at $22.93 per share or $60.6 million. The registration statement and prospectus, signed by Defendants Evans and Zappala, among others, filed in connection with the offering incorporated by reference Aspen's consolidated balance sheets as of June 30, 1999 and 2000 and the consolidated income statements for each of the years in the three—year period ended June 30, 2000. Defendants have now conceded that each of those financial reports was materially false and misleading when issued.

67.     On or about November 14, 2000, Aspen filed with the SEC Form 10-Q for the quarter ended September 30, 2000. The 10-Q, signed by defendant Zappala, confirmed the

Company's previously announced financial results and included the following representations

concerning the Company's performance, stating in pertinent part as follows:

> Software license revenues represented 46.9% of total revenues for the three
> months ended September 30, 2000, as compared to 40.3% in the comparable
> period of fiscal 2000. Revenues from software licenses for the three months ended
> September 30, 2000 were $32.6 million, an increase of *51.5%* from *$21.5* million
> in the comparable period of fiscal 2000. This percentage increase was primarily
> attributable to an increased penetration in the market as well as increased sales of
> our eSupply Chain suite of products.
>
>         *    *    *
>
> Revenues from service and other for the three months ended December 31, 2000
> were $41.1 million, an increase of 23.8% from $33.2 million in the comparable
> period in fiscal 2000. Revenues from service and other for the six months ended
> December 31, 2000 were $78.0 million, an increase of 19.9% from $65.0 million
> in the comparable period in fiscal 2000. These increases reflect an improvement in
> our support and maintenance business resulting from last year's license growth...
>
>         *    *    *
>
> In the opinion of management, the accompanying consolidated condensed
> financial statements have been prepared in conformity with generally accepted
> accounting principles and include all adjustments, consisting only of normal
> recurring adjustments, necessary for a fair presentation.

68.    On or about November 29, 2000, Aspen registered for sale to the public more than

124,000 shares of its common stock previously issued in connection with its acquisition of

ICARUS Corporation and ICARUS Services Limited ("ICARUS") at an aggregate offering price

of $4.9 million. On or about August 29, 2000, Aspen acquired ICARUS for total consideration of

$24.5 million, including 248,411 shares of Aspen common stock, valued on the date of

acquisition at *$50.0625* per share or $12.4 million.  The registration statement and prospectus,

signed by Defendants Evans and Zappala, among others, filed in connection with the offering

incorporated by reference Aspen's consolidated balance sheets as of June 30, 2000 and 1999 and

the consolidated income statements for each of the years in the three—year period ended June

30, 2000. Defendants have now conceded that each of those financial reports was materially

32

false and misleading when issued.

69. The statements referenced above in ¶¶64-68, which were represented in the SPA as accurate and in compliance with GAAP, were each materially false and misleading for the reasons stated in ¶56(a)-(e). In addition the statements in ¶¶64-68 failed to disclose and misrepresented the following adverse facts:

(a) that Aspen's reported revenue was materially overstated due to Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers, among other things; Aspen's routine violations of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶121-134 below. In fact, Defendants have now admitted that Aspen's originally reported fiscal 2001 and 2000 revenues were materially overstated by at least $12.5 million and $7.0 million, respectively, due to improper recognition of license, service and maintenance fees on contingent and/or consignment sales to resellers, among other things;

(b) that Aspen's reported revenues were materially misstated due to Defendants' improper practice of keeping certain revenues "in the freezer" which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; therefore the statement in Aspen's first quarter 2001 Form 10-Q that license revenues increased due to "increased market penetration" was misleading because it failed to disclose Aspen's improper earnings management practices; and

(c) as a result of the foregoing, defendant Evans' statement that the "primary driver of [Aspen's revenue] growth" was sales of the Company's "supply chain solutions" was not true.

33

**F.     2nd Q: 2001; Logica UK Ltd. and IBM Transactions**

70.     On or about January 24, 2001, Aspen issued a press release announcing its financial results for the second quarter fiscal 2001, ended December 31, 2000. For the quarter, the Company reported total revenues of $81.7 million and a net loss of $2.9 million or $0.09 per share. ***On a pro-forma basis, the Company reported net earnings of $4.3 million, or $0.13 per share*** excluding certain research and development charges and expenses related to Aspen's Petro Vantage investment.[5] According to FirstCall/Thompson Financial, ***the Company's pro-forma earnings nearly doubled consensus analyst estimates of $0.07 per share.*** Aspen also reported that license revenues for the second quarter grew 39 percent to $40.6 million, while services revenue increased 24 percent to $41.1 million. Defendant Evans commented on the Company's performance, stating in pertinent part as follows:

> Services revenue and profitability showed dramatic year-over-year improvement as a result of investments we have made to expand our supply chain implementation capacity and productivity.

The press release further quoted defendant Evans as stating that: "We were pleased to see continued strong license revenue growth this quarter across a broad base of business... ."

### 1. Logica UK Ltd. Transaction

71.     Defendants and others were responsible for Aspen improperly recognizing $1.75 million of software license revenue in its fiscal quarter ended December 31, 2000 on a sale of Logica UK Limited ("Logica"), a British software company. The revenue should not have been recognized because there was a side agreement to the contract which provided that Logica was not obligated to pay Aspen unless Aspen provided Logica with a minimum amount of software

---

[5] The Company's actual GAAP result for the quarter was a net loss of more than $2.6 million.

implementation services revenue.  As such, the earnings process was not complete, collectibility was not probable and the license fee was not fixed or determinable.

72.     The January 24, 2001 Aspen press release falsely and inaccurately summarized its financial results for the fiscal second quarter ended December 31, 2000.

73.     Defendants knew that the recognition of license revenue from the Logica transaction in the quarter in which it was recognized was improper.

74.     The revenue from the Logica transaction totaled approximately 4.3% of Aspen's license revenue for the quarter ended December 31, 2000.  The misstatements caused by the improper revenue recognition were material.

75.     In or about March 2005, Logica was one of the transactions restated by Aspen following completion of the internal investigation by its audit committee.

76.     The Logica transaction was one of four transactions referred to by Aspen (but not by name) in the press release it issued on October 27, 2004 noting that its audit committee had commenced an internal investigation.

77.     The effect of the improper accounting for the Logica transaction was to overstate net income for the quarter ended December 31, 2000 and for the year ended June 30, 2001 by $1.75 million, or $0.05 per share and to understate net income by $727,000 ($0.02 per share), $758,000 ($0.02 per share), and $266,000 ($0.01 per share) in the quarters ended December 31, 2002, March 31, 2003, and June 30, 2003 respectively.

### 2. IBM Transaction

78.     Defendants and others were responsible for Aspen improperly recognizing $2.8 million of software license revenue in its fiscal quarter ended December 31, 2000 on a sale to IBM Corporation ("IBM") because (i) Aspen directed an IBM employee to sign the software

license agreement ("SLA") in January 2001 but date it December 2000 and (ii) IBM's anticipated payment to Aspen was contingent on Aspen finding end-users to whom IBM would resell Aspen's software.

79.     The $2.75 million in license revenue from the IBM transaction was improperly recorded on Aspen's books and records and reported on Aspen's Form 10-Q for the quarter ended December 31, 2000, which was signed by defendant Zappala and filed with the Commission on or about February 14, 2001. At the time Aspen recognized the $2.75 million in license revenue, there was not persuasive evidence of an arrangement, the fee was not fixed or determinable, collectibility was not probable and the earnings process was not complete.

80.     The January 24, 2001 Aspen press release falsely and inaccurately summarized its financial results for the fiscal second quarter ended December 31, 2000.

81.     Defendants knew that the recognition of license revenue from this IBM transaction in the quarter in which it was recognized was improper.

82.     The misstatements caused by the improper revenue recognition were material. The IBM transaction totaled approximately 7% of Aspen's license revenue for the quarter ended December 31, 2000.

83.     In or about March 2005, IBM was one of the transactions restated by Aspen following completion of the internal investigation by its audit committee.

84.     As such the effect of the improper accounting for this IBM transaction was to overstate net income for the quarter ended December 31, 2000 by $2.75 million, or $0.09 per share, and to understate net income for the quarter ended June 30, 2001 by $2.75 million, or $0.09 per share. There was no effect on the cumulative net loss for the year ended June 30, 2001, because both misstatements occurred in the same fiscal year.

85.    On or about February 14, 2001, Aspen filed with the SEC Form 10-Q for the

quarter ended December 31, 2000. The 10-Q, signed by defendant Zappala, reaffirmed the

Company's previously announced financial results and included the following representations

concerning the Company's performance, stating in pertinent part as follows:

> Software license revenues represented 49.7% of total revenues for the three
> months ended December 31, 2000, as compared to 46.9% in the comparable
> period of fiscal 2000. Revenues from software licenses for the three months ended
> December 31, 2000 were $40.6 million, an increase of 38.6% from $29.3 million
> in the comparable period of fiscal 2000. Software license revenues represented
> 48.4% of total revenues for the six months ended December 31, 2000, as
> compared to 43.9% in the comparable period of fiscal 2000. Revenues from
> software licenses for the six months ended December 31, 2000 were $73.2
> million, an increase of 44.0% from *$50.8* million in the comparable period of
> fiscal 2000. These percentage increases were primarily attributable to an *increased
> penetration in the market* as well as increased sales of our eSupply Chain suite of
> products and license revenues derived from our acquisitions [of e—Chemicals and
> Broner Systems]...
>
> * * *
>
> Revenues from service and other for the three months ended December 31, 2000
> were $41.1 million, an increase of 23.8% from $33.2 million in the comparable
> period in fiscal 2000. Revenues from service and other for the six months ended
> December 31, 2000 were $78.0 million, an increase of 19.9% from $65.0 million
> in the comparable period in fiscal 2000. These increases reflect an improvement
> in our support and maintenance business resulting from last year's license growth,
> as well as improvements in the pricing and productivity of our supply chain
> services businesses.
>
> * * *
>
> In the opinion of management, the accompanying consolidated condensed
> financial statements have been prepared in conformity with generally accepted
> accounting principles and include all adjustments, consisting only of normal
> recurring adjustments, necessary for a fair presentation.

86.    The statements referenced above in ¶¶70 and 85, which were represented in the

SPA as accurate and in compliance with GAAP, were each materially false and misleading for

the reasons stated in ¶56(a)-(e). In addition the statements in ¶¶70 and 85 failed to disclose and

misrepresented the following adverse facts:

(a)    that Aspen's reported revenue was materially overstated due to

37

Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers and other customers before such fees were collectible, among other things; Aspen's routine violation of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶121-134 below. In fact, Defendants have now admitted that Aspen's originally reported fiscal 2001 and 2000 revenues were materially overstated by at least $12.5 million and $7.0 million, respectively, due to improper recognition of license, service and maintenance fees on contingent and/or consignment sales to resellers, among other things;

(b)     that Aspen's reported revenues were materially misstated due to Defendants' improper practice of keeping certain revenues "in the freezer" which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; therefore the statement in Aspen's second quarter 2001 Form 10-Q that license revenues increased due to "increased penetration in the market" was misleading because it failed to disclose Aspen's improper earnings management practices; and

(c)     as a result of the foregoing, defendant Evans' statement that Aspen's reported financial results were further evidence of the Company's "dramatic year-over-year improvement" in "profitability" was not true.

G.     3rd Q: 2001

87.     On April 24, 2001, Aspen issued a press release announcing its financial results for the third quarter fiscal 2001, ended March 31, 2001. For the quarter, the Company reported total revenues of $76.4 million and *a pro forma net loss of $3.2 million* or $0.11 per share, excluding expenses relating to PetroVantage and amortization of goodwill.[6] Aspen also reported that license revenues for the third quarter totaled $34.2 million and services revenues were $42.2

---

[6]     The Company's GAAP result for the quarter was a net loss of more than $5.3 million.