Eric T. Chaffin, Esq. (EC-0585)
SEEGER WEISS LLP
One William Street
New York, NY 10009
T. (212) 584-0700
*Counsel for Plaintiffs/ Defendants-In-*
*Counterclaims/ Plaintiffs-In-Cross-Claims*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| 380544 CANADA, INC., WAYNE SIM and SALVADOR CLAVÉ, | : | |
| | : | |
| Plaintiffs, | : | **CIVIL NO. 1:07-CV-01204(JFK)** |
| | : | |
| vs. | : | |
| | : | |
| ASPEN TECHNOLOGY, INC., DAVID L. McQUILLIN, LAWRENCE B. EVANS and LISA ZAPPALA | : | |
| | : | |
| Defendants. | : | |
| ASPEN TECHNOLOGY, INC., | : | **PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION TO THE INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT** |
| | : | |
| Plaintiff –In-Counterclaims, | : | |
| | : | |
| vs. | : | |
| | : | |
| WAYNE SIM and SALVADOR CLAVÉ, | : | |
| | : | |
| Defendants-In-Counterclaims. | : | |
| WAYNE SIM and SALVADOR CLAVÉ, | : | |
| | : | |
| Plaintiffs-In-Cross-Claims, | : | |
| vs. | : | |
| | : | |
| DAVID L. McQUILLIN, LAWRENCE B. EVANS and LISA ZAPPALA, | : | |
| | : | |
| Defendants-In-Cross-Claims. | : | |

## TABLE OF CONTENNTS

INTRODUCTION .............................................................................………1

STATEMENT OF FACTS ...........................................................................2

ARGUMENT ...............................................................................................8

I.    Legal Standard .............................................................................8

II.   Plaintiffs Timely Filed Federal Securities Claims Against Evans and Zappala ......9

III.  The Complaint States Fraud Claims Against the Individual Defendants Upon Which Relief Can Be Granted ...............................................10

      A.  The Pleading Standard for Fraud Claims........................................10

      B.  The Complaint Pleads the Fraud and Each Individual  Defendants' Participation in the Fraud with Particularity ...................................11

          1........................................The Complaint Properly Pleads That the Individual Defendants'—Former CEOs and CFO—Participated in the Fraud as a Group ...............................................................12

          2.  The Complaint Adequately Pleads Defendant McQuillin's Role in the Fraud .........................................................................15
          .......................................................................................

          3.  The Complaint Adequately Pleads Zappala's Role in the Fraud..............18

          4.  The Complaint Adequately Pleads Evans' Role in the Fraud...................18

      C.  The Complaint Adequately Pleads Scienter ...................................20

          1.  The Complaint Alleges Strong Circumstantial Evidence That the Individual Defendants Engaged in Conscious Misbehavior or Acted Recklessly ...............................................................20
          .......................................................................................

              a.    The Complaint Alleges Strong Circumstantial Evidence That McQuillin Engaged in Conscious Misbehavior or Acted Recklessly21

              b.    The Complaint Alleges Strong Circumstantial Evidence That Evans Engaged in Conscious Misbehavior or Acted Recklessly ...............23

        c.    The Complaint Alleges Strong Circumstantial Evidence That
Zappala Engaged in Conscious Misbehavior or Acted Recklessly ..24
.................................................................................................................

      2.  The Complaint Alternatively Pleads Scienter by Pleading That the
Individual Defendants had Motive and Opportunity to Commit Fraud.....27
.................................................................................................................

IV.    The Complaint Adequately Pleads Section 20(a) Control Person
Liability..........................................................................................................29

V.     The Complaint Adequately Pleads Common Law Fraud .....................................30

VI.    The Complaint Adequately Pleads Conspiracy to Commit and Aiding and
Abetting Common Law Fraud…………………………………………………...31

CONCLUSION......................................................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*ABF Capital Management v. Askin Capital Management, L.P.*, 957 F. Supp. 1308
   (S.D.N.Y. 1997) ...................................................................................................10, 11, 31, 32

*American Pipe and Construction Co., et al. v. State of Utah*, 414 U.S. 538 (1974) ....................10

*Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807 (S.D.N.Y. 2006)........................................10, 31

*Conley v. Gibson*, 355 U.S. 41 (1957) ...............................................................................................9

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) .............................................................................11

*Diamond State Ins. Co. v. Worldwide Weather Trading LLC*, 02 *Civ. 2900*, 2002 WL
   31819217 (S.D.N.Y. Dec. 16, 2002) ..............................................................................31

*DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242 (2d Cir. 1987).................12, 14

*Elliott Associates, L.P. v. Hayes*, 141 F. Supp. 2d 344 (S.D.N.Y. 2000) .....................................13

*Ezra v. Charitable Trust v Tyco International, Ltd.*, 466 F.3d 1 (1st Cir. 2006)...........................19

*Farey-Jones v. Buckingham*, 132 F. Supp. 2d 92 (E.D.N.Y. 2001)...............................................32

*Ferber v. Ehrlich*, No. 93-818, 1994 U.S. Dist. LEXIS 4614 (S.D.N.Y. Apr. 7, 1994)...............32

*Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 94 F. Supp. 2d 491 (S.D.N.Y.2000)............32, 34

*Ganini v. Citizens Utilities Com.*, 228 F.3d 154 (2d Cir. 2000) ....................................................11

*Howard v. Everex System*, 228 F.3d 1057 (9th Cir. 2000) .....................................................13, 25

*In re American Bank Note Holographics, Inc. Securities Litigation*, 93 F. Supp. 2d 424
   (S.D.N.Y. 2000)......................................................................................................................13

*In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*, 324 F. Supp. 2d 474
   (S.D.N.Y. 2004).................................................................18, 19, 21, 22, 23, 25, 26, 27

*In re Bally Total Fitness Sec. Litig.*, Nos. 04-C-3550, et al., 2007 WL 551574
   (N.D. Ill. Feb. 20, 2007)………………………………………………………………….26, 27

*In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001)........................................19

*In re Cinar Corp. Securities Litigation*, 186 F. Supp. 2d 279 (E.D.N.Y. 2002)...........................15

*In re EVCI Colleges Holding Corp. Securities Litigation*, 469 F. Supp. 2d 88
        (S.D.N.Y. 2006)....................................................................................................................15

*In re Livent, Inc. Noteholders Securities Litigation*, 151 F. Supp. 2d 371
        (S.D.N.Y. 2001)....................................................................................................................30

*In re Luxottica Group S.p.A., Securities Litigation*, 293 F. Supp. 2d 224
        (E.D.N.Y. 2003)......................................................................................................................8

*In re Oxford Health Plans, Inc. Securities Litigation*, 187 F.R.D. 133 (S.D.N.Y. 1999)..12, 13, 29

*In re Philip Services Corp. Securities Litigation*, 383 F. Supp. 2d 463 (S.D.N.Y. 2004).......11, 22

*In re Van Der Moolen Holding N.V. Securities Litigation*, 405 F. Supp. 2d 388 (S.D.N.Y.
        2005) ....................................................................................................................................13

*In re Veeco Instruments, Inc. Securities Litigation*, 235 F.R.D. 220 (S.D.N.Y. 2006) ...........26, 27

*In re Worldcom, Inc. Sec. Litigation*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003)....................21, 29, 30

*Jaghory v. New York State Department of Education*, 131 F.3d 326 (2d Cir. 1997) ....................8

*Koehler v. Bank of Bermuda (New York) Ltd.*, 209 F.3d 130 (2d Cir. 2000) ...............................10

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) ...............................................................................9

*McDaniel v. Bear Stearns & Co., Inc.*, 196 F. Supp. 2d 343 (S.D.N.Y.2002) .............................33

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)..................................................................11

*Milano v. Freed*, 767 F. Supp. 450 (E.D.N.Y. 1991) ...................................................................10

*Novak v. Kasaks*, 216 F.2d 300 (2d Cir. 2000)..........................................................15, 24, 25, 29

*Ouaknine v. Macfarlene*, 897 F.2d 75 (2d Cir. 1990)...................................................................11

*Press v. Chemical Investment Services Corp.*, 166 F.3d 529 (2d Cir. 1999)................................16

*RMED International Inc., v. Sloan's Supermarkets, Inc.*, 207 F. Supp. 2d 292
        (S.D.N.Y. 2002)....................................................................................................................21

*Rolf v. Blyth, Eastern Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir. 1978) .........................................24

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir.2000)..................................................................25, 29

*SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996)...............................29

*SEC v. Todd*, No. 03-2230, 2006 U.S. Dist. LEXIS 41182 (S.D. Cal. May 30, 2006) ..........19, 20

*Schnall v. Annuity & Life Re (Holdings), Ltd., 02 Civ. 2133*, 2004 WL 231439
    (D.Conn. Feb. 4, 2004) ....................................................................25

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ..................................27

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)......................................................8

*Thomas Kernaghan & Co. v. Global Intellicom, Inc.*, 2000 WL 640653
    (S.D.N.Y. May 17 2000)................................................................18

*Unicredito Italiano Spa v. J.P. Morgan Chase Bank*, 288 F. Supp. 2d 485
    (S.D.N.Y. 2003) ..........................................................................32

## DOCKETED CASES

*In re Aspen Technology, Inc. Securities Litigation*, No, 04-12375-JLT (D. Mass.)...................2, 9

## RULES

Fed. R. Civ. P. 9(b) ........................................................................... 9, 11, 12

Fed. R. Civ. P. 11………………………………………………………………..16

Fed. R. Civ. P. 12(b)(6)...................................................................8, 12

## INTRODUCTION

Plaintiffs Wayne Sim, Salvador Clavè and 380544 Canada, Inc. (collectively "Plaintiffs") respectfully submit this omnibus memorandum of law in opposition to the motions to dismiss separately filed by defendants Lawrence B. Evans ("Evans"), David L. McQuillin ("McQuillin") and Lisa Zappala ("Zappala") (collectively "Individual Defendants").

Plaintiffs entered into a Securities Purchase Agreement ("SPA") with Aspen Technology, Inc. ("Aspen Tech" or "Aspen") on May 9, 2002 that Zappala signed for Aspen.  Under the SPA, Aspen and the Individual Defendants represented that Aspen was financially healthy and had proper accounting controls.  In reality, Aspen and the Individual Defendants were engaged in a multi-million dollar accounting fraud to prematurely and improperly recognize revenue in violation of generally accepted accounting principles ("GAAP") to inflate Aspen's stock price, meet Wall Street expectations and thicken their wallets.  Aspen has since admitted that its financial statements for fiscal years 1999 to 2004 were materially false and misleading when issued and restated those financial statements.  In March 2007, McQuillin pled guilty to criminal securities fraud for his role in the fraud and most recently, the SEC brought a civil enforcement action against the Individual Defendants based on their roles in the fraud.

Despite Aspen admitting the financial fraud, McQuillin's guilty plea and the SEC enforcement action against the Individual Defendants, the Individual Defendants move the Court at this initial stage of the litigation to dismiss all five counts against them, arguing primarily that the Complaint does not adequately plead their roles in the fraud or their scienter.  Evans and Zappala further argue that Plaintiffs' federal securities claims are time-barred.  The Complaint, however, consists of 75 pages and 180 paragraphs detailing timely filed claims. [1]  In great detail,

---

[1]      McQuillin does not argue that Plaintiffs' federal securities claims are time-barred.

it describes the fraud and the transactions at issue.  It also describes how Aspen was required to correct its prior fraudulent statements and restate its earnings for 1999 through 2004.  And, it also details the Individual Defendants' roles in that fraud, as well as their states of mind.  The Individual Defendants of course argue otherwise but their legal arguments are fundamentally flawed and do not pass muster, especially at the pleadings stage.

## STATEMENT OF FACTS

The Complaint alleges that the Individual Defendants, all high ranking Aspen officers, committed accounting fraud from as early as 1999 through 2004.  *See*, *e.g.*, Complaint ("Compl.") ¶38.  These facts came to light publicly, on October 27, 2004, when Aspen announced that its Audit Committee had undertaken a "detailed review" of the Aspen's accounting for software and licensing service agreements that resulted in Aspen not releasing its financial results for its first quarter.  *Id.* ¶8.  Two days later, on October 29, 2004, federal prosecutors announced a probe into Aspen's accounting practices.[2]  *Id.*  On November 9, 2004, a securities class action was filed in *In re Aspen Technology, Inc. Securities Litigation*, No, 04-12375-JLT (D. Mass.) against Aspen and the Individual Defendants; that action has since settled and Plaintiffs opted out of the settlement.  *Id.* ¶42.

On March 15, 2005, Aspen filed an Amended 2004 10-K with the SEC stating that its previous SEC filings for the years 1999 through 2004 and quarterly 10-Q reports could not be relied upon because they were materially false and misleading.  *Id.* ¶¶6, 38.  In January 2007, the SEC brought civil enforcement charges against McQuillin, Evans and Zappala in the District of Massachusetts for their roles in the fraudulent scheme.  *Id.* ¶22.

---

[2]     This probe led to McQuillin's guilty plea to both criminal conspiracy and substantive securities fraud for the period from December 2000 to September 2002.  *Id.* ¶19; Chaffin Declaration ("Chaffin Decl."), Ex. A (Transcript of Guilty Plea of David McQuillin before Judge McKenna dated March 26, 2007) ("McQuillin Guilty Plea").

Aspen is a supplier of software products and services for manufacturing companies in several industries. *Id.* ¶¶18, 28. Aspen trades on the NASDAQ under the symbol AZPN. *Id.* Aspen's revenues primarily come from selling computer software licenses and services connected with the software's use. *Id.* ¶5.

From 1999 to 2002, Aspen acquired numerous companies including as Hyprotech Limited ("Hyprotech"), with Aspen common stock. *Id.* ¶29, 37, 66 and 101. Prior to Aspen's acquisition of Hyprotech, it was a multi-million dollar fully-owned subsidiary of AEAT that developed and supplied worldwide engineering simulation software. *Id.* ¶¶26-27. Plaintiff Sim was one of Hyprotech's original creators and its Chief Executive Officer from June 2000 until Aspen acquired Hyprotech in 2002. *Id.* ¶¶15, 29. Plaintiff Clavé was Hyprotech's Chief Operating Officer from July 2001 until the acquisition. *Id.* ¶16.

In 2001, the Individual Defendants entered into discussions with AEAT regarding Aspen's potential purchase of Hyprotech. *Id.* ¶29. Aspen recruited Plaintiffs and other investors to raise money for Aspen to acquire Hyprotech through a private placement of Aspen stock. *Id.* ¶30. Sim was involved in and approved of the merger based on the Individual Defendants' misrepresentations about Aspen's financial health and accounting controls. *Id.* ¶29.

On May 9, 2002, the Individual Defendants induced Plaintiffs to enter into the private placement Securities Purchase Agreement ("SPA") based on misrepresentations about Aspen's finances including, *inter alia*, Aspen's process engineering software revenues, Aspen's internal accounting controls and Aspen's accounting process that Plaintiffs were assured complied with GAAP. *Id.* ¶¶30-31, 34. The SPA, which Zappala signed as Aspen's CFO, further represented that Aspen's SEC Reports and Financial Statements were "prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods

involved ("GAAP")[.]"  *Id.* ¶¶34, 159.

The Complaint alleges that during the relevant time period, the Individual Defendants caused Aspen to improperly and prematurely recognize revenue on software license, maintenance and service agreements because of side agreements containing contingent terms that prevented Aspen from recognizing revenue in those fiscal quarters. *Id.* ¶¶6, 40.  The Complaint in detail describes the SEC filings and press releases that contained the fraudulent and misleading statements and that omitted material facts.  *Id.* ¶¶44-120.  The Complaint further alleges that the Individual Defendants knew or should have known of the fraud and that they had a motive and opportunity to commit fraud.  *See e.g.,, Id.* ¶¶2, 39, 42-43, 47, 73, 81, 93, 109, 117, 126, 128-30, 136-42, 154-56; Chaffin Decl., Ex. A at 11-12 (McQuillin Guilty Plea).

The Complaint further breaks down each financial quarter during the relevant time period and lists the fraudulent statements made by the defendants, including the date and place of each misleading statement issued and the speaker, if applicable.  In summary, the Complaint provides, *inter alia*:

- **4ᵗʰ Q: 1999 and 1ˢᵗ Q:2000 (Lyondell-Equistar Transaction)** (Compl. ¶¶44-50)**:** The Complaint alleges that the Individual Defendants caused Aspen to improperly recognize $9.9 million of software license revenue and falsely summarized Aspen's fiscal results in August 5, 1999 and October 26, 1999 press releases. Compl. ¶¶44, 45-46.  The revenue should not have been recognized because there was a side agreement whereby Aspen promised Lyondell-Equistar that it would deliver an undetermined amount of software in the future at no additional cost. *Id.* ¶44.  The improper accounting for the Lyondell-Equistar transaction overstated net income in the fiscal years ended June 30, 1999 and 2000 by $4.5 million ($0.18 per share) and $3.6 million ($0.12 per share), respectively, and understated net income in the years ended June 30, 2001, 2002, 2003 and 2004 by $2 million each year, or between $0.05 and $0.07. *Id.* ¶50.

- **2ⁿᵈ Q: 2000 (Union Carbide Transaction)** (Compl. ¶¶51-56)**:** The Complaint alleges that the Individual Defendants falsely stated that Aspen's revenues were $61.8 million and falsely summarized its fiscal results in a January 25, 2000 press release and the February 14, 2000 SEC Form 10-Q signed by Defendant Zappala. *Id.* ¶¶52-53, 56.  The 10-Q represented that Aspen's financial statements

conformed with GAAP. *Id.* ¶53. Aspen and the Individual Defendants intentionally delayed the recognition of revenue on the Union Carbide transaction so that Aspen could report sales as needed to stabilize Aspen's quarterly earnings and meet Wall Street estimates. *Id.* ¶43. Defendant McQuillin in a December 1999 sales meeting specifically stated: ***that "we are going to keep this [Union Carbide revenue] in the freezer" in order to "smooth out the numbers."*** *Id.* (emphasis added). Aspen materially overstated revenues by at least $6.8 million and $7.0 million, respectively, for originally reported fiscal years 1999 and 2000. *Id.* ¶56. The Complaint quotes Defendants Zappala and Evans statements in the press release during this period were false. *Id.* ¶52, 56.

- **3ʳᵈ Q: 2000** (Compl. ¶¶57-59)**:** The Complaint alleges that the Individual Defendants falsely stated that Aspen's revenues were $67.8 million and falsely summarized Aspen's fiscal results in an April 24, 2000 press release and the May 15, 2000 SEC Form 10-Q signed by Defendant Zappala. *Id.* ¶¶57-58, 59(a). Aspen's revenues were materially overstated by at least $6.8 million and $7.0 million, respectively, for originally reported fiscal years 1999 and 2000. *Id.* ¶59(a). The 10-Q represented that Aspen's financial statements conformed with GAAP. *Id.* ¶58. The Complaint cites Zappala's and Evans' quotes in press releases that contain false revenue statements. *Id.* ¶57.

- **4Q: 2000** (Compl. ¶¶60-63)**:** The Complaint alleges that the Individual Defendants falsely stated that Aspen's revenues were $268.1 in fiscal 2000, Aspen's revenues were actually $261.1 million, and that the Individual Defendants falsely summarized Aspen's fiscal results in an August 8, 2000 press release and the September 28, 2000 SEC Form 10-Q signed by Defendants Zappala and Evans. *Id.* ¶¶60-63. The 10-Q represented that Aspen's financial statements conformed with GAAP when they in fact did not. *Id.* ¶62. The Complaint quotes Evans in the press release as stating: "We are pleased to have ***exceeded our goals for both growth and profitability in the fourth quarter and fiscal year…"*** *Id.* ¶¶60, 63(a) (emphasis added).

- **1ˢᵗ Q: 2001 (Petrolsoft Corporation and ICARUS Corporation and ICARUS Services Limited Transactions)** (Compl. ¶¶64-69)**:** The Complaint alleges that the Individual Defendants falsely stated that Aspen's revenues were $69.5 million and that the Individual Defendants falsely summarized Aspen's fiscal results in an October 24, 2000 press release and November 14, 2000 SEC Form 10-Q signed by Defendant Zappala. *Id.* ¶¶64, 67, 69. The Complaint further alleges that the 10-Q represented that Aspen's financial statements conformed with GAAP. *Id.* ¶67. On October 31, 2000 and November 29, 2000, Aspen acquired PetrolSoft Corporation and ICARUS Corporation and ICARUS Services Limited, respectively. *Id.* ¶¶66, 68. Both Zappala and Evans signed the prospectus and registration statement, which incorporated consolidated balance sheets that Defendants later conceded were materially false and misleading when issued. *Id.* The revenues were materially overstated by at least $12.5 million and $7.0 million, for fiscal years 2001 and 2000 respectively. *Id.* ¶69. The Complaint

quotes Evans' statements in the October 24, 2000 press release that were false. *Id.* ¶¶64, 69(c).

- **2nd Q: 2001 (Logica UK Ltd. and IBM Transactions)** (Compl. ¶¶70-87)**:** The Complaint alleges that the Individual Defendants falsely stated that Aspen's revenues were $81.7 million, Aspen improperly recognized $1.75 million and $2.8 million of software license revenues on sales to Logica and IBM, respectively (both had side agreements with Aspen), and falsely summarized its fiscal results in a January 24, 2001 press release and February 14, 2001 SEC Form 10-Q signed by Defendant Zappala. *Id.* ¶¶70-72, 78-79, 85.  The 10-Q further represented that Aspen's financial statements conformed with GAAP. *Id.* ¶85. The Complaint quotes Evans' statements in the January 24, 2001 press release that were false. *Id.* ¶70.

- **3rd Q: 2001** (Compl. ¶¶87-89)**:** The Complaint alleges that the Individual Defendants falsely stated that Aspen's revenues were $76.4 million and that the Individual Defendants falsely summarized Aspen's fiscal results in an April 24, 2001 press release and May 15, 2001 SEC Form 10-Q signed by Zappala. *Id.* ¶¶87-89.  The 10-Q further represented that Aspen's financial statements conformed with GAAP. *Id.* ¶88. The financial statements materially overstated revenues by at least $12.5 million and $7.0 million, respectively, for originally reported fiscal years 2001 and 2000.  *Id.* ¶89.  The Complaint quotes Evans' statements in the April 24, 2001 press release. *Id.* ¶87.

- **4th Q: 2001 (Yukos Transaction)** (Compl. ¶¶43, 90-98)**:** The Complaint alleges that the Individual Defendants caused Aspen to improperly recognize $4.3 million in a software license sale to Yukos (because of a side agreement McQuillin, along with others, negotiated with Yukos representatives) in revenues and falsely summarized its fiscal results in an August 7, 2001 press release and September 28, 2001 SEC Form 10-K signed by Evans and Zappala. *Id.* ¶¶90-91, 96-97.  The 10-K further represented that Aspen's financial statements conformed with GAAP. *Id.* ¶97. Defendant Evans in the August 7, 2001 press release stated that: "We are pleased to have ***exceeded expectations for both revenues and profitability*** this quarter in what remains a very difficult environment. . . …"  *Id.* ¶91.  Defendant McQuillin has since pled guilty to committing securities fraud in relation to this transaction.  *See* Chaffin Decl., Ex A. at 11-12 (McQuillin Guilty Plea).

- **1st Q: 2002 (Houston Consulting Group, L.P. and Coppermine, LLC Transaction)** (Compl. ¶¶99-102)**:** The Complaint alleges that the Individual Defendants falsely stated that Aspen's revenues were $61.2 million and the Individual Defendants falsely summarized Aspen's fiscal results in an October 25*,* 2001 press release and November 14, 2001 SEC Form 10-Q signed by Zappala. *Id.* ¶¶99-100, 102. The 10-Q further represented that Aspen's financial statements conformed with GAAP.  *Id.* ¶102. The revenues were materially overstated by at least $11.0 million and $12.5 million, respectively, for originally reported fiscal

years 2002 and 2001. *Id.* On June 15, 2001, Aspen acquired Houston Consulting and Coppermine by issuing common stock in private placements. *Id.* ¶101. Both Defendants Zappala and Evans signed the prospectus and registration statement, which incorporated consolidated balance sheets that Aspen later conceded were materially false and misleading when issued. *Id.* Evans, in an October 25, 2001 press release stated: "Due to slower activity during the summer months, ***a larger portion of our first quarter revenues close in September [2001], which made last month's terrorist attacks particularly disruptive to several end-of-quarter transactions*** in an already challenging business climate…" *Id.* ¶99. Defendant Zappala, in the same press release, stated: "Our strong services revenue and expanding services backlog, which increased to $125 million this quarter, are indicative of continued investment by our customers in our solutions…." *Id.*

- **2nd Q: 2002** (Compl. ¶¶103-106)**:** The Complaint alleges that the Individual Defendants falsely stated that Aspen's revenues were $81.9 million and that the Individual Defendants falsely summarized Aspen's fiscal results in a January 23, 2002 press release and February 14, 2002 SEC Form 10-K signed by Zappala. *Id.* ¶¶103, 105, 106. The 10-K further represented that Aspen's financial statements conformed with GAAP. *Id.* ¶105. Revenues were materially overstated by at least $11.0 million and $12.5 million, respectively, for originally reported for fiscal years 2002 and 2001. *Id.* ¶106(a). Defendant Evans in the January 23, 2002 press release stated that: "***[Aspen] revenue growth significantly exceeded our expectations.***" *Id.* ¶104 (emphasis added).

- **3rd Q: 2002 (IBM Transaction)** (Compl. ¶¶107-114): The Complaint alleges that the Individual Defendants caused Aspen to improperly recognize $1.7 million of software license revenue in a license sale to IBM (because of a side agreement), in revenues and the Individual Defendants falsely summarized Aspen's fiscal results in an April 25, 2002 press release and May 15, 2002 SEC Form 10-K signed by Zappala. *Id.* ¶¶107, 108, 113. The 10-K further represented that Aspen's financial statements conformed with GAAP. *Id.* ¶113. The Complaint further quotes Evans' statements in the April 25, 2002 press release. *Id.* ¶107.

- **4th Q: 2002 (Petroleum Services Company Transaction)** (Compl. ¶¶43, 115-120)**:** The Complaint alleges that the Individual Defendants caused Aspen to improperly recognize $1.9 million of software license revenue on a sale to Petroleum Services Company ("PSC") and the Individual Defendants falsely summarized Aspen's fiscal results in an August 15, 2002 press release; the PSC transaction was restated by Aspen following completion of the internal investigation by its audit committee in March 2005. *Id.* ¶¶115, 119. The Complaint alleges that McQuillin knew about the inappropriate side agreement and improper revenue recognition but did nothing. *Id.* ¶43. The improper accounting for the Petroleum Services Company transaction overstated net income for the quarter and year ended June 30, 2002 by $1.9 million, or $0.5 per share, and understated the next eight quarters by between $57,000 and $687,000 (up to $0.02 per share) per quarter. *Id.* ¶120. The Complaint quotes Evans'

statements in the August 15, 2002 press release with the false revenue statements. *Id.* ¶116.

The Complaint further details why each statement was false or misleading. *Id.* ¶44 (4th Q: 1999 and 1st Q 2000), ¶56 (2nd Q: 2000), ¶59 (3rd Q:2000), ¶63 (4Q: 2000), ¶69 (1st Q:2001), ¶86 (2nd Q: 2001), ¶89 (3rd Q: 2001), ¶98 (4th Q: 2001), ¶102 (1st Q:2002), ¶106 (2nd Q: 2002), ¶114 (3rd Q: 2002) and ¶115 (4th Q: 2002). In these instances, the Individual Defendants' statements were false because, *inter alia,* they materially overstated Aspen's revenues, they failed to disclose that Aspen lacked internal accounting controls and that Aspen's accounting did not comply with GAAP. In each of the quarters where Aspen restated its financial results, the Complaint alleges the details of the fraudulent statements made and also where possible, identifies the individuals quoted in press releases and those who signed the SEC filings. *Id.* ¶¶44-120.

## ARGUMENT

### I.   Legal Standard

In considering a motion to dismiss, a court should read the complaint with "great generosity," *In re Luxottica Group S.p.A., Sec. Litig.*, 293 F.Supp.2d 224, 230 (E.D.N.Y. 2003) (citations omitted), by "accept[ing] all factual allegations in the complaint as true and draw[ing] inferences from those allegations in the light most favorable to the plaintiff." *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997) (citations omitted); *see also Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 514 (2002) ("Given the Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."). Ultimately, the court must ***not*** dismiss the Complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Here, the Individual Defendants fail to meet their burden of demonstrating that the Complaint does not state claims upon which relief can be granted or that, on the face of the Complaint, the statute of limitations on the federal securities claims has expired.  Accordingly, each Individual Defendant's motion to dismiss should be denied in its entirety.[3]

## II.   <u>Plaintiffs Timely Filed Federal Securities Claims Against Evans and Zappala</u>

On the face of the Complaint, Plaintiffs claims under Exchange Act § 10(b), SEC Rule 10b-5 and the Exchange Act §20(a) ("federal securities fraud claims") against Defendants Evans and Zappala were timely filed.[4]  Relying on an October 27, 2004 press release Aspen issued regarding a potential restatement of its financial results, Evans and Zappala claim that the two-year statute of limitations on Plaintiffs' federal securities claims against them expired by the time Plaintiffs filed the instant case on February 7, 2007.  *See* Defendants Evans' Memorandum of Law In Support of His Motion to Dismiss ("Evans Memo") at 8, Memorandum of Law in Support of Defendant Zappala's Motion to Dismiss Complaint ("Zappala Memo") at 5-6 .  Their argument, however, ignores that a securities class action case against them and Aspen – which is cited in the Complaint, ¶42, – was filed on or about November 9, 2004 – only 14 days after they claim the statute of limitations began to run.  *See In re Aspen Technology, Inc. Securities Litigation*, No, 04-12375-JLT (D. Mass.) ("Class Complaint").  The filing of that class action

---

[3]     If the Court somehow finds that the Complaint fails to state any fraud claims with sufficient particularity under Rule 9(b), Plaintiffs respectfully request leave to amend the Complaint.  *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (leave to amend "almost always" given pursuant to dismissal under Rule 9(b) unless plaintiff had prior opportunity to amend complaint or allegations were made after full discovery in related case).

[4]     McQuillin is not moving to dismiss Plaintiffs' federal securities claims against him based on the statute of limitations.

tolled the statute of limitations on Plaintiffs' federal securities claims until Plaintiffs opted out of a settlement of that class action on February 8, 2006.[5]  Compl. ¶42.  *American Pipe and Construc. Co., et al. v. State of Utah*, 414 U.S. 538, 554 (1974) (holding that filing of class action "suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.").  Accordingly, when Plaintiffs filed the instant case on February 7, 2007, they were well within the applicable two year statute of limitations.

## III.  The Complaint States Fraud Claims Against the Individual Defendants Upon Which Relief Can Be Granted

### A.  The Pleading Standard for Fraud Claims

The Complaint alleges both common law and federal securities fraud claims.  *See* Complaint, ¶¶151-175.  The elements of Plaintiffs' federal securities fraud claims include that: (1) defendants made a false material misrepresentation or omitted to disclose material information; (2) defendants acted with scienter; and (3) plaintiffs' relied on defendants' actions, which caused plaintiffs' injury.  *See Koehler v. Bank of Bermuda (New York) Ltd.*, 209 F.3d 130, 136 (2d Cir. 2000).[6]  The Second Circuit generally requires fraud allegations to provide: the statements made that were false or misleading; particulars about how the statements were

---

[5]  Whether Sim and Clavè were officers or putative class members and whether they perceived that they were such is an inquiry that cannot be resolved on a motion to dismiss.  *See Milano v. Freed*, 767 F.Supp. 450 (E.D.N.Y. 1991) (holding factual issues regarding whether statute of limitations was tolled precluded granting motion to dismiss).

[6]  Assuming *arguendo* that New York common law applies, the elements of Plaintiffs' common law fraud claims include: (1) defendant made a materially false representation; (2) defendant intended to defraud; (3) plaintiff reasonably relied upon the representation; and (4) plaintiff was damaged as a result.   *See ABF Capital Mgmt v. Askin Capital Mgmt., L.P.*, 957 F.Supp. 1308, 1323 (S.D.N.Y. 1997) (Sweet, J.).  These requirements are essentially identical to those for pleading a violation of Rule 10b-5.  *See Compudyne Corp. v. Shane*, 453 F.Supp. 2d. 807, 832 (S.D.N.Y. 2006).  Massachusetts also recognizes common law fraud and the elements do not appear materially different from New York common law.

fraudulent; the time and place the statements were made; and identity of the person who made the statements.  *See ABF Capital Mgmt v. Askin Capital Mgmt., L.P.*, 957 F.Supp. 1308, 1318 (S.D.N.Y. 1997) (Sweet, J.); *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989).

Under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), Plaintiffs must plead fraud with particularity.  *Ganini v. Citizens Utils. Com.*, 228 F.3d 154, 168 (2d Cir. 2000).  Rule 9(b), however, also provides that not all elements of fraud claims need to be pled with equal particularity.  In fact, Rule 9 recognizes the difficulty in *pleading* state of mind and, therefore, it specifically provides that "[m]alice, intent, knowledge and other conditions of mind of a person *may be averred generally*."  Fed.R.Civ.P. 9(b); *ABF Capital Mgmt v. Askin Capital Mgmt., L.P.*, 957 F.Supp. at 1318 (emphasis added).  To plead knowledge under Rule 9(b), "minimal factual basis for... conclusory allegations of scienter" are sufficient  "'if supported by facts giving rise to a 'strong inference' of fraudulent intent.'"  *Id. quoting Ouaknine v. Macfarlene*, 897 F.2d 75, 80 (2d Cir. 1990).  In the Second Circuit, a plaintiff may allege a "strong inference" of scienter by alleging: "(1) facts showing that defendants had motive and opportunity to commit fraud; or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness." *In re Philip Services Corp. Sec. Litig.*, 383 F.Supp.2d 463, 469 (S.D.N.Y. 2004) (Mukasey, J.).

**B.    The Complaint Pleads Fraud and Each Individual Defendants' Participation in the Fraud with Particularity**

The Individual Defendants do not and cannot argue that Plaintiffs adequately pled the accounting fraud scheme.  Indeed, Aspen Technology has restated its financial results and answered the Complaint, McQuillin pled guilty to both criminal conspiracy and substantive securities fraud and Zappala concedes that the Complaint pleads the "apparent level of detail of

mentioning individual transactions that were wrongly accounted for." *See* Def Zappala's Memo. at 2.  In short, the Complaint goes well beyond putting the Individual Defendants on notice of the fraud.  *See DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (explaining purpose of Rule 9(b) is to provide defendants, *inter alia*, with fair notice of plaintiff's claim so defendants can prepare defense, protect its reputation or goodwill); Complaint ¶¶26-120.

Rather than arguing that the Complaint failed to adequately aver the fraud at Aspen Technology, the Individual Defendants argue that the Complaint fails to plead their roles in and knowledge of the accounting fraud.  The Individual Defendants' arguments ignore the group pleading doctrine, ignore the numerous individualized allegations against each of them in the Complaint and ignore a wealth of allegations in the Complaint that they acted at least recklessly and in most instances with knowledge of the fraud.  Accordingly, for the reasons discussed more fully below, Defendants' Rule 12(b)(6) and 9(b) motion as to the common law and federal securities fraud claims should be denied.

### 1.    The Complaint Properly Pleads That the Individual Defendants'— Former CEOs and CFO—Participated in the Fraud as a Group

The Individual Defendants argue that Plaintiffs must specifically allege each defendant's role in the fraud to comply with Rule 9(b) and the PSLRA.  Their argument, however, ignores that each of them were high level corporate insiders during the relevant time period and, therefore, may be grouped for pleading purposes.[7]  *See In re Oxford Health Plans, Inc. Sec.*

---

[7]    Notably, Zappala's papers completely ignore the group pleading doctrine, Evans only acknowledges the doctrine but ignores allegations that make it applicable to this case and McQuillin merely adopts Evans' hollow acknowledgment.  *See* Evans's Memo at 15, fn 12, Defendant McQuillin's Memorandum of Law in Support of Motion to Dismiss ("McQuillin Memo") at 9, fn 7, Zappala Memo at 16-17.  Evans, who is the only defendant to address the doctrine, erroneously asserts that the Complaint fails to plead that he made statements about

*Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (Brieant, J.) (well settled that plaintiffs can use group-pleading to satisfy requirements under 10(b) and Rule 10(b)(5) and nothing in PSLRA has altered doctrine);  *In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 443 (S.D.N.Y. 2000) (McMahon, J.) (allegations grouping CEO and CFO were sufficient because defendants prepared financial reports containing misrepresentations); *In re Van Der Moolen Holding N.V. Sec. Litig.,* 405 F.Supp.2d 388, 399 (S.D.N.Y. 2005) (Sweet, J.) (holding plaintiffs adequately relied on group pleading where individual defendants were clearly cognizable corporate insiders with active daily roles in company).

The group pleading doctrine is an exception to the requirement that the fraudulent acts of each Individual Defendant must be separately identified in the complaint.  *Elliott Associates, L.P. v. Hayes*, 141 F.Supp.2d 344, 354 (S.D.N.Y. 2000).  The doctrine "allows plaintiffs to 'rely on the presumption that statements in prospectuses, *registration statements, annual reports, press releases* or other group published information are the collective work of those individuals with direct involvement in the everyday business of the company.'"  *See In re Van Der Moolen Holding N.V. Sec.Litig.,* 405 F.Supp.2d at 398 (emphasis added).

Here, during the relevant time period, Evans was Aspen's founder, CEO and Chairman of Aspen's Board of Directors.  *Id.* ¶20.  Zappala was Aspen's Chief Financial Officer.  *Id.* ¶21. McQuillin was initially Aspen's Executive Vice President of Worldwide Sales and Marketing

---

Aspen's accounting and he further argues that, in any event, he did not participate in preparing the support for those statements.  *See* Evans Memo ay 15, fn 12.  As discussed above, however, the Complaint specifically alleges that Evans made various false statements in press releases and SEC filings.  *See*, *e.g.*, Complaint ¶¶45, 46 , 51-52, 56-60, 62-64, 69-70, 87, 89, 91, 93, 97, 107 and 116.  Moreover, the fact that Evans argues that he did not participate in preparation of the statements does not shield him from liability.  *See Howard v. Everex Sys.*, 228 F.3d 1057, 1062 (9th Cir. 2000) ("Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements.")

and Co-Chief Operating Officer and in October 2002, he became Aspen's President and CEO. *Id.* ¶19.  Their positions at Aspen undoubtedly made them corporate insiders.

The Complaint alleges that the fraud was orchestrated at the highest levels of the Company and that allegation is highly corroborated by McQuillin's guilty plea to conspiracy to commit securities fraud.[8]  *See* Compl. ¶ 7; Chaffin Decl., Ex. A at 11-12 (McQuillin Guilty Plea) (McQuillin stating "In 2001, I was the co-chief operating officer for Aspen Technology" and further detailing a conspiracy that McQuillin entered with other unnamed persons at Aspen to cause Aspen to falsely recognize revenue on the Yukos transaction in 2001).  Indeed, these Defendants were so integrally involved in the accounting fraud that the SEC brought a civil enforcement action against the Individual Defendants for their roles in the fraud.  *Id.* ¶ 22.

The Complaint details the allegedly fraudulent statements made by the Individual Defendants in each of the thirteen fiscal quarters at issue.  *Id.* ¶¶ 43-120.  The Complaint also details the revenue transactions that violated GAAP and alleges that the Individual Defendants facilitated those transactions.  *Id.* ¶¶ 40-41, 43, 56, 59, 63, 69, 86, 89, 98, 102, 106, 114, 121-135.  The Complaint further attributes the fraudulent statements in each of the press releases and SEC filings to the Individual Defendants as a group, based on their positions and roles within the Company.  *Id.* ¶¶ 3-4, 36, 39, 53, 58, 67, 85, 88, 100, 105, 113, 159, 160.  *See In re Cinar Corp. Sec. Litig.*, 186 F.Supp.2d 279, 318 (E.D.N.Y. 2002) (group pleading doctrine permits plaintiffs "to circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of fraudulent intent); s*ee Divittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (unnecessary to show specific connection between Defendants and fraudulent representations if Defendants are insiders).

---

[8]   Defendant McQuillin pled guilty on March 26, 2007 after Plaintiffs filed their Complaint on February 15, 2007.

### 2. The Complaint Adequately Pleads Defendant McQuillin's Role in the Fraud

In addition to pleading McQuillin's role as part of group that committed securities fraud, the Complaint also details McQuillin's individual role in the fraud.  McQuillin is a former high ranking Aspen officer who negotiated the Securities Purchase Agreement ("SPA") for Aspen (Compl. ¶¶ 7, 31, 36, 159), he has admitted to falsifying revenue during the period directly before the SPA was entered, and he is alleged to have participated in numerous other fraudulent transactions.

First, the Court must not forget that McQuillin has pled guilty to conspiracy to commit securities fraud and one count of substantive securities fraud.  *See* Chaffin Decl., Ex. A at 13 (McQuillin Guilty Plea).  The conspiracy which McQuillin pled guilty to began in December 2000 and went through September 2002, which is the time leading up to and through the signing of the Securities Purchase Agreement (which was entered in May 2002).  *Id.*; Compl. ¶¶29-31.

The Complaint further relies upon confidential informants to allege McQuillin's participation in the fraud.  *See* Compl. ¶¶42-43.  The Second Circuit has held that plaintiffs may properly rely on confidential sources as long as they are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *See Novak v. Kasaks*, 216 F.2d 300, 314 (2d Cir. 2000); *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F.Supp.2d 88, 96-97 (S.D.N.Y. 2006) (McMahon, J.) (holding that defendants' impugning credibility of confidential witnesses ineffective at pleading stage because does not matter whether confidential witnesses are telling truth but whether there is probability that they know what they are talking about).

Here, Plaintiffs rely on two confidential informants ("CIs") that were cited in the class action complaint, which Aspen subsequently settled.  Plaintiffs described the CIs' positions

within Aspen so that the Court has assurance that they were in positions to learn information detailed in the Complaint from first-hand sources.  *See* Compl. ¶43, fn. 1.  CI 1 is a former Aspen sales manager from March 1998 through April 2001 who reported to the Vice President of Aspen's Oil & Gas Sales Division.  *Id.*  The Complaint alleges that CI 1 was in a position to learn his information first-hand through contact with McQuillin during regular sales department meetings. Id.  Similarly, CI 2 was a former director of business development at Aspen and is alleged to have been employed by Aspen from January 1997 to October 2002.  Compl. ¶43, fn 2. CI 2 is further alleged to have been the commercial manager since 1999 for Aspen's alliance with Union Carbide, an Aspen customer with whom Aspen entered into a financial transaction that was later restated.  *Id.* ¶ 43, 51-56.

Defendant McQuillin ineffectively argues that the CIs are unreliable because they were not involved in Aspen's accounting decisions.[9]  *See* McQuillin Memo at 12.  However, a significant part of the accounting fraud scheme at issue involved side agreements in sales with customers, which allowed Aspen executives to manipulate Aspen's revenues to meet Wall Street analysts' expectations.[10]  Indeed the Complaint details CI 1's personal knowledge of McQuillin's participation in the accounting fraud.  CI 1 is alleged to have stated that Aspen's senior management, which would have included McQuillin who was then Executive Vice President of

---

[9]    For the reasons discussed *supra*, Evans' similar arguments must be rejected. *See* Evans' Memo at 19.

[10]   Evans and McQuillin assert, without supporting case law, that Plaintiffs cannot rely on confidential informants from the class complaint.  *See* Evans' Memo at 19, McQuillin Memo at 12.  However, Rule 11 requires attorneys filing pleadings, including complaints, with the Court to: "certify[] that to the best of the [attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that "allegations and other factual contentions have evidentiary support[.]"  *See* Fed.R.Civ.P. 11.  Further, courts cannot weigh credibility of witnesses at this stage.  *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999) (court must accept as true plaintiffs' allegations for purposes of motion to dismiss).

Worldwide Sales and Marketing, pressured sales personnel to meet quarterly sales targets "at any cost" and "encourage[ed] sales personnel to agree to almost any term or contingency in order to get the sale recorded." *Id.* ¶43.  CI 1 further stated that, "senior level management instructed [the] sale force to persuade the customer NOT to complete the order or contract date so that Aspen could prematurely record the sales, or, in certain situations, to ask the customer to back-date an order so that it could not meet sales targets." *Id.*

Further, CI 2 stated that he confronted McQuillin about an inappropriate side agreement for a contract with Petroleum Services Company that allowed Aspen to close the transaction by the end of the quarter. *Id.* ¶43  McQuillin allowed Aspen to prematurely recognize revenue on that transaction. *Id.*

In sum, CI 1 and 2, as detailed in the Complaint, were in positions to know the information they provided about McQuillin (and the other executives) as described in the Complaint.  Their information is reliable and supports the Complaint's allegations about McQuillin's participation in the fraud.  Indeed, the information from the CIs is uniquely reliable in the instant case because it is corroborated by McQuillin's guilty plea to a criminal securities fraud conspiracy during the period from 2000 to 2002.  Further, McQuillin's guilty plea colloquy also corroborates the informants; McQuillin admitted that he, along with others, obtained an illegal side agreement from Yukos to generate revenue for Aspen because he "knew that the company was falling short of its estimate for software license revenue." *See* Chaffin Decl., Ex. A at 11 (McQuillin Guilty Plea).  This is precisely the scheme described by the CIs.

Accordingly, the CIs are reliable.  Also, the Complaint adequately details McQuillin's role in the fraud.

### 3.      The Complaint Adequately Pleads Zappala's Role in the Fraud

Defendant Zappala does not and cannot argue that the Complaint fails to identify her role in the fraud.  In addition to the group pleadings discussed above, the Complaint also alleges that Zappala, as Aspen's Chief Financial Officer, signed the SPA and Aspen's quarterly and annual financial statements that were filed with the SEC, which contain materially false statements as detailed in the Complaint.  Compl. ¶¶45, 52, 53, 57, 58, 60-63, 66-67, 79, 87-88, 97, 99, 100, 103-106, 113 and 159.  For example, in those signed financial statements, Zappala falsely represented that Aspen had adequate accounting controls to accurately report its financial results and she falsely represented that Aspen's financial statements were prepared in accordance with GAAP.  *Id.* ¶¶53, 56, 58-59, 62-63 66-69, 79, 85-86, 88-89, 97-98 100, 102, 105-106, 113-114; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 491 (S.D.N.Y. 2004) (Conner, J.) (corporate officers who sign financial statements have a duty to familiarize themselves with relevant facts regarding the company's core operations and financial reporting; they cannot ignore reasonably available data that financial statements they issued were materially false or misleading); *Thomas Kernaghan & Co. v. Global Intellicom*, Inc., 2000 WL 640653, at *5 (S.D.N.Y. May 17 2000) (Cote, J.) (Chaffin Decl., Ex. B) (SEC filings with alleged misrepresentations may form basis the basis for 10(b) actions).

### 4.      The Complaint Adequately Pleads Evans' Role in the Fraud

As Aspen's founder, CEO and Chairman of the Board, Evans personally made representations in press releases and signed SEC filings that were false and ultimately resulted in Aspen restating its financial statements.  Compl. ¶¶45-46, 51-52, 56-57, 59-60, 62-64, 69-70, 87, 89, 91, 93, 97, 107, 116.  The Complaint details allegedly false or misleading statements by Evans in at least thirteen press releases; Aspen's SEC Form 10-Ks for 2000 and 2001; and in

18

Aspen's registration statements and prospectuses for companies Aspen acquired including Petrolsoft Corporation, ICARUS Corporation and ICARUS Services Limited, Houston Consulting Group, L.P. and Coppermine, LLC. *Id., see also* Compl ¶¶66, 68, 101; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 491 (S.D.N.Y. 2004) (Conner, J.) (fact that financial *results were restated* is sufficient basis for pleading that those statements were false when made) (*citing In re Cylink Sec. Litig.*, 178 F.Supp.2d 1077, 1084 (N.D. Cal. 2001) ("the mere fact that … statements were restated at all" is sufficient to establish falsity at pleading stage)).   Moreover, Plaintiffs allege that Defendant Evans, through reliable confidential informants (as discussed *supra* at III.B.2), participated in the accounting fraud.  *See* Compl, ¶¶42-43 (attributing Evans with statements such as keeping revenues "in the freezer" for later use).

Apparently recognizing that Aspen's restatement of its financial results limits his ability to obtain dismissal of Plaintiffs' fraud claims, Evans argues that a First Circuit case, *Ezra v. Charitable Trust v Tyco Int'l, Ltd.,* 466 F.3d 1, 9 (1st Cir. 2006), is analogous because there, a CEO was dismissed from a financial restatement fraud case.  *See* Evans Memo at 12. In *Ezra,* however, the CEO who was dismissed from the case did not begin working for Tyco until *after* the financial fraud had taken place.  Therefore, without question, there could be no allegation that the CEO participated, much less knowingly or recklessly participated, in the underlying fraud.  Here, on the other hand, Evans is Aspen's founder and was CEO at the time the fraud was allegedly committed.  He was also CEO at the time Aspen acquired Hyprotech and when he made misrepresentations to Plaintiffs that induced them to enter the SPA in May 2002.  Compl. ¶¶20, 30-31 and 43.  Accordingly, this case is in no way analogous to *Ezra*.

Likewise, Evans' reliance on *SEC v. Todd*, No. 03-2230, 2006 U.S. Dist. LEXIS 41182,

*20 (S.D. Cal. May 30, 2006), is misplaced.  *See* Ex. 1 attached to Vallely Decl. in Support of Evans Memo; Evans Memo at 14.  First, the *Todd* case involved a motion for summary judgment and not a dismissal motion.  Second, the court in *Todd* granted defendant's summary judgment motion only *after the close of discovery* when the SEC could not show that the CEO knew certain transactions were unlawful when they occurred and could not show that he was reckless in his response to the fraud once he learned of their illegality.  *Id.* at *20-21.  There are no parallel facts here, especially if the Court accepts the allegations of the Complaint as true, as required at this stage of the litigation.  Evans will have ample time to make his motion after Plaintiffs are provided discovery.

In sum, the Complaint adequately details Evans' role in the fraud as a member of the group and individually.

### C.   The Complaint Adequately Pleads Scienter

As discussed *supra,* Section III.A., scienter can be pled by alleging facts that show strong circumstantial evidence that a defendant engaged in conscious misbehavior, acted recklessly or, alternatively, by alleging facts that show that the defendant had the motive and opportunity to commit the fraud.  The Complaint alleges both.  Compl. ¶¶19-21, 30-31, 43, 136-141 and 159.

### 1.   The Complaint Alleges Strong Circumstantial Evidence That the Individual Defendants Engaged in Conscious Misbehavior or Acted Recklessly

The Complaint alleges that the Individual Defendants, *inter alia,* violated GAAP by knowingly or recklessly causing Aspen to enter into transactions where there were side agreements and other contingent contractual terms that precluded revenue recognition, caused Aspen to recognize revenue on those transactions and/or falsely represented Aspen's financial results, including revenue and earnings per share, in press releases and financial statements that

Plaintiffs relied upon to enter the SPA.  *See* Compl. ¶¶43, 47, 56, 59, 63, 69, 73, 81, 86, 89, 93, 98, 102, 106, 109, 114, 117.

Circumstantial evidence of conscious misbehavior or recklessness includes, *inter alia*, evidence that the Individual Defendants: (1) deliberately engaged in illegal behavior; (2) knew facts or had access to information suggesting that their public statements were inaccurate; or (3) failed to check information they had a duty to monitor.  *See In re Worldcom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 412 (S.D.N.Y. 2003) (recklessness sufficiently pled where complaint alleged that defendants had knowledge of facts or access to information contradicting their public statements); *see RMED Int'l Inc., v. Sloan's Supermarkets, Inc.*, 207 F.Supp.2d 292, 299 (S.D.N.Y. 2002) (Leisure, J.) (same).

A financial restatement by a company is typically strong evidence of scienter.  *See generally In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 488-89 (S.D.N.Y. 2004) (finding scienter where size and nature of restatement caused by systemic abuses that resulted in serious public misrepresentation of company's financial condition).  Here, Aspen restated its financial statements from 1999 to 2004 because of non-final contracts and other revenue manipulation practices that caused Aspen to wrongly recognize revenue in various quarters.  Compl. ¶¶6, 38-39.  Aspen informed investors that its previous SEC filings, which Plaintiffs relied on to enter the SPA, could not be relied upon.  Compl. ¶¶36, 38-39.  Moreover, as discussed below, the Individual Defendants in each of their respective positions had access to information suggesting that their public statements were false.

> **a.  The Complaint Alleges Strong Circumstantial Evidence That McQuillin Engaged in Conscious Misbehavior or Acted Recklessly**

McQuillin cannot credibly argue that the Complaint fails to adequately plead his scienter. He was charged with and subsequently pled guilty in this Court to criminal securities fraud

conspiracy and substantive securities fraud at Aspen during the period from December 2000 through September 2002, which is a significant portion of the time period at issue in this litigation.  *See* Compl. ¶¶19**,** 39; Chaffin Decl., Ex. A (McQuillin Guilty Plea).

Moreover, even leaving aside the guilty plea, McQuillin was also a high level Aspen Executive who was in a position to know about the fraud, including the improper side agreements.  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d at 488-489. ("Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued.").

The Complaint further attributes several culpable statements by McQuillin, which demonstrate his knowledge of the fraud, including:

- in a December 1999 sales meeting *defendant McQuillin stated that "we are going to keep this [Union Carbide revenue] in the freezer" in order to "smooth out the numbers."*

- Defendant McQuillin stated in several sales meetings that "my stock options are getting too low and we need to get them up," and *"how do I orchestrate the deals to get the stock price up?"*

- a former director of business development, confirmed that the Individual Defendants improperly managed Aspen's reported earnings and stated that both defendants Evans and McQuillin euphemistically referred to this practice as keeping revenues "in the freezer."

*See* Compl. ¶43.  Such express allegations of deliberate misconduct easily rise to the level of scienter that must be pled.  *In re Philip Services Corp. Sec. Litig.*, 383 F.Supp.2d 463, 472 (S.D.N.Y. 2004).

Accordingly, McQuillin's claim that Plaintiffs have failed to adequately plead his scienter should be rejected.

      **b.**    **The Complaint Alleges Strong Circumstantial Evidence That Evans Engaged in Conscious Misbehavior or Acted Recklessly**

The Complaint alleges strong circumstantial evidence that Evans engaged in conscious misbehavior or acted recklessly in ignoring the signs of accounting fraud at Aspen. Compl. ¶¶7, 31, 34, 36, 40, 43, 56, 59, 63, 69, 86, 89, 98, 101-102, 106, 114 and 121-135. Evans was the founder and highest ranking official at Aspen and, therefore, was unequivocally in a position to access information to reveal that his statements made in, *inter alia*, press releases and SEC filings, were false. *See Atlas*, 324 F.Supp.2d at 489 ("when contradictory facts of critical importance to the company either were apparent, or should have been apparent" and, therefore, an inference arises that "a high-level officer[] and director[] had knowledge of those facts by virtue of [his] position[] with the company.")

Moreover, the Complaint alleges private statements made by Evans that contradict his public statements in press releases and financial statements. For example, Evans made the following statements in press releases about Aspen exceeding revenues and profit expectations, which are alleged to be fraudulent:

> We are pleased to have ***exceeded our goals for both growth and profitability in the fourth quarter and fiscal year…*** We are pleased with the performance of our supply chain solutions this past year [are] license revenue more than doubled, and we are excited about our prospects for the year ahead. Compl. ¶60 (emphasis added).

> We are pleased to have ***exceeded expectations for both revenues and profitability*** this quarter in what remains a very difficult environment. . . we closed significant multimillion dollar transactions with Jacobs Engineering, Pemex, SASOL in South Africa, Valero Refining and ***Yukos, a large Russian oil company.*** *Id* ¶91 (emphasis added).

> ***[Aspen's] revenue growth significantly exceeded our expectations."***
> *Id.* ¶104 (emphasis added).

The Complaint alleges that Evans, within the Company, referred to Aspen's method of "cooking the books" and discussed improperly managing Aspen's reported earnings to keep revenue "in

the freezer," for future quarters to meet Wall Street analysts' earnings expectations.  Compl. ¶¶7, 43, 56(f), 59(b),63(b), 69(b), 86(b), 89(b), 98(b), 106(b), 114(b).

Finally, while Evans has not pled guilty to criminal securities fraud like McQuillin, the SEC has charged Evans in a civil enforcement proceeding for his role in the accounting fraud at Aspen.  Compl. ¶22.

The Complaint therefore alleges that Evans knew about Aspen's fraudulent  accounting practices and that his public statements were false.  These allegations are specific that Evans engaged in conscious misbehavior or, at the very least, acted recklessly.  Accordingly, the fraud claims against Evans are well pled and should not be dismissed.

### c.   The Complaint Alleges Strong Circumstantial Evidence That Zappala Engaged in Conscious Misbehavior or Acted Recklessly

The  Complaint  alleges  that  Zappala,  as  CFO  of  Aspen,  failed  to  check  information, including, *inter alia*, the financial statements and internal accounting practices that she had a duty to monitor. Compl.¶¶21, 159-160.  Indeed, Zappala signed Aspen's financial statements and made statements in press releases, the SPA and the SEC filings that the financial statements were accurate and in compliance with GAAP. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (holding  recklessness  adequately  pled  where  facts  allege  defendant  failed  to  review  or  check information defendant had duty to monitor); *citing Rolf v. Blyth, Eastern Dillon &* Co., Inc., 570 F.2d  38,  47-48  (2[d]  Cir.  1978)  (sufficiently  pled  defendant  broker  was  reckless  where  he reassured  plaintiff  that  investment  advisor  "knew  what  he  was  doing"  but  never  actually investigated  the  advisor's  decisions).   Zappala  also  is  alleged  to  have  continually  reassured Plaintiffs in 2002 at meetings regarding Aspen's acquisition of Hyprotech that, *inter alia*, Aspen was  financially  healthy,  had  appropriate  internal  accounting  controls  and  followed  GAAP  – which  was  undeniably  false. Compl.¶¶4,  10,  30,  31,  34,  39.   Zappala  cannot  make  the

representations that she did as CFO to Plaintiffs and now hide behind the "shield" of allegedly not knowing what she said was false.  She had an affirmative obligation to confirm the accuracy of her statements.  *See Howard*, 228 F.3d at 1062.

Apparently recognizing the weakness of her position on scienter, Zappala argues that Plaintiffs must allege that she possessed internal reports, memorandum or meeting minutes showing that she knew her statements were false when made.  *See* Zappala Memo at 11 (*quoting Novak v. Kasaks*, 216 F.2d 300, 308 (2d Cir. 2000)).  Such allegation is required only if plaintiffs alleged fraud based purely on optimistic statements. *See Atlas*, 324 F.Supp.2d at 495 (explaining that *Novak v. Kasaks* requirement that plaintiff plead defendant possessed contradictory information applies only when plaintiff alleges that defendant made overly optimistic statements).  Unlike in *Novak*, the Complaint here does not merely allege that Zappala made overly optimistic statements and instead it alleges that Zappala recklessly made false statements (*i.e.*, that there were internal accounting controls to meet GAAP when there were not).  Compl. ¶¶34, 53, 58, 67, 85, 88, 100, 105, 113, 159; *Id. citing Rothman*, 220 F.3d at 90 (differentiating false statements of historical fact from simple overly optimistic statements).  Also unlike *Novak*, Zappala was a CFO who signed affirmative representations certifying that the company's financial results, not future projections, were accurate.  *See Schnall v. Annuity & Life Re (Holdings)*, Ltd., 02 Civ. 2133, 2004 WL 231439, at *7 (D.Conn. Feb. 4, 2004) (Chaffin Decl., Ex. C) ("There also can be no dispute that defendant…had a duty to exercise a certain level of care when making financial disclosures.  These were not disclosures concerning future performance.  These were statements about past performance…as to which [defendant] had knowledge or should have had knowledge.")

Moreover, Judge Conner in *Atlas*, 324 F.Supp.2d at 495, appropriately recognized that a plaintiff is not required to plead that a defendant possessed internal reports when the defendant's recklessness is alleged in other ways, such as based on information from confidential sources. Compl. ¶43 (alleging that Zappala was aware of wrongful transactions and "intentionally delayed the recognition of revenue on transactions [including Union Carbide] so Aspen could report sales as needed to stabilize Aspen's quarterly earnings and meet Wall Street estimates.")  *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (McMahon, J.) (holding recklessness sufficiently pled where complaint alleged, through confidential witnesses, that individual defendants had knowledge of alleged accounting improprieties).

Despite the Complaint's specific scienter allegations, Zappala further erroneously argues that Plaintiffs' allegations rely on "fraud by hindsight."  *See* Zappala Memo at 13.  "Fraud by hindsight," however, refers to when plaintiffs: (1) allege bad news that was announced but should have been announced sooner; or (2) allege defendant's prior optimistic statements were false because subsequent developments proved them to be false.  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig*, 324 F.Supp.2d at 494.  There is no such allegation here.

Moreover, in support of her fraud by hindsight argument, Defendant Zappala relies on *In re Bally Total Fitness Sec. Litig.*, Nos. 04-C-3550, et al., 2007 WL 551574 (N.D. Ill. Feb. 20, 2007), arguing that it involves allegations similar to this case.  *See* Chaffin Decl., Ex. D.  In *Bally*, a slip opinion dismissing a 10(b)(5) class action in the Northern District of Illinois, the Court dismissed an amended complaint because plaintiffs failed to cure deficiencies *after* the court granted an initial motion to dismiss and gave plaintiffs leave to replead.  *Id.* at *14.  The Court concluded that while the company restated certain periods because of accounting errors, plaintiffs failed to allege facts that could show that the individual defendants had the requisite

culpable state of mind because the accounting errors were based on technical accounting rules rather than manipulation of revenue.  *Id.* at *2-3.

Unlike in *Bally*, the accounting fraud here involved falsely recognized revenue and manipulation of revenue reporting.  Moreover, the fraud at issue is so significant that it has resulted in criminal charges, including a guilty plea by McQuillin and SEC civil enforcement proceedings against all three Individual Defendants. *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. at 231-232 (recognizing that accounting manipulation cases concerning premature revenue recognition are "especially indicative of conscious misbehavior since such violations 'do not commonly occur inadvertently,' but instead 'suggest a conscious decision to improperly recognize revenue.'").

In sum, the Complaint alleges that Zappala was knowledgeable or at least reckless in not investigating the fraudulent accounting practices and, therefore, it adequately pleads her scienter.

### 2.    The Complaint Alternatively Pleads Scienter by Pleading That the Individual Defendants had Motive and Opportunity to Commit Fraud

In addition to the above scienter allegations, the Complaint also pleads that the Individual Defendants had the motive and opportunity to commit fraud.  "Motive entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged.  Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

Here, the Individual Defendants had multiple motives to artificially inflate Aspen's revenues and paint a rosy picture of Aspen's accounting practices and financial health.  First, they were motivated to meet Wall Street expectations so they could retain their high paying executive positions and earn profits from selling Aspen stock.  *See* Compl. ¶¶136-141; Chaffin Decl., Ex. A at 11 (McQuillin Guilty Plea) (McQuillin stating that he "knew it was unlikely that

we would make our [revenue] numbers" unless he and others entered into an improper side agreement).  The Complaint alleges that Defendant McQuillin, who has pled guilty to securities fraud, stated in several sales meetings that "my stock options are getting too low and we need to get them up," and ***"how do I orchestrate the deals to get the stock price up?"***  Compl. ¶43. Indeed, Defendant McQuillin, throughout the period until the fraud was discovered, made at least $1.5 million from exercising stock options and selling artificially inflated Aspen stock into the marketplace.  Compl. ¶139.   McQuillin also received at least $2,446,000 million in salary and bonuses during the same time period.  *Id.* ¶¶138.  Similarly, Evans, who euphemistically referred to improperly managing Aspen's reported revenues as keeping revenues "in the freezer," earned at least $2 million in salary and bonuses and $81,000 from exercising stock options and selling artificially inflated Aspen stock.  Compl. ¶137.  Likewise, Zappala earned $1,245,000 in salary and bonuses and at least $622,000 from exercising stock options and selling artificially inflated Aspen stock.  Compl. ¶141.  Ultimately, the Complaint alleges that each of the Individual Defendants directly benefited from artificially inflating Aspen's stock price, which provides a motive to engage in the fraud.  *Novak*, 216 F.3d at 308 (2d Cir. 2000) (motive adequately pled where corporate insiders allegedly misrepresented material facts of company's performance to public to allegedly profit from artificially high stock price).

The Individual Defendants were further motivated to commit fraud to induce Plaintiffs to enter into the SPA and acquire Hyprotech.  Compl. ¶¶1, 30, 37.  Plaintiff Sim would not have approved of or recommended the acquisition if he knew that the Individual Defendants misrepresented fundamental aspects about Aspen's business including, *inter alia*, Aspen's process engineering software revenues and internal accounting controls and processes.  *Id.* ¶¶29, 31.  The Individual Defendants were allegedly motivated to manipulate Aspen's revenue to

inflate its stock price so that the stock could be used to acquire other companies such as Hyprotech.  *See Rothman v. Gregor*, 220 F.3d 81, 93-94 (2d Cir.2000) (recognizing that "artificial inflation of stock price in the acquisition context" is evidence of scienter).

Finally, in addition to motive, each of the Individual Defendants also had the opportunity to perpetuate the fraud *via* their positions at Aspen, as discussed more fully *supra*.  The Individual Defendants were in charge of Aspen's accounting, SEC filings and operations. Compl. ¶¶53, 58, 67, 85, 88, 100, 105, 113, 159-160.  Indeed, the Individual Defendants negotiated the SPA, Defendant Zappala signed it, and she represented, *inter alia*, that Aspen's financial statements for 1999-2002 were reliable and complied with GAAP.  Compl. ¶¶34, 39, 159.  Therefore, the Individual Defendants are alleged to have had motive and opportunity to establish scienter for the fraud claims.

## IV.    The Complaint Adequately Pleads Section 20(a) Control Person Liability

The Complaint adequately alleges that the Individual Defendants violated Section 20(a), the control person liability provision of the Exchange Act.  To establish liability under Section 20(a), a plaintiff must allege:

> a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.  Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

S*ee In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (citing *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472(2d Cir. 1996).  Courts have held that a defendant is a controlling person if a plaintiff alleges that the defendant signed an SEC filing containing alleged misrepresentations subject to 10(b) claims.  *In re Worldcom, Inc. Sec. Litig.*,

294 F.Supp.2d 392 at 419.

As discussed in Section III above, the Individual Defendants do not dispute that Aspen's 1999 to 2004 financial statements were materially false and misleading. Instead, they argue that the Complaint does not adequately plead that they were control persons under the Act.[11] The Complaint, however, pleads that Evans and Zappala were control persons because they signed Aspen's financial statements filed with the SEC. *In re Worldcom, Inc. Sec. Litig.*, 294 F.Supp.2d at 419. Moreover, at least through 2002, Evans and Zappala were CEO and CFO respectively and, therefore, control persons over McQuillin, who has pled guilty to securities fraud during that period at Aspen. Further, McQuillin pled guilty to engaging in a scheme with others in which he described directing people to enter into an illegal side agreement and hide information from auditors so that Aspen could book false software engineering revenue. *See* Chaffin Decl. Ex. A at 11-12 (McQuillin Guilty Plea). Accordingly, not only are the Individual Defendants liable for their direct participation in the fraud, as discussed in Section III above, but they are also liable for controlling other persons who they knew to be participating in fraud. *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.Supp.2d 371, 417-418 (S.D.N.Y. 2001) (Marrero, J.) (recognizing that even recklessness is an appropriate minimum standard of culpability that plaintiffs must plead under Section 20(a)).

## V.     The Complaint Adequately Pleads Common Law Fraud

The Complaint adequately pleads common law fraud against the Individual Defendants. To establish a claim for common law fraud in New York, it is necessary to show that: (1) defendant made a materially false representation; (2) defendant intended to defraud; (3) plaintiff reasonable relied upon the representation; and (4) plaintiff was damaged as a result. *See ABF*

---

[11]     *See* Evans Memo at 22, McQuillin Memo at 15 and Zappala Memo at 18.

*Capital Mgmt v. Askin Capital Mgmt., L.P.*, 957 F.Supp. 1308, 1323 (S.D.N.Y. 1997) (Sweet, J.). These requirements are essentially identical to those for pleading a violation of Rule 10b-5.  *See Compudyne Corp. v. Shane*, 453 F.Supp. 2d. 807, 832 (S.D.N.Y. 2006) (Sweet, J.).  Accordingly, for the same reasons discussed in Section III *supra*, the Individual Defendants' motion to dismiss these claims should be denied.

## VI.    The Complaint Adequately Pleads Conspiracy to Commit and Aiding and Abetting Common Law Fraud

To allege conspiracy to commit fraud, a plaintiff must allege: "(1) an agreement among two or more parties, (2) a common objective, (3) acts in furtherance of the objective, and (4) knowledge." *See Diamond State Ins. Co. v, Worldwide Weather Trading LLC*, 02 Civ. 2900, 2002 WL 31819217, at *4 (S.D.N.Y. Dec. 16, 2002) (McKenna, J.) (Chaffin Decl., Ex. E).

Here, the Complaint alleges that the Individual Defendants together knowingly engaged in a scheme to enter into side agreements with customers to improperly and prematurely recognize revenue to meet Wall Street expectations and artificially inflate Aspen's stock price to induce Plaintiffs to enter into the SPA.  Compl. ¶1, 4, 30, 43, 168-72.  While the Individual Defendants argue that the Complaint fails to allege such an agreement, the plain language of the Complaint shows otherwise.  *See Id.* ¶3 (stating that "Defendants engaged in a scheme to deceive…Plaintiffs… concerning Aspen's true financial results and software license revenues by claiming that certain software license agreements had been reached in certain financial periods, when in fact they had not.  Through this scheme, Defendants and their co-conspirators made it appear as though Aspen's financial performance was better in various quarters than it actually was, thereby making it appear that Aspen had either met, exceeded, or came closer to its

financial targets and analysts' expectations than it actually had.").[12]

Defendants Evans and McQuillin inappropriately rely on *Ferber v. Ehrlich*, No. 93-818, 1994 U.S. Dist. LEXIS 4614, *24 (S.D.N.Y. Apr. 7, 1994) (Cedarbaum, J.) to argue that Plaintiffs' conspiracy to commit common law fraud claims are duplicative of the common law fraud claims and should be dismissed.  *See* Ex. 5 attached to Vallely Decl. in Support of Evans Memo; Evans Memo at 22-23; McQuillin Memo at 16.  *Ferber*, however, related to breaches of a fiduciary duty and not common law fraud.  *Id.*  Moreover, *Ferber* actually held that the plaintiff in that case could not bring a conspiracy to commit breach of fiduciary duty because the plaintiff failed to allege an underlying fiduciary duty, which was a necessary precursor to a conspiracy claim.  In short, *Ferber* simply has no application to the instant case, which involves a common law fraud conspiracy with a well-pled substantive fraud claim.  *See Farey-Jones v. Buckingham*, 132 F.Supp.2d 92, 104 (E.D.N.Y. 2001) (holding "a claim of conspiracy may lie where an underlying tort of fraud has been adequately pleaded").

The Individual Defendants' arguments to dismiss the aiding and abetting fraud claims should also be rejected.  The elements of a claim for aiding and abetting fraud include: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." *Unicredito Italiano Spa v. J.P. Morgan Chase Bank*, 288 F.Supp.2d 485, 502 (S.D.N.Y. 2003) (Swain, J.); (citing *Gabriel Capital, L.P. v. NatWest Finance, Inc.,* 94 F.Supp.2d 491, 511 (S.D.N.Y.2000)

---

[12]     Moreover, and in any event, McQuillin pled guilty to criminal conspiracy to commit securities fraud.  *See* Chaffin Decl., Ex. A at 11-12 (McQuillin Guilty Plea) (McQuillin stating: "I agreed with others in AspenTech to prepare a side letter that would have allowed Yukos the right to cancel the software agreement in the future…All of us knew that the existence of the side letters would have made it impermissible for AspenTech to book the full revenue from the license agreement in the fourth quarter…It was our plan to keep the side letters from AspenTech's auditors…so revenue would be improperly booked.").

(Scheindlin, J.)).  "Substantial assistance" exists where "(1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Id.* at 502 (citing *McDaniel v. Bear Stearns & Co., Inc.,* 196 F.Supp.2d 343, 352 (S.D.N.Y.2002) (Scheindlin, J.)).

As discussed in detail in Section III *infra*, the Complaint details the fraud at Aspen Technology, describes how each of the Individual Defendants facilitated the fraud and describes their knowledge of the fraud.  Accordingly, the Individual Defendants' motion to dismiss Plaintiffs' aiding and abetting fraud claim should be rejected.

## CONCLUSION

For all of the foregoing reasons, each of the Individual Defendants' motions to dismiss should be denied in their entirety.

Dated:  May 17, 2007
New York, New York

By:  /s/ Eric T. Chaffin_____
Eric T. Chaffin, Esq. (EC-0585)
Roopal P. Luhana (RL-3958)
SEEGER WEISS LLP
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

*Counsel for Plaintiffs/ Defendants-In-Counterclaims/    Plaintiffs-In-Cross-Claims*