UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
380544 Canada, Inc., Wayne Sim, and       :
Salvatore Clave                           :
                        Plaintiffs,       :
                                          :
                v.                        :    **OPINION & ORDER**
                                          :    07 Civ. 1204(JFK)
Aspen Technology, Inc., Lawrence Evans,    :
David McQullin, and Lisa Zappala,         :
                                          :
                        Defendants.       :
----------------------------------------X

<u>APPEARANCES</u>:
        <u>For the Plaintiffs</u>:
                SEEGER WEISS, LLP
                One William Street
                Suite 1101
                New York, New York 10004
                        Of Counsel: Eric Chaffin, Esq.

        <u>For Defendant Aspen Technology, Inc.</u>:
                SKADDEN ARPS SLATE MEAGHER & FLOMM, LLP
                1 Beacon Street
                Boston, Massachusetts 02108
                        Of Counsel: Kurt Hemr, Esq.

        <u>For Defendant Lawrence Evans</u>:
                FOLEY HOAG, LLP
                155 Seaport Boulevard
                Boston, Massachusetts 02109
                        Of Counsel: Nicholas Theodorou, Esq.

        <u>For Defendant David McQuillin</u>:
                DLA PIPER US, LLP
                33 Arch Street
                Boston, Massachusetts 02109
                        Of Counsel: Bruce Falby, Esq.
                                    Sonal Patel, Esq.
        <u>For Defendant Lisa Zappala</u>:
                GOODWIN PROCTER, LLP
                53 State Street
                Boston, Massachusetts 02109
                        Of Counsel: John Falvey,Esq.

**JOHN F. KEENAN, United States District Judge**

1

**JOHN F. KEENAN, United States District Judge**

Plaintiffs 380544 Canada, Inc., Wayne Sim, and Salvatore Clave (collectively, the "Plaintiffs") brought this action against defendant Aspen Technology, Inc. ("Aspen") and individual defendants Lisa Zappala, Lawrence Evans, and David McQuillin (collectively, the "Individual Defendants"), who are former high-ranking officers of Aspen, alleging securities fraud in violation of sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), as well as common law fraud. Plaintiffs' claims arise from the defendants' alleged false or misleading statements in both public statements and private communications with the plaintiffs regarding Aspen's revenues and accounting controls. Plaintiffs allege that, as a result of the defendants' fraudulent portrayal of Aspen's financial health and the efficacy of its accounting practices, Plaintiffs were induced to enter into a Securities Purchase Agreement, under which they bought approximately $6.8 million of Aspen's stock. Plaintiffs allege that, when the defendants' fraud was exposed, Aspen's stock price plummeted, resulting in Plaintiffs' financial losses.

Defendants Zappala and Evans have moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' federal securities fraud claims as time barred. All three Individual Defendants have moved, pursuant to Rule

12(b)(6), to dismiss the federal securities fraud claims and related common law claims for failure to satisfy the heightened pleading requirements for securities fraud under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4. In addition, the Individual Defendants have moved, pursuant to Rule 12(b)(6), to dismiss the Cross Claims that were filed against them by Plaintiffs, for contribution on Aspen's Counterclaim.

For the reasons set forth below, Defendants Zappala's and Evans' motions to dismiss the Complaint are granted, with prejudice as to the federal securities fraud claims but with leave to Plaintiffs to replead the common law fraud claims. Defendant McQuillin's motion to dismiss is in part granted and in part denied. The three Individual Defendants' motions to dismiss Plaintiffs' Cross Claims are granted, and the Cross Claims are dismissed with prejudice.

## BACKGROUND

The following facts are taken from the Complaint, documents referenced in or incorporated by the Complaint, and facts of which the Court may take judicial notice.[1]

---

[1]In reviewing a Rule 12(b)(6) motion, the court may consider the following materials: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in

Aspen Technologies ("Aspen") is a provider of process engineering software, organized under Delaware law, with a principal place of business in Cambridge, Massachusetts, and publically traded on the NASDAQ. Compl. ¶ 18. Aspen sells its software, and related maintenance and consulting services, primarily to companies in the petroleum, chemical, and pharmaceutical industries. Id. It is a large multinational corporation with sales offices in 33 cities (twelve in the United States, and 21 internationally); a total of 2200 full-time employees; and gross annual revenues in excess of $320 million. Id. ¶ 53 n.3; Decl. of Patrick J. Vallely in Support of Def. Lawrence B. Evans' Motion to Dismiss ("Vallely Decl."), Ex. C, at 12, 13, 25.

The Individual Defendants are former high-ranking officers and/or directors of Aspen. Specifically, David McQuillin ("McQuillin") was Aspen's Executive Vice President of Worldwide Sales and Marketing from 1997 to 2002, Co-Chief

---

framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." In re Merrill Lynch & Co., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (citations omitted).

Operating Officer from 2001 to 2002, and President and CEO from 2002 until his resignation on November 24, 2004. Compl. ¶ 19. Lawrence Evans ("Evans") was Aspen's founder, as well as its Board Chairman and CEO until October 2002, when he stepped down as CEO and continued to serve as Board Chairman. Id. ¶ 20. Lisa Zappala ("Zappala") was Aspen's Senior Vice President and Chief Financial Officer ("CFO") from 1998 until her resignation as CFO in July 2003. Id. ¶ 21. Zappala continued to serve as Senior VP of Finance until her full resignation in December 2004. Id.

In 2001, Aspen began negotiations with AEAT, a British software company, regarding Aspen's potential purchase of Hyprotech, a software subsidiary of AEAT. Id. ¶¶ 26, 29. Plaintiff Wayne Sim ("Sim"), a Canadian citizen and resident, was Hyprotech's founder and CEO. Id. ¶ 15. Plaintiff Salvador Calve, a Spanish citizen residing in Canada, was Hyprotech's Chief Operating Officer. Id. ¶ 16.

*The Securities Purchase Agreement*

In order to raise cash and finance its acquisition of Hyprotech, Aspen recruited investors to purchase approximately $50 million of Aspen's stock via a private placement. Sim and Clave were among those investors. Id. ¶¶ 30-32. From May 2001 through April 2002, prior to the plaintiffs' purchase of Aspen's stock under the private placement agreement, several telephonic and in-person meetings took place in which Aspen's executives

made various representations to Sim and Clave regarding Aspen's finances, operations, and internal accounting controls. Id. ¶ 31. On May 9, 2002, Sim and Clave entered into a private placement Securities Purchase Agreement (the "SPA") with Aspen. Pursuant to the SPA, Sim, acting through his wholly owned company, 380544 Canada, Inc., purchased 550,000 shares of Aspen's common stock and warrants for $6.6 million. Clave purchased 16,665 shares for approximately $200,000. Under the SPA, investors – including the plaintiffs – purchased a total of over 4.1 million shares of Aspen's stock for approximately $50 million in cash. On May 10, 2002, Aspen announced its acquisition of Hyprotech. Id. ¶¶ 30, 32, 35-37.

The SPA provided, among other things, that Aspen's financial transactions were recorded and its public filings with the SEC prepared in conformity with generally accepted accounting principles ("GAAP"). Id. ¶ 34. The SPA was signed by Individual Defendant Zappala as Aspen's CFO. Id. ¶ 159.

After the execution of the SPA, both Sim and Clave were hired by Aspen. From June 2002 until his resignation in August 2004, Sim acted variously as Aspen's Chief Product Officer and Senior Vice President of Sales. Id. ¶ 15. From June 2002 to October 2004, Clave acted variously as Aspen's Vice President of Sales for the Engineering Business Unit and Senior Vice President of Sales Operations. Id. ¶ 16.

*Revelation of the Alleged Accounting Fraud*

On October 27, 2004, Aspen announced that its Audit Committee had undertaken a review of the accounting for software licensing and service agreements and would be unable to release its first quarter financials.[2]  On October 29, 2004, Aspen announced that federal prosecutors had launched an investigation of Aspen's accounting practices.  On November 18, 2004, Aspen announced that it had received notice from the NASDAQ that it was subject to de-listing due to its failure to file its Form 10-Q quarterly report for the quarter ended September 30, 2004.  On November 24, 2004, Aspen issued a press release announcing (I) that the company would be forced to restate its financials for fiscal years 2000 through 2004 and, thus (ii) those financial statements could not be relied on.  On January 31, 2005, Aspen announced that the Audit Committee's review had identified sixteen separate material transactions for the fiscal years 2002 through 2004, that were improperly accounted for. Id. ¶ 8.

On March 15, 2005, Aspen filed an Amended Form 10-K for the fiscal year ending June 30, 2004 (the "Amended Form 10-K"). In the Amended Form 10-K, Aspen advised that its annual and quarterly reports filed with the SEC for the fiscal years 1999 through 2004 could not be relied upon.  The Amended Form 10-K also restated Aspen's pre-tax and after-tax earnings for each of

_____

[2]Aspen's fiscal year ends on June 30.

the six fiscal years from 1999 through 2004.  The restatements

revealed that Aspen had overstated its net (or after-tax) income

in 2002 (by 1.4%), 2003 (by 14.6%) and 2004 (by 24.4%); had

understated its net income in 1999 (by 24.6%) and 2001 (by

44.7%); and that the difference between the reported and restated

income in 2000 was not material. <u>Id.</u> ¶¶ 9, 38-39.

        The accounting improprieties that forced the

restatement stemmed from Aspen's improper recognition of revenue

from software licensing and service agreements.  Specifically,

Aspen admitted in the Amended Form 10-K that it improperly

recognized revenue by:  (I) entering into side agreements that

altered the terms of its sales arrangements, thus allowing Aspen

to recognize revenue prematurely; (ii) recording consignment

sales as revenue, when in fact such sales were subject to the

risk of return by the consignees; (iii) recording revenue from

software licenses before it had substantially performed under the

sales agreements; and (iv) recording revenue of maintenance

services before it had actually performed those services. <u>Id.</u> ¶

40.  In the Amended Form 10-K, Aspen conceded that these

accounting improprieties were all material violations of GAAP

that required retroactive restatement. <u>Id.</u>

        As a result of Aspen's negative announcements and,

finally, the issuance of the Amended Form 10-K, Aspen's stock

price declined.  In addition, a number of proceedings, both civil and criminal, ensued.

On November 9, 2004, a Consolidated Class Action Complaint for securities fraud was filed against Aspen in the United States District Court for the District of Massachusetts (the "Class Action Complaint").[3]  That case has settled. <u>Id.</u> ¶ 42. Plaintiffs allege that they "opted out of the class settlement." <u>Id.</u> ¶ 42.  The Class Action Complaint states, however, that "[e]xcluded from the Class are defendants, the officers and directors of the Company, at all relevant times . . . ." (Class Action Compl. ¶ 14; <u>see also</u> Consolidated Amended Compl. ¶ 23, attached as Ex. F. to Vallely Decl.)

In January 2007, the SEC brought civil enforcement charges against Evans, McQullin, and Zappala in the District of Massachusetts.[4]  That case remains pending.  Also in January 2007, the Office of the United States Attorney for the Southern District of New York filed an information against McQuillin,

---

[3]<u>In re Aspen Technology, Inc. Sec. Litig.</u>, No. 04-12375-JLT (D. Mass.).

[4]<u>S.E.C. v. Evans et al.</u>, No. 07-10027 (D. Mass.).

charging him with two counts of criminal securities fraud.[5] Compl. at 1.

The gravamen of the Complaint is that Aspen and the Individual Defendants knowingly made false statements about Aspen's revenues and accounting practices in meetings leading up to the execution of the SPA, in the SPA itself, in certain statements to Wall Street analysts, and in SEC filings and press releases that reported and commented on Aspen's financial results in each of the thirteen fiscal quarters preceding the execution of the SPA. The Complaint alleges that these multiple false statements induced Plaintiffs to enter into the SPA and subsequently suffer damages when the company's stock price fell.

The Complaint, which runs to 75 pages and 180 paragraphs, contains a separate section for each of the thirteen fiscal quarters preceding the execution of the SPA. For seven of the thirteen fiscal periods, the Complaint describes specific transactions for which the revenues were improperly accounted.

---

[5] United States v. McQuillin, No. 07 Cr. 17 (S.D.N.Y.) (McKenna, J.). On March 26, 2007, a little more than a month after this action was filed, McQuillin pleaded guilty to both counts of the information, before Judge McKenna. On October 19, 2007, McQuillin was sentenced to a term of three years' probation, including six months' home confinement and 28 days of confinement in a community center. In addition, McQuillin was ordered to perform 50 hours of community service and pay a fine of $12,000 in addition to the statutory special assessment of $200. See ECF Doc. No. 11.

For example, in the section devoted to accounting improprieties that took place in the second quarter of fiscal 2001, the Complaint alleges that, in January 2001, Aspen issued a press release in which it announced the financial results for the quarter ending December 31, 2000. Id. ¶ 70. In that press release, Aspen reported growth of licensing revenue of 39% and growth of revenue from service contracts of 24%. Id. In the press release, Evans is quoted as stating that revenue and profitability showed "dramatic year-over-year improvement as a result of investments we have made to expand our supply chain implementation capacity and productivity" and that Aspen was "pleased to see continued strong license growth this quarter . . . ." Id. The Complaint then details two transactions that Aspen entered into during that quarter in which the company improperly accounted for revenues. In one transaction, involving the sale of software to Logica UK, a British software company, Aspen improperly recognized $1.75 million of software license revenue "because there was a side agreement to the contract which provided that Logica was not obligated to pay Aspen unless Aspen provided Logica with a minimum amount of software implementation services revenues." Id. ¶ 71. Thus, under GAAP, the $1.75 million in revenue from the sale should not have been booked. The improper recognition of this revenue resulted in a material

overstatement of net income.  The Logica transaction was one of the transactions restated by Aspen in its Amended Form 10-K.

In a second transaction from that quarter, Aspen improperly recognized $2.75 million in software license revenue on a sale to IBM.  The recognition of revenue was improper because "(i) Aspen directed an IBM employee to sign the software license agreement [] in January 2001 but date it December 2000 and (ii) IBM's anticipated payment to Aspen was contingent on Aspen finding end-users to whom IBM would resell Aspen's software." Id. ¶ 78.  Thus, the $2.75 million in revenue was improperly booked and reported in Aspen's Form 10-Q for that quarter, which was signed by Zappala. Id. ¶ 79.  This transaction also was restated in the Amended Form 10-K.

The Complaint then quotes extensively from Aspen's SEC Form 10-Q for the second quarter of 2001, which was signed by Zappala and "reaffirmed the Company's previously announced financial results . . . ." Id. ¶ 85.  The section of the Complaint concludes with allegations regarding the falsity of the financial data in the press release and Form 10-Q and the falsity of Evans' quoted comments in the press release. Id. ¶ 86.  In addition, the section alleges that the falsity of the financial data and Aspen's representation that it complied with GAAP was caused by, among other things, the "Defendants' improper practice

of recognizing revenue on contingent and/or consignment sales."
Id.

For the remaining six quarterly periods, in which there are no allegations regarding specific improperly booked transactions, the Complaint simply quotes from or cites to the press release that was issued and the quarterly form 10-Q that was filed with the SEC for each quarter. The press releases frequently quote Zappala or Evans or both as commenting on Aspen's financial performance for the fiscal period at issue. The Complaint then alleges that the financial statements released for those periods were false, that the revenues were misstated by various amounts, and that the financial statements were subsequently restated. The Complaint typically asserts that "Aspen's reported revenues were materially misstated due to Defendants' improper practice of keeping certain revenues 'in the freezer' which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders . . . ." Id. ¶ 89(b). See also ¶¶ 59(b), 63(b), 69(b), 102(b), 106(b).

*The False Statements*

For each of the thirteen fiscal quarters, the Complaint alleges that the statements contained in the SEC filings and press releases issued in the quarter "which were represented in the SPA as accurate and in compliance with GAAP, were each

materially false and misleading . . . ." Id. ¶ 56.  The false
statements can be grouped into five general categories: (I)
statements made to Plaintiffs in meetings leading up to the
execution of the SPA; (ii) statements in the SPA itself; (iii)
statements in SEC filings, in particular Aspen's Form 10-Q and
Form 10-K reports for each of the thirteen quarters for which
Aspen subsequently restated its financial results, as well as two
registration statements and prospectuses for stock sales that
took place in two of the quarterly periods, in which Aspen's
misstated financial statements were incorporated; (iv) statements
in press releases issued by Aspen in connection with its release
of quarterly financial results; and (v) statements made by
Individual Defendant Zappala to Wall Street research analysts, in
which Zappala expressed optimism about future revenue growth.

   *(I) False Statements in Meetings Leading up to the SPA*

       "Aspen executives, including the Defendants" conducted
a number of telephonic and in person meetings with Plaintiffs
leading up to the execution of the SPA on May 9, 2002. Id. ¶ 31.
The meetings "took place on various dates, including May 30,
August 29, and September 21, 2001 and January, March 22 and April
2, 2002." Id.  The Complaint alleges that, during those meetings,
"Defendants misrepresented Aspen's finances including Aspen's
process engineering software revenues; internal accounting
controls and process; [and] operations including the number of

Aspen employees; . . . ." Id. Plaintiffs also allege that

"Defendants" made "oral representations [that Aspen's financial

statements were prepared in accordance with GAAP] to Plaintiffs

during the course of their meetings pre-dating the Securities

Purchase Agreement." Id. ¶ 122. The Complaint contains no

allegations about where the meetings were held or which of the

Individual Defendants made specific statements to which of the

plaintiffs.

*(ii) False Statements in the SPA*

Plaintiffs allege that, although the SPA represented

that "Aspen's 10-Ks and 10-Qs did not contain any untrue

statements of material fact or material omissions," the SPA was

in fact "materially false and misleading because it failed to

disclose and misrepresented adverse facts . . . ." Id. ¶ 43. In

addition to misrepresenting Aspen's financial results, Plaintiffs

allege that the SPA, which was signed by Zappala, contained a

section entitled "Internal Accounting Controls" in which the

defendants falsely represented that Aspen's "transactions are

recorded as necessary to permit preparation of financial

statements in conformity with generally accepted accounting

principles . . . ." Id. ¶ 34. Further, Plaintiffs claim that the

defendants' warranties and representations in the SPA were

knowingly false. Specifically, Plaintiffs point to the

defendants' representation that, "Since the date of the latest

audited financial statements included within the SEC Reports, (I) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) the Company has not incurred any material liabilities (contingent or otherwise)" other than those permitted by GAAP or previously disclosed by Aspen. Id. ¶ 153. Plaintiffs allege that these representations in the SPA were "false as Aspen had falsified entries and engaged in illegal transactions to inflate the revenues that were reported in the audited statements." Id. ¶ 154.

*(iii) False Statements in SEC Filings*

For each of the thirteen quarters in which Aspen improperly booked revenue, the Complaint refers to or quotes from Form 10-Q quarterly reports, Form 10-K annual reports, and/or Statements of Registration and Prospectuses for sales of Aspen's stock. As noted, the Complaint alleges that the Form 10-Qs and 10-Ks reported false financial results for the relevant quarterly and annual periods that were subsequently restated in the Amended Form 10-K. In addition, the Complaint alleges that the Registration Statements and Prospectuses (issued in connection with the public sale of Aspen's common stock to fund Aspen's purchases of other companies) incorporated Aspen's false financial statements. In addition to setting forth false financial statements, each of the SEC filings contained the

allegedly false representation that, "[i]n the opinion of management, the accompanying consolidated condensed financial statements have been prepared in conformity with generally accepted accounting principles . . . ." <u>Id.</u> ¶ 88. Each filing also contained representations regarding Aspen's policies for recognizing revenue on software license sales, as well as maintenance and service contracts.

Each of the Form 10-Qs was signed by Zappala, as Aspen's CFO. Each of the Form 10-Ks was signed by both Zappala and by Evans, as Aspen's CEO. The Registration Statements and Prospectuses referenced in the Complaint were also signed by both Zappala and Evans.

*(iv) False Statements in Press Releases*

The press releases referenced in the Complaint were issued shortly after the end of each quarterly and/or annual period. The press releases report the subsequently restated financial results for each of the quarterly and annual periods at issue.[6] The press releases also contain quotes from Zappala and/or Evans regarding Aspen's business operations. For example, in a press release dated August 7, 2001, in which Aspen reported

_____

[6]In addition to the thirteen press releases issued in connection with the reporting of financial results, the Complaint references a press release that was issued by Aspen in December 1999 announcing the agreement which Aspen entered into with Union Carbide, in which Aspen improperly accounted for the recording of software licensing revenue. <u>See</u> Compl. ¶ 51.

17

its financial results for the fiscal year and fourth quarter ending June 30, 2001, Evans stated that Aspen was "pleased to have exceeded expectations for both revenues and profitability this quarter in what remains a very difficult environment. . . .", and that Aspen had "closed significant multimillion transactions" with, among others, "Yukos, a large Russian oil company." Id. ¶ 91. The financial results for that quarter and year included $4.3 million in revenue attributed to the sale of software to Yukos. The revenue from the Yukos transaction, however, was improperly recognized, because "(I) Yukos signed the software license agreement in July 2001 but dated it in June 2001 (before the quarter end) and (ii) McQuillin entered into a side agreement with Yukos creating contingencies to Yukos's payment obligations that were not reflected in the software license agreement." Id. ¶ 90. Thus, the Complaint alleges, "Evans' statement that Aspen 'exceeded expectations for both revenues and profitability' during the fourth quarter fiscal 2001 . . . lacked a reasonable basis at all times and were therefore materially false and misleading." Id. ¶ 98. Similarly, in a press release issued on January 23, 2002, in which Aspen announced its financial results for the second quarter of fiscal year 2002 (ending December 31, 2001), Evans stated that the company's "revenue growth significantly exceeded our expectations." Id. ¶ 104. Because fiscal 2002 revenues were overstated by $11

million, due to Aspen's improper recognition of revenue, Evans' statements allegedly lacked reasonable basis and were false and misleading.

In another example, Zappala is quoted in a press release, issued on January 25, 2000, as stating the following regarding Aspen's financial results for the second quarter of fiscal year 2000: "Strong demand for our technology and solid execution helped us to exceed expectations for revenue and profitability in the second quarter." Id. ¶ 52. Because Aspen's revenues were overstated for fiscal year 2000 due to improper revenue recognition, the Complaint alleges that "Zappala's statement that '[s]trong demand' and 'solid execution' allowed the Company to 'exceed expectations for revenues and profitability in the second quarter" of fiscal year 2000 was untrue.

*(v) Zappala's False Statements to Analysts*

In January 2000, Aspen issued a press release in which it reported that net per share earnings for the second quarter of fiscal year 2000 were triple the per share earnings of the prior year's second quarter. Id. ¶ 52. After issuance of the press release, Wall Street analysts published a research report in which it reiterated its "buy" recommendation for Aspen stock and stated that Zappala "'guided the Street to expect improving results on the top line' including '25% license [revenue]

growth.'" Id. ¶ 54. Because Aspen's revenues for fiscal year 2000 were materially overstated, the Complaint alleges that Zappala's statements to the analysts, which were predicated on the falsely positive earnings numbers for fiscal year 2000 and predicted high revenue growth for the following year, were false.

*Individual Defendants' Awareness of the Improper Accounting*

The Complaint contains allegations regarding McQuillin's, and to a much lesser extent Evans', awareness of Aspen's improper accounting practices. In addition, the Complaint contains several allegations regarding the Individual Defendants' compensation and stock transactions that arguably relate to the defendants' motive to participate in the alleged accounting fraud. Finally, the Complaint also includes a number of general allegations regarding the "defendants'" or the "Individual Defendants'" knowledge or reckless disregard of the accounting improprieties.

*Specific Allegations*

The Complaint quotes liberally from an account provided in the Class Action Complaint in which two confidential informants reported certain comments made by McQuillin, and to a lesser degree by Evans, indicating their awareness of Aspen's improper accounting practices.[7]

_____

[7]The confidential informants also state that "Aspen" was culpable of many accounting improprieties, including the backdating of sales and premature recognition of revenue.

The first confidential informant ("CI 1") was a sales manager employed by Aspen from March 1998 to April 2001. CI 1 was based in Aspen's Houston office and had reporting responsibilities to sales executives who reported to other sales executives who, in turn, reported to McQuillin. Id. ¶ 43 & n.1. At the time CI 1 was employed by Aspen, McQuillin was Aspen's Executive Vice President of Worldwide Sales, and CI 1 regularly attended sales meetings at which McQuillin was present. Id. ¶ 43. According to CI 1, at a December 1999 sales meeting during which the sale of software licenses to Union Carbide and other companies was being discussed, McQuillin stated, "we are going to keep this [Union Carbide revenue] in the freezer" in order to "smooth out the numbers." According to CI 1, McQuillin also stated in several sales meetings, "how do I orchestrate the deals to get the stock price up?" Id.

The second confidential informant ("CI 2") was employed as Aspen's director of business development for the company's polymer business. Id. ¶ 43 & n.2. CI 2 "confirmed that Defendants improperly managed Aspen's reported earnings" and that both "Evans and McQuillin euphemistically referred to this

---

Further, the confidential informants state that Aspen's senior management exerted great pressure on the sales staff to meet quarterly targets and that the management instructed the staff either to prematurely record or backdate sales in order to meet those targets. These allegations relate solely to the corporate defendant, Aspen, and not to the Individual Defendants, and are not relevant for the purpose of deciding the present motions.

practice as keeping revenues 'in the freezer.'" Id. ¶ 43. More
specifically, CI 2 reported on a transaction undertaken by Aspen
in late 2000, in which Aspen attempted to sell $4 million in
software licenses to Equate Petrochemical.  According to CI 2,
Aspen negotiated with Equate Petrochemical through a middleman,
Petroleum Services Company ("PSC").  CI 2, along with other Aspen
executives, participated directly in the negotiations with PSC
and understood from the negotiations that PSC would purchase from
Aspen only if Aspen had a firm commitment from an end-purchaser.
When, near the end of the third quarter of fiscal year 2001, it
appeared that neither Equate Petrochemical nor any other party
would agree to purchase the software as an end-user, the deal was
in jeopardy.  According to CI 2, his Aspen colleagues presented
PSC's representative with a letter stating that, if PSC purchased
the software on paper prior to the end of the quarter, Aspen
would accept return of the software if Equate did not finally
purchase the software by the end of the following quarter.  CI 2
stated that he informed McQuillin about the terms of this
prospective "questionable" side deal and received McQuillin's
assurance that he was "going to look into it." Id.  McQuillin
never discussed this any further with CI 2.  Aspen booked the
revenue for the sale in the quarter ending March 31, 2001 but did
not receive payment from Equate until the late summer of 2001
(namely, the first quarter of fiscal 2002).  Id. In other words,

22

CI 2's account shows that (I) Aspen's sales executives attempted to execute a side deal which would allow them to book sales revenue improperly; (ii) McQuillin was confronted with this fact before the illicit side deal was executed; (iii) McQuillin did not take action and (iv) the side deal was consummated and the revenue improperly booked.

The Complaint also includes a short section on the Individual Defendants' compensation and trading activity during the period at issue. Evans is alleged to have received $2 million in compensation and to have received proceeds of "at least $81,000" from exercising Aspen stock options and selling "artificially inflated Aspen stock into the marketplace." Id. ¶¶ 136, 137. McQuillin's compensation was $2,446,000, and his exercise of options and sale of stock during the period of alleged fraud netted him "at least $1.5 million" in proceeds. Id. ¶ 139. Zappala's compensation was $1,245,000 and her proceeds from the sale of Aspen stock, as a result of her exercise of options, was $622,000. Id. ¶¶ 140-41.

*General Allegations*

The Complaint contains several highly general allegations regarding the defendants' knowledge of and/or reckless failure to learn about Aspen's accounting improprieties. For example, the Complaint quotes extensively from statements, contained in Aspen's SEC filings, that set forth Aspen's

accounting practices for various categories of revenues.  After
citing these excerpts, the Complaint alleges that "[t]he above
representations were materially false and misleading when made
because, as Defendants knew, or recklessly disregarded, Aspen did
not recognize revenue in accordance with its publically stated
accounting policies." Id. ¶ 128.  Similarly, the Complaint
alleges that "Defendants knew, or recklessly ignored, that
[Aspen's booking of consignment sales as actual revenue] violated
GAAP because, during the relevant period, the SEC had issued
numerous statements warning its registrants to be ever vigilant
about their revenue recognition practices." Id. ¶ 130.   The
Complaint also quotes the SPA as representing that, since the
issuance of the SEC filings prior to the execution of the SPA,
there had occurred no event that could result in a material
adverse effect to Aspen and that Aspen had incurred no material
liability.  The Complaint alleges that "Defendants well knew that
representation was false as Aspen had falsified entries and
engaged in illegal transactions to inflate the revenues that were
reported in the audited statements." Id. ¶ 154.

_The Counterclaim & Cross Claims_

        With its Answer, Aspen filed a Counterclaim against
Plaintiffs Sim and Clave, alleging fraud, breach of fiduciary
duty, and a civil RICO violation.  Aspen's Counterclaim alleges
that in November 2002, while serving as officers of Aspen, Sim

and Clave obtained documents that revealed that Aspen had improperly accounted for revenue in the Yukos transaction. Sim and Clave allegedly failed to disclose this information to the company. Instead, Sim traded on the inside information and allegedly realized illicit profits of approximately $384,000. After they left Aspen in the fall of 2004, Sim and Clave also allegedly offered to disclose the incriminating inside information to Aspen's Board of Directors and Audit Committee in exchange for a cash payment, an offer which Aspen refused. The Counterclaim alleges that, had Sim and Clave complied with their fiduciary duty to Aspen and revealed the information in 2002, Aspen would have been alerted to the fraud, would not have been forced to restate its financials for fiscal years 2003 and 2004, and thus would have avoided the costs associated with the restatement for those years.

In their answer to Aspen's Counterclaim, Sim and Clave asserted Cross Claims for contribution against the Individual Defendants. In their Cross Claims, Plaintiffs assert causes of action against the Individual Defendants for fraud and breach of fiduciary duty. In essence, the Cross Claims allege that, had the Individual Defendants not committed the fraud and willful fiduciary breaches as alleged in the Complaint, Aspen would not have incurred the restatement expenses which Aspen seeks to recover via its Counterclaim.

*Procedural History*

Plaintiffs filed their Complaint on February 15, 2007, asserting causes of action against (I) all defendants for their violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Count I"); (ii) the Individual Defendants for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as "controlling persons" of Aspen in Aspen's violations of Section 10(b) and SEC Rule 10b-5 ("Count II"); (iii) all defendants for common law fraud ("Count III"); (iv) all defendants for common law fraudulent inducement ("Count IV"); (v) all defendants for conspiracy to commit and/or aiding and abetting common law fraud ("Count V"); and (vi) Aspen only for common law breach of contract.[8]

On April 17, 2007, Aspen answered the Complaint and filed its Counterclaim against Sim and Clave.  On May 10, 2007, Sim and Clave answered the Counterclaim and filed Cross Claims against the Individual Defendants for contribution on the Counterclaim.

On April 27, 2007, the Individual Defendants filed the present motions to dismiss the Complaint.  The motions to dismiss the Complaint were fully briefed on May 29, 2007.  On July 17,

---

[8]The breach of contract claim is not at issue in the present motions.

2007, the Court received the fully briefed motions by the Individual Defendants' to dismiss Sim's and Clave's Cross Claims. The parties conducted oral argument on February 1, 2008.

## DISCUSSION

*(I)  Legal Standard on Motion to Dismiss*

On a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the complaint as true. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).  The Court, however, is not required to accept as true conclusory allegations or "a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The issue on a 12(b)(6) motion to dismiss is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claim. Id.  A court should "read the complaint generously and draw reasonable inferences in favor of the pleader." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  On a motion to dismiss a complaint under Rule 12(b)(6), the district court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980).  The complaint may be dismissed under Rule 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that

could be proved consistent with the allegations." <u>Hishon v. King</u> <u>& Spalding</u>, 467 U.S. 69, 73 (1984) (citing <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).

*(II)  Statute of Limitations*

Zappala and Evans have moved to dismiss Plaintiffs' federal securities fraud claims (comprising Count I, the claim for violation of Section 10(b) and SEC Rule 10b-5, and Count II, the Section 20(b) "controlling persons" claim) on the ground that those claims are barred by the applicable statute of limitations.[9] "A plaintiff must file a securities fraud claim within the earlier of '2 years after the discovery of the facts constituting the violation' or '5 years after such violation.'" <u>In re Parmalat</u> <u>Sec. Litig.</u>, 493 F. Supp. 2d 723, 730 (S.D.N.Y. 2007) (quoting 28 U.S.C. § 1658(b)).  Zappala and Evans, who have adopted each other's arguments on the statute-of-limitations issue, contend that "Plaintiffs have been on notice of the allegedly problematic transactions since October 27, 2004, when Aspen issued a press release announcing that its Audit Committee was investigating the accounting treatment of certain transactions." (Zappala Mem. at

_____

[9]McQuillin has not moved to dismiss the federal securities fraud claims on a statute-of-limitations ground.  According to Evans, McQuillin has not asserted this argument because "McQuillin and Aspen entered into tolling agreements with Plaintiffs' counsel that prevent McQuillin from raising the limitations arguments that Mr. Evans [and Zappala] ha[ve] raised." (Evans Reply Mem. at 1 n.1.)

5.)  Plaintiffs did not file the instant action until February 15, 2007, which was more than 27 months after they were purportedly on notice of the fraudulent conduct at issue.  Thus, the defendants contend that Plaintiffs' federal securities fraud claims are time-barred.

Plaintiffs do not dispute that they were on inquiry notice as of October 27, 2004.  In any event, Aspen's announcement of October 24, 2007, as well as the filing of the Class Action Complaint on November 9, 2004 and the press release of November 24, 2004, were sufficient as a matter of law to place the plaintiffs on notice. See Dietrich v. Bauer, 76 F. Supp. 2d 312, 343 (S.D.N.Y. 1999).  As the court explained in Dietrich:

> The information that triggers inquiry notice of the probability of an alleged securities fraud is any financial, legal, or other data, including public disclosures in the media about the financial condition of the corporation and other lawsuits alleging fraud committed by the defendants, available to the plaintiff providing him with sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities].

Id.

Here, Aspen's public disclosures of October 24 (the announcement that the Audit Committee had undertaken a detailed review of past transactions and the company was unable to release its quarterly financials) and of November 24 (the issuance of the press release announcing that financials for 2000-2004 had to be restated and could not be relied upon) as well as the November 9,

2004 filing of the Class Action Complaint alleging securities fraud against the defendants, clearly placed Plaintiffs on inquiry notice more than two years before the instant action was filed.

Instead of disputing notice, Plaintiffs argue that the two-year statute of limitations was tolled by the filing of the Class Action Complaint on November 9, 2004. Plaintiffs claim that "[t]he filing of that class action tolled the statute of limitations on Plaintiffs' federal securities claims until Plaintiffs opted out of a settlement of that class action on February 8, 2006." (Pl. Omnibus Mem. In Opp. to the Individual Defs.' Mot. to Dismiss the Compl. ("Pl. Mem.") at 9-10.)

Under the rule stated by the Supreme Court in American Pipe and Construction Co. v. State of Utah, 414 U.S. 538, 554 (1974), the filing of a class action complaint "suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Once the statute of limitations has been tolled, "it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." Crown v. Parker, 462 U.S. 345, 354 (1983). Once potential members "cease to be members of the class--for instance, when they opt out or when the

certification decision excludes them--the limitation period
begins to run again on their claims." Ca. Pub. Emples. Ret. Sys.
v. Caboto-Gruppo Intesa BCI (In re WorldCom Sec. Litig.), 496
F.3d 245, 255 (2d Cir. 2007).

The question is whether Plaintiffs were "asserted
members of the class" encompassed by the Class Action Complaint.
The parties dispute whether this question may be answered at the
pleadings stage.  Plaintiffs maintain, in a footnote, that
"[w]hether Sim and Clave were officers or putative class members
and whether they perceived they were such is an inquiry that
cannot be resolved on a motion to dismiss." (Pl. Mem. at 10 n.5.)
Zappala and Evans contend that the plaintiffs' status as officers
of Aspen is evident from the pleadings and documents that are
either incorporated by reference or judicially noticeable by the
Court.

Defendants point, first, to the Class Action Complaint,
a document that is quoted extensively in the Complaint and is
undisputably incorporated by reference.  The Class Action
Complaint defines the class as consisting of those who purchased
Aspen's stock between August 8, 2000 to October 24, 2004.  The
Class Action Complaint states that "[e]xcluded from the Class are
defendants, the officers and directors of the Company, at all
relevant times . . . ." (Class Action Compl. ¶ 14.)  Sim and

Clave are alleged to have been vice presidents of Aspen during the class period.

Next, the defendants cite to the law of Delaware, Aspen's state of incorporation, which provides that the titles and duties of a corporation's officers are to be set forth in the corporation's by-laws. See Del. C. § 142(a). Finally, the defendants cite Aspen's by-laws, which state that Aspen's officers "shall consist of a President, a Treasurer, a Secretary and such other officers, if any, as the board of directors from time to time may in its discretion elect or appoint, including . . . one or more Vice Presidents . . . ." (Vallely Decl., Ex. G. § 6.1.)

The Court may take judicial notice of Delaware's law. See Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998). The Court also may take judicial notice of Aspen's by-laws, which pursuant to federal regulations were filed with the SEC. See Kramer v. Time Warner, Inc. 937 F.2d 767, 774 (2d Cir. 1991) (stating that a district court may "take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned'") (quoting Fed. R. Evid. 201(b)(2)).

It is undisputed that the plaintiffs were vice presidents of Aspen during the relevant class period. It is also undisputed that, under Aspen's by-laws, "Vice Presidents" are included among the officers who may be elected or appointed by the company's board of directors. Thus, the Class Action Complaint shows that both Sim and Clave, as Aspen's officers during the relevant class period, were excluded as putative class members in the class action that was filed in the district of Massachusetts.

Plaintiffs cite Milano v. Freed, 767 F. Supp. 450 (E.D.N.Y. 1991) for the proposition that the resolution of the question is inappropriate at this point in the litigation. Milano is inapposite. In that case, the defendants claimed that the plaintiffs' medical malpractice claim was time-barred under New York state law. Plaintiffs argued that the claim was timely under the "continuous treatment" doctrine, which provides that "where there is a continuous treatment related to the original condition or complaint, . . . the statute of limitations is tolled during the course of that treatment." Id. at 454 (internal quotation marks and citation omitted). The court held that whether the plaintiff underwent continuing treatment during the time period at issue was a factual question that could not be resolved on a motion to dismiss. Here, by contrast, as discussed, it is clear from the pleadings and documents

incorporated by reference that Plaintiffs were vice presidents of
Aspen who were excluded as members of the putative class by the
express terms of the Class Action Complaint.  No further factual
inquiry is required.

Despite Plaintiffs' assertion in the Complaint that
they "opted out" of the class action filed in the District of
Massachusetts, the plain language of the Class Action Complaint
and Aspen's by-laws is controlling.  Although a court should
"read the complaint generously and draw reasonable inferences in
favor of the pleader," Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.
1989), where allegations set out in the complaint are
contradicted by other matters asserted or by materials attached
to or incorporated by reference in the complaint, the court is
not obliged to credit the allegations in the complaint. Brown v.
New York City Hous. Auth., No. 05 Civ. 7332, 2006 U.S. Dist.
LEXIS 30193, at *4-5 (S.D.N.Y. May 16, 2006).  Where the
plaintiff's allegations are contradicted by a document that the
complaint incorporates by reference, the document controls. See
Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400 (S.D.N.Y.
2002).  Thus, Plaintiffs' allegation that they "opted out" is
overcome by the express language of the Class Action Complaint,
which excludes Sim and Clave from the class.

Accordingly, Sim and Clave cannot be deemed "asserted
members" of the class and do not benefit from the tolling rule of

American Pipe.  The time for filing their federal securities claims thus expired two years after they were placed on notice about the misconduct at issue.  Regardless of whether the plaintiffs were deemed to have notice on October 24, November 9, or November 24, 2004, the Complaint in this case was filed in February 2007, more than two years after any of those three dates.  Thus, Sim's, Clave's, and 380544 Canada's federal securities fraud claims are time-barred.[10]

However, although Counts One and Two must be dismissed as against Evans and Zappala, the common law fraud claims survive.  The Court's jurisdiction over the common law claims is original rather than supplemental.  As the Complaint states, federal jurisdiction in this action is based not only on the federal securities fraud statutes, it also arises from the complete diversity between the parties and the fact that more than $75,000 is in dispute. See Compl. § 12.  Thus, the Court will retain jurisdiction over the common law claims.  As discussed below, the standard for pleading common law fraud is

_____

[10] In their briefs, the parties did not address whether the Court's determination regarding Sim's and Clave's status as officers of Aspen should also apply to Sim's company, Plaintiff 380544 Canada.  At oral argument, I directed the parties to submit supplemental briefing on the issue.  Plaintiffs submitted a letter to the Court in which they "concede that 380544 Canada, Inc. and Wayne Sim (the sole owner of 380544 Canada, Inc.) Are one and the same for purposes of determining whether the statute of limitations on Plaintiffs' federal securities claims are tolled." (Pl. Letter, Feb. 15, 2008, at 1.)

not materially different from the standard for pleading federal

securities fraud.  Therefore, regardless of the fact that the

federal claims against Zappala and Evans are dismissed as time-

barred, the Court must still determine whether Plaintiffs

adequately pleaded fraud against all Defendants.

*(III) Counts I, III, IV:  Section 10(b) and Rule 10b-5; Common
Law Fraud and Fraudulent Inducement*

*(A) Legal Standard*

      Section 10(b) provides that
> It shall be unlawful for any person, directly or
> indirectly . . . to use or employ, in connection with the
> purchase or sale of any security . . . any manipulative
> or deceptive device or contrivance in contravention of
> such rules and regulations as the Commission may
> prescribe as necessary and appropriate in the public
> interest for the protection of investors.

15 U.S.C. § 78j(b).  Under this statutory authority, the SEC

promulgated Rule 10b-5, which makes it unlawful

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or
> to omit to state a material fact necessary in order to
> make the statements made, in the light of the
> circumstances under which they were made, not
> misleading, or

> (c) To engage in any act, practice, or course of
> business which operated or would operate as a fraud or
> deceit upon any person, in connection with the purchase
> of any security.

17 C.F.R. § 240.10b-5.

      Under New York common law, to assert a claim for fraud,

a plaintiff must allege that: (1) the defendant made a materially

false representation; (2) with intent to defraud and (3) the

plaintiff reasonably relied on the representation, and (4) suffered injury as a result. See ABF Capital Mgmt. v. Askin Capital Mgmt., L.P., 957 F. Supp. 1308, 1323 (S.D.N.Y.). The elements for common law fraud are the same as the elements for violations of Section 10(b) and Rule 10b-5, with the exception that a claim for common law fraud need not allege that the fraud was in connection with the purchase or sale of securities. "[B]ecause [the elements of common law fraud] are substantially identical to those governing § 10(b), the identical analysis applies." Hunt v. Enzo Biochem, No. 06 Civ. 170, 2008 U.S. Dist. LEXIS 1472, at *28-29 (S.D.N.Y. Jan. 8, 2008).

*(B) Pleading Requirements*

To state a claim for a violation of Section 10(b) of the Exchange Act and Rule 10b-5, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). The plaintiff also must satisfy the heightened pleading standards of Rule 9(b) and the PSLRA. Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Accordingly, the complaint "must: (1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999) (citation omitted). The PSLRA, which essentially codified Rule 9(b), provides that if the plaintiff alleges a misstatement or omission of material fact, "the complaint shall specify each statement alleged to have been misleading, the reason why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "A claim for common law fraud under New York law must also satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b)." Id; see also Compudyne Corp. v. Shane, 453 F. Supp. 2d 807, 832 (S.D.N.Y. 2006) (stating that the pleading requirements for common law fraud are "are essentially identical to those for pleading a violation of Rule 10b-5"). In addition, the pleading requirements for common law fraud and fraudulent inducement are identical. See JHW Greentree Capital, L.P. v. Whittier Trust Co., No. 05 Civ. 2985 (HB), 2006 U.S. Dist. LEXIS 22400, at *21-22 (S.D.N.Y. April 24, 2006, 2006).

© *Scienter Element*

In securities fraud cases, the plaintiff must allege facts showing that defendants acted with the required state of mind, or scienter.[11] The Rule 9(b) scienter pleading standard in the Second Circuit is as follows:

> [P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent, which may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 187 (2d Cir. 2004) (internal quotations marks omitted). In Tellabs, Inc. v. Makor Issues & Rights, Ltd ., 127 S. Ct. 2499, 2510 (2007), the Supreme Court held that to plead a "strong inference of scienter," a complaint must allege facts that give rise to an inference of scienter at least as strong as any competing inference. Id. at 2509. The determination is "inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" Id. at 2510. In comparing inferences, a court should consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. A complaint adequately pleads scienter only if a reasonable person would deem

---

[11] Scienter requires a showing of "intent to deceive, manipulate, or defraud," or reckless conduct. ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (internal quotation marks and citations omitted).

the inference of scienter both "cogent" and "at least as likely as any plausible opposing inference." Id. at 2504-06, 2513. "The Tellabs decision also emphasizes that the inquiry is to be made in the context of a traditional motion to dismiss -- assuming the well-pleaded facts of the complaint to be true -- and that all the facts alleged, taken collectively, must be considered in deciding whether the pleading gives rise to a strong inference of scienter." In re Top Tankers, Inc., No. 06 Civ. 13761, 2007 U.S. Dist. LEXIS 94259, at *17 (S.D.N.Y. Dec. 18, 2007).

*(D) Analysis*

The Individual Defendants do not dispute that Plaintiffs have adequately pleaded that the allegedly false statements were made in connection with the purchase or sale of securities or that Plaintiffs reliance on the statements resulted in their financial loss. The sole issues to be addressed are whether (I) the Complaint adequately pleads that the false statements are attributable to the Individual Defendants and (ii) the Complaint alleges facts that give rise to a sufficiently strong inference of scienter for each of the Individual Plaintiffs.

*(I) Link Between the Individual Defendants and the False Statements*

The Individual Defendants do not, and cannot, dispute the actual falsity of the financial statements that were contained in Aspen's press releases and SEC filings for the

thirteen quarters at issue and were subsequently restated in the Amended Form 10-K. "Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp.2d 474, 486 (S.D.N.Y. 2004). Rather, the Individual Defendants argue primarily that the plaintiffs failed to link each defendant to the false statements at issue. To determine whether the Complaint successfully attributes the statements to each defendant requires a separate analysis for each category of statements.

_____ *(a) Meetings Leading up to the SPA*

_____Although the Complaint broadly alleges that "[t]he meetings that led up to the Acquisition and SPA involved various presentations by Aspen executives, including the Defendants" and that "[d]uring the meetings, Defendants misrepresented Aspen's finances," the reference to "Defendants", as a group, is insufficient. "[I]ndiscriminate defendant 'clumping' does not adhere to the particularity standards of Fed. R. Civ. P. 9(b) and the PSLRA." Dresner v. Utility.com, Inc., 371 F. Supp. 2d 476, 493-94 (S.D.N.Y. 2005) "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'" Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)). See also SEC v. U.S. Envtl., Inc., 82 F. Supp.

41

2d 237, 240 (S.D.N.Y. 2000) ("[P]laintiff must satisfy Rule 9(b) as to each individual defendant, and cannot do so by making vague allegations about the defendants as a unit."). Because the Complaint merely alleges, without any specificity, that the Individual Defendants, acting as a unit, made false statements during several meetings leading up to the SPA, Plaintiffs have failed adequately to attribute statements made during those meetings to any of the Individual Defendants.

*(b) The SPA*

Although the Complaint alleges that Zappala signed the SPA, there are no allegations that any of the three Individual Defendants were involved in the drafting of the SPA or otherwise participated in its preparation. Nevertheless, under the group pleading doctrine, the allegedly false statements in the SPA may be attributed to the three Individual Defendants.

The group pleading doctrine allows plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000). However, the doctrine "is extremely limited in scope. Courts in the Second Circuit and elsewhere have construed the doctrine as applying only to clearly

cognizable corporate insiders with active daily roles in the relevant companies or transactions." Id. (internal quotation marks and citations omitted). The group pleading doctrine has been held to apply to contracts, like the SPA, between a company and prospective purchasers of common stock and warrants. See, e.g., Dresner, 371 F. Supp. 2d at 495 (allegedly false statements made in a merger agreement, pursuant to which plaintiff purchased defendant company's stock, could be attributed to individual defendants who were corporate insiders); BCH Interim Funding, L.P. v. Finantra Capital, Inc., 283 F. Supp. 2d 968, 980 (S.D.N.Y. 2003) (holding that group pleading doctrine applied to alleged misstatements in loan documents).

The Individual Defendants were clearly "corporate insiders with active daily roles" in Aspen's operations in May 2002, at the time the SPA was signed. The Complaint alleges that Evans was Aspen's CEO, Zappala the CFO, and McQuillin the Executive Vice-President of Worldwide Sales and Marketing, as well as Aspen's Co-Chief Operating Officer. The group pleading doctrine has applied to corporate executives who occupied similar or even less-high ranking positions than those held by the Individual Defendants. See, e.g., In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) (holding that group pleading doctrine applied to an executive vice president-general counsel, and an executive vice president of human resources during the

relevant class period, because "[b]y virtue of their high level positions at the Company throughout the Class Period, the Court is bound to infer at this stage that all three had direct involvement in BISYS' daily affairs.")); In re Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 768 (S.D.N.Y. 2001), abrogated on other grounds by In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003) (holding that group pleading doctrine applied to outside director who was founder of company and held 3% of company's shares, because he "was more akin to a 'corporate insider' with a special relationship to the Company, rather than an outside director").

In sum, the Complaint adequately links the Individual Defendants to the statements in the SPA.

© *SEC Filings*

Plaintiffs have successfully alleged that the false financial results contained in the SEC filings for the thirteen fiscal quarters at issue are attributable to the Individual Defendants. To the extent that Zappala signed the Form 10-Qs and both Zappala and Evans signed the Form 10-Ks, the allegedly false statements in those documents are directly attributable to them. See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d at 487 ("false financial statements recited in a document filed with the SEC are attributable to the corporate officers that are signatories to that document"). Further, the

44

statements in the SEC filings are also attributable to all three Individual Defendants under the group pleading doctrine. It is well settled that SEC filings are precisely the sort of group-published information to which the doctrine typically applies. See Polar Int'l, 108 F. Supp. 2d at 237. As discussed, the defendants occupied sufficiently high positions at Aspen, with active daily roles, so that they may be deemed to have made the statements contained in the SEC filings.

*(d) Press Releases*

Where Zappala and Evans are directly quoted in the press releases, those quotes are attributable to each defendant. Further, the group pleading doctrine links all three Individual Defendants to the false financial results that were reported in the press releases. Like SEC filings, corporate press releases are the sort of group-published, publically disseminated documents that fall squarely within the doctrine's scope. See Polar Int'l, 108 F. Supp. 2d at 237.[12]

_____

[12] McQuillin and Zappala do not take issue with the actual falsity of the statements contained in the press releases. Evans, however, argues that the Complaint fails to allege how each of the statements he is quoted as making in the press releases is false, contending that the quoted statements are nothing more than either "prototypical puffery that is not actionable under the securities laws" or cautiously optimistic statements that are covered by the "bespeaks caution" doctrine and the PSLRA's safe harbor provision for forward-looking statements. (Evans Mem. at 17, 18.). To the extent that the Complaint alleges that the "press releases issued during the [thirteen quarters] were false [because] they reported, discussed, or analyzed figures that subsequently were restated as

*(e) Zappala's Statements to Analysts*

Zappala does not dispute that the statements she allegedly made to Wall Street analysts are attributable to her or that those statements are allegedly false.

In sum, the Complaint's allegations are sufficient to link the false statements in the SPA, in press releases, and in SEC filings to each of the Individual Defendants. The Complaint also sufficiently alleges that Zappala made allegedly false statements to certain Wall Street analysts. The Complaint fails to allege, however, that any statements made in meetings leading up to the execution of the SPA are attributable to any of the Individual Defendants.

## *(ii) Scienter*

As stated above, to adequately plead scienter in a securities fraud case, a plaintiff must allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or show that the defendant had both the motive and opportunity to commit fraud. Under the Supreme

_____

well as any financial statistics derived from restated figures," such statements are adequately pleaded to be false. In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005). Thus, Plaintiffs have adequately pleaded the falsity of statements in the press releases that report, discuss, or analyze Aspen's false financial results with respect to each of the Individual Defendants. The Court need not determine, however, whether each of Evans' quoted remarks are actually false, because, as discussed below, the Complaint fails adequately to plead Evans' scienter.

Court's holding in <u>Tellabs</u>, the inference of scienter must be at least as compelling as any competing, non-culpable inference. Each of the Individual Defendants argues that the Complaint fails adequately to allege scienter under a theory of either (a) motive and opportunity or (b) conscious misbehavior or recklessness.

*(a) Motive & Opportunity*

The Individual Defendants do not dispute that they had the opportunity to commit the allege fraud. The allegations in the Complaint do not, however, support a finding that the defendants had motive.

The Second Circuit has explained that motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1130 (2d Cir. 1994). "General allegations that the defendants acted in their economic self-interest are not enough." <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 170 (2d Cir. 2000). In addition, "[m]otives that are generally possessed by most corporate directors and officers do not suffice." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 139 (2d Cir. 2001). "Insufficient motives . . . can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation. On the other hand, we have held motive sufficiently pleaded where plaintiff alleged that defendants misrepresented corporate performance to

inflate stock prices while they sold their own shares." Id.
(citations omitted).

Plaintiffs assert two motives by the Individual
Defendants for the alleged fraud:  "meet[ing] Wall Street
expectations" in order to retain their lucrative positions and
profit from selling Aspen's stock; and "inflat[ing] [Aspen's]
stock price so that the stock could be used to acquire other
companies such as Hyprotech."  (Pl. Mem. at 27.) To support a
finding of motive, Plaintiffs rely solely on bare allegations of
the Individual Defendants' compensation and their sale of Aspen's
stock during the period the alleged accounting fraud occurred.

To the extent that Plaintiffs attempt to allege that
the defendants were motivated to commit accounting fraud to
remain well-paid Aspen executives and profit through an increase
in the company's stock price, these allegations are plainly
insufficient to support a finding of motive. See Kalnit, 264 F.3d
at 140 ("[A]n allegation that defendants were motivated by a
desire to maintain or increase executive compensation is
insufficient because such a desire can be imputed to all
corporate officers.")

Plaintiffs' allegations regarding the defendants' sale
of shares are also are insufficient to support pleading of
motive.  Plaintiffs have not alleged that the defendants sold
their shares around the time that they made the allegedly false

48

or misleading statements or otherwise sold shares to benefit from the alleged accounting fraud. "Stock ownership establishes motive only if defendants are also alleged to have benefitted from an inflated stock price in a particular manner, for example, by selling a large number of shares shortly after the alleged fraud." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130-31 (2d Cir. 1994). While "unusual" insider stock trading may give rise to an inference of fraudulent intent or scienter, "executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d at 561 (citations omitted). Here, Plaintiffs have not alleged when the defendants sold their shares and have not alleged that the sales related in any way to the alleged accounting fraud described in the Complaint. Further, Plaintiffs "do not provide any information about what portion of their respective total stock holdings each defendant sold." In re BISYS Sec. Litig., 397 F. Supp. 2d at 445. Thus, there is nothing in the Complaint to indicate that the defendants' sale of their shares was unusual. Finally, Plaintiffs' argument that the defendants were motivated to inflate Aspen's stock price in order to finance acquisitions finds no support anywhere in the Complaint and, in any event, is plainly insufficient to show motive. See, e.g., Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004) (holding that seeking to inflate stock price to "complete a

previously arranged corporate acquisition . . . and to retire debt" was insufficient allegation of motive); In re Health Mgmt., Inc. Sec. Litig., 970 F. Supp. at 204.

Thus, Plaintiffs have failed to allege facts sufficient to raise a strong inference that the Individual Defendants had the motive to commit the alleged fraud.

(b) Conscious Misbehavior/Recklessness

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior [or recklessness] by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 139. The Second Circuit has defined conscious misbehavior as "deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (citations omitted). Recklessness has been defined as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. (internal quotation marks and citations omitted). The Second Circuit has explained:

Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically

50

alleged defendants' knowledge of facts or access to
information contradicting their public statements. Under
such circumstances, defendants knew or, more importantly,
should have known that they were misrepresenting material
facts related to the corporation."

Id.

The allegations regarding each Individual Defendant's
scienter will be discussed in turn.

*McQuillin's Scienter*

McQuillin argues that "[t]here is simply nothing in the
Complaint that alleges that McQuillin consciously or recklessly
manipulated or misrepresented Aspen's revenues." (McQuillin's
Mem. at 14.)  McQuillin contends that his position as a high-
ranking executive and the mere fact that Aspen restated its
financial results are, standing alone, insufficient to support a
strong inference of fraud.  McQuillin is correct that allegations
regarding a defendant's managerial status are insufficient to
support a strong inference of scienter. See In re Health Mgmt.
Sys., Inc. Sec. Litig., No. 97 Civ. 1865, 1998 U.S. Dist. LEXIS
8061, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) ("[C]ourts
have routinely rejected the attempt to plead scienter based on
allegations that because of defendants' board membership and/or
their executive managerial positions, they had access to
information concerning the company's adverse financial
outlook.").  McQuillin also is correct that the mere fact that a
company has restated financials is insufficient to support

scienter. <u>See</u> <u>Goplen v. 51job, Inc.</u>, 453 F. Supp. 2d 759, 773 (S.D.N.Y. 2006).

Here, however, the Complaint contains allegations of McQuillin's direct participation in improperly accounted-for transactions during three of the thirteen fiscal quarters at issue.

First, the Complaint alleges that McQuillin orchestrated a side agreement with the Russian oil company, Yukos, in the fourth quarter of fiscal year 2001. Specifically, the Complaint alleges that "McQuillin entered into a side agreement with Yukos creating contingencies to Yukos's payment obligations that were not reflected in the software license agreement." Compl. ¶ 90. The Complaint alleges that, as a result of the side agreement, revenue from the Yukos transaction was improperly booked in the fourth quarter of fiscal year 2001. The financial results for the quarter reflected the improperly booked revenue and were reported in documents whose authorship is attributable to McQuillin under the group pleading doctrine, namely Aspen's SEC Form 10-K and press release for that quarterly and annual period. Thus, the Complaint raises a sufficiently strong inference that McQuillin knew the financial results for

the fourth quarter of fiscal year reflected the improperly booked Yukos transaction and therefore were false when made.[13]

Second, the account of a confidential informant raises a strong inference that McQuillin knew that Aspen's financial statements for the second quarter of fiscal year 2000 were false when made. Specifically, the Complaint alleges that "CI 1", a former Aspen sales manager, attended a December 1999 departmental sales meeting at which McQuillin, referring to revenue from an imminent licensing deal with Union Carbide, stated, "we are going to keep this in the freezer" in order to "smooth out the numbers." Compl. ¶ 43. Further, CI 1 states that, during "several sales meetings," McQuillin asked "how do I orchestrate deals to get the stock price up?" Id. The account offered by CI 1 raises a strong inference that McQuillin knew about (and perhaps directed) the improper accounting of the Union Carbide

---

[13]Plaintiffs also contend that McQuillin's guilty plea and allocution to the criminal securities fraud charges filed against him provide a conclusively strong inference of his scienter. McQuillin's guilty plea and the minutes of that plea are matters outside the pleadings which should not be considered on a Rule 12(b)(6) motion. See Global Network Communs., Inc. v. City of New York, 458 F.3d 150, 156 (2d Cir. 2006). A court may not take judicial notice of proceedings in another case "for the truth of the matters asserted in the other litigation." Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998) (emphasis added). Plaintiffs in essence ask that the Court consider McQuillin's statements at his plea hearing for their truth, which the Court may not do. In any event, as noted, the Complaint's allegations regarding McQuillin's participation in the Yukos transaction sufficiently plead his scienter with respect to the false financial statements that were issued in that fiscal quarter.

licensing deal, a transaction in which Aspen is alleged to have booked "only amounts needed to meet or exceed the Company's" revenue expectations. Id. ¶ 56(f).  As a result of the improperly booked Union Carbide transaction, Aspen issued false financial results in its SEC Form 10-Q for the second quarter of fiscal year 1999 and was subsequently forced to restate those results in its Amended 2004 Form 10-K.  As discussed above, those statements are attributable to McQuillin.

Third, the account of the second confidential informant, CI 2, raises a strong inference that McQuillin at least recklessly disregarded accounting improprieties in the third quarter of fiscal year 2001 and, thus recklessly disregarded the fact that financial results for that period were false when made.  The Complaint alleges that CI 2 alerted McQuillin to the fact that two of Aspen's senior sales executives were about to conclude an improper side agreement with PSC which would result in the improper booking of revenue from what was essentially a consignment sale.  Although McQuillin allegedly told CI 2 that he would "look into it", McQuillin said nothing more about the matter to CI 2 and the revenue from the transaction at issue was improperly booked. Compl. ¶ 43.  As a result of the improperly booked PSC transaction, Aspen issued false financial statements for the third quarter of fiscal year 2001 and subsequently restated those results in its Amended Form

10-K.  Even assuming that McQuillin did not intentionally assist his colleagues in prematurely booking the licencing revenues for the Petroleum Services transaction, CI 2's account sufficiently alleges that McQuillin, as a corporate insider occupying a high position in the sales department, acted recklessly because he "ignored red flags that should have alerted [him] to the fact that the company's reported financials were false when issued." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2004).

McQuillin argues, unconvincingly, that there is a non-culpable explanation for the remarks that CI 1 allegedly heard him make and that, in any event, the accounts of CI 1 and CI 2 are inherently unreliable.

Regarding the remarks allegedly heard by CI 1, McQuillin argues, in his reply brief, that those remarks "are cryptic and not connected to the alleged fraud." (McQuillin Rep. Mem. at 3.)  McQuillin asserts that the alleged remark – "how do I orchestrate deals to get the stock price up?" – is not an unusual remark for an executive in his position.  Regarding the allegation that McQuillin stated his intention to keep the Union Carbide revenues "in the freezer" to "smooth out the numbers," McQuillin argues that he is not alleged to have been involved in the Union Carbide transaction.  Further, McQuillin points out that his statement about keeping revenues "in the freezer"

(which, presumably, refers to the improper post-dating of revenue) could not apply to the Union Carbide transaction, because Aspen is alleged to have over stated, rather than understated, revenue for the quarter in which the Union Carbide deal took place.

While the revenue for the Union Carbide deal ultimately was recognized prematurely, leading to an overstatement of Aspen's earnings for the second quarter of fiscal 1999, McQuillin's comment about keeping revenue "in the freezer" to "smooth out the numbers" and his question about how to orchestrate deals to "get the stock price up" raises a strong inference that McQuillin was aware of and involved in accounting improprieties during that fiscal period for the purpose of meeting Wall Street's expectations and inflating the value of Aspen's stock. That Aspen ultimately overstated rather than understated its revenue on the Union Carbide deal does not undermine the inference most readily suggested by CI 1's account: namely, that in the second quarter of fiscal 2000, McQuillin knowingly involved himself in improper revenue recognition in a software licensing transaction in order to meet earnings expectations and increase his company's stock price. This inference is cogent and at least as compelling as any non-culpable inference that McQuillin asserts.

Regarding the general reliability of the confidential informants, McQuillin adopts the argument, asserted by Evans, that the informants are "from a wholly separate case," that Plaintiffs thus have no idea who those informants are, and that Plaintiffs have failed to allege that either CI 1 or CI 2 was involved in Aspen's accounting decisions, even though "the informants purport to relate inside information about Aspen's accounting practices. . . ." (Evans Mem. at 19-20). McQuillin also notes that "plaintiffs do not cite any legal authority for their argument that they may rely on confidential sources from another separate and distinct legal proceeding." (McQuillin Rep. Mem. at 2.)

A plaintiff is not required to reveal the identity of confidential sources at the pleading stage. See Novak, 216 F.3d at 313. Rather, to satisfy pleading requirements, the confidential sources need only be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Id. at 314. Here, the Complaint identifies CI 1 as a former Aspen sales manager who attended sales meetings at which McQuillin was present, and, in particular, a December 1999 sales meeting during which McQuillin made the statements at issue. The Complaint identifies CI 2 as a former director of business development for Aspen's polymer business who negotiated

a software licensing deal between Aspen, an intermediate company, and a prospective end-purchaser in late 2000 and early 2001. CI 1 is identified with sufficient particularity to "support the probability" that he heard McQuillin at sales meetings discuss keeping revenue "in the freezer". CI 2 also is identified with sufficient particularity to "support the probability" that he alerted McQuillin to the existence of Aspen's side agreement with an intermediate company, that McQuillin promised to "look into it" but did not do so, and that CI 2 subsequently became aware that Aspen booked revenue from the deal before it actually received payment. It is of no moment that the accounts of CI 1 and CI 2 are block-quoted from the Class Action Complaint. The Court must accept Plaintiffs' allegations in the Complaint as true, regardless of whether the allegations are taken from a complaint in another case. It is not the burden of the plaintiffs to show that it is permissible for them to quote accounts of confidential sources from a separate proceeding; rather, it is McQuillin's burden to show that Plaintiffs may <u>not</u> do so. McQuillin cites no authority for the proposition that a plaintiff may not rely in his pleadings on the accounts of confidential informants that are set forth in complaints from separate actions. Although the confidential informants are not personally known to Plaintiffs or Plaintiffs' counsel, the fact that the informants' accounts are derived from an earlier

pleading in a different case simply does not render the instant pleading inadequate. The informants are identified with sufficient particularity to support the probability that they possessed information relating to at least McQuillin's awareness of the alleged accounting fraud.

In addition, contrary to McQuillin's argument, the confidential sources need not have been integrally involved in Aspen's accounting operations or in the preparation of the actual false financial results. For purposes of this motion, the accounts provided by CI 1 and CI 2 are relevant only to the extent that they contain factual allegations that give rise to a strong inference that McQuillin (and, to a much lesser extent, Evans, as discussed below) knowingly participated in accounting improprieties. Plaintiffs rely on the informants' accounts solely for the purpose of alleging scienter.

The complaint does <u>not</u> sufficiently allege, however, that McQuillin had any knowledge of, or recklessly disregarded, the accounting improprieties that are alleged to have occurred in transactions in fiscal quarters other than the three that are discussed above. There are simply no allegations that McQuillin participated in or was aware of any fraudulent agreements other than those three.

As noted, McQuillin's status as Executive Vice President of Worldwide Sales and Marketing and/or Co-Chief

Operating Officer is not, standing alone, enough to allege his scienter relating to the falsity of the financial statements issued in the other quarters. <u>See</u> <u>In re Health Mgmt., Inc., Sec. Litig.</u>, 970 F. Supp. 192, 204 (E.D.N.Y. 1997). Plaintiffs cite <u>In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.</u>, 324 F. Supp. 2d at 488, for the proposition that knowledge of false financial statements may be imputed to "key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." <u>Atlas</u>, however, is distinguishable. There, the court found that the individual defendants, who were high-ranking corporate officers and signatories to the SEC filings that contained the false statements at issue, "were not entitled to make statements concerning the company's financial statements and <u>ignore[d] reasonably available data that would have indicated that those statements were materially false or misleading</u>." <u>Id.</u> (emphasis added). The statements concerned the value of Atlas' fleet of airplanes, which were subsequently found to have been massively overstated, requiring Atlas to restate its financial results by $281.4 million due to its failure to recognize the impairment value of its fleet of planes. As a result of the restatement, Atlas was "transformed from a company with retained earnings of approximately $ 185 million to a company with an accumulated

deficit of approximately $ 178 million." Id. at 489.  In light of the size of the overvaluation of Atlas' inventory and the subsequent massive restatement, amounting to approximately a 200% swing in retained earnings, the Atlas court found that the high-ranking individual defendants knew or should have known about the falsity of the financial statements that they signed.

Aspen's restatements were not nearly as dramatic.  For the time period at issue (fiscal years 2000 to 2002), Plaintiffs allege that the greatest restatement of operating income occurred in fiscal year 2001, in which Aspen understated its financials by 33.3%. See Compl. ¶ 39.  The greatest overstatement of operating income, of 5.8%, occurred in fiscal year 2002.[14]  These relatively subtle restatements do not support a strong inference that McQuillin, by virtue of his corporate rank, knew or should have known about fraudulent transactions and false statements in the other ten quarters.  Further, Plaintiffs have failed to identify any meetings, documents, reports, or other "red flags" to show that McQuillin knew or should have known that revenue was

---

[14]The overstatements of operating income in fiscal years 2003 and 2004, of 16.7% and 186.0%, respectively, are irrelevant.  The Complaint does not address allegedly fraudulent transactions or false statements made in those years.  In addition, Plaintiffs' claims stem from the allegation that they were fraudulently induced to enter into the SPA, in May 2002, by the defendants' false representations.  Thus, the restatements for fiscal years 2003 and 2004 bear no relation to Plaintiffs' claims and are immaterial to the question of whether McQuillin, or his co-defendants, knew or should have known that statements for those years were false when issued.

improperly recognized in the other ten quarters and that the financial results for those quarters were thus false when issued. See Goplen v. 51job, Inc., 453 F. Supp. 2d at 768.

In sum, the Complaint alleges facts sufficient to raise a strong inference that McQuillin knew, or recklessly disregarded the fact, that Aspen's financial statements were false when made, in the following three fiscal quarters:  the second quarter of fiscal year 2000 (relating to the Union Carbide transaction); the third quarter of fiscal year 2001 (relating to the Petroleum Services transaction); and the fourth quarter of fiscal year 2001 (relating to the Yukos transaction).  The Complaint thus sufficiently alleges McQuillin's scienter with respect to financial statements made in the SPA, SEC filings, and in press releases that reflect or incorporate financial data from these three quarterly periods.

The Complaint has not sufficiently alleged McQuillin's scienter, however, with respect to financial statements that do not reflect or incorporate data from the three above-mentioned quarterly periods.

*Zappala's Scienter*

Plaintiffs fail to allege that Zappala, individually, was involved in any of the transactions for which Aspen improperly booked revenues.  Further, Plaintiffs fail to allege that Zappala was actually in possession of any documents, data,

or other information to suggest that her statements regarding Aspen's financial results for any of the thirteen quarters at issue were false. As Zappala correctly states, "Not a single report, memorandum, meeting minute, or like item is specifically identified in the Complaint to show that Ms. Zappala allegedly knew that her statements were false when made." (Zappala Mem. at 11.)

As noted above, Zappala's status as Aspen's CFO during the time when the false statements were issued cannot support any inference of scienter. Similarly, the mere fact that the financial statements that Zappala signed were subsequently restated does not support a finding of scienter. Plaintiffs argue, citing to paragraphs 21, 159, and 160 of the Complaint, that they have alleged that Zappala recklessly "failed to check information, including, inter alia, the financial statements and internal accounting practices that she had a duty to monitor." (Pl. Mem. at 24.) But paragraph 21 merely identifies Zappala as Aspen's CFO; paragraph 159 alleges only that the "Individual Defendants," including Zappala, were high ranking officials within Aspen who had the power to control corporate decision-making and "unlimited access" to documents containing the allegedly false statements; and paragraph 160 alleges that "the Individual Defendants had direct and supervisory involvement" in Aspen's daily operations and thus had the power to control the

fraudulent transactions at issue.  These conclusory allegations,

asserted in the context of Plaintiffs' "controlling persons"

claim under Section 20(a) of the Exchange Act, and not the

Section 10(b) claim, do not sufficiently allege facts from which

the Court may infer that Zappala recklessly failed to ensure that

Aspen's financial statements were accurate and in compliance with

GAAP.  There is simply no allegation that Zappala was confronted

with any of the "red flags" that are required to support a strong

inference of reckless disregard.  Compare Cosmas v. Hassett, 886

F.2d at 12 (pleading standard for recklessness met where the

plaintiffs alleged that defendants made or authorized statements

that sales to China would be "an important new source of revenue"

when they knew or should have known that Chinese import

restrictions in place at the time would severely limit such

sales).  As stated above, the magnitude and nature of Aspen's

restatements was not so extraordinary as to support a finding

that Zappala was confronted with and recklessly ignored the "red

flag" of wrongdoing.  This contrasts with the alleged "red flag"

with which McQuillin was confronted, when CI 2 alerted him to the

existence of a side agreement in the PSC transaction in the third

quarter of fiscal 2001.

Plaintiffs appear to suggest that Zappala's

recklessness may be inferred from the account of the December

1999 sales meeting provided by CI 1.  Plaintiffs cite paragraph

43 of the Complaint as "alleging that Zappala was aware of wrongful transactions and 'intentionally delayed the recognition of revenue on transactions [including Union Carbide] so Aspen could report sales as needed to stabilize Aspen's quarterly earnings and meet Wall Street estimates.'" (Pl. Mem. at 26, quoting Compl. ¶ 43, alteration in Pl. Mem.). But the account of CI 1, which is wholly contained in paragraph 43, never mentions Zappala. Zappala is in no way linked to the Union Carbide transaction, to the December 1999 sales meeting at which McQuillin alleged made his remark about keeping revenues "in the freezer," or any other transaction or meeting that suggests that she knew about the accounting improprieties.

Plaintiffs are left to rely solely on allegations that (I) Zappala made statements regarding Aspen's accounting controls and financial results to analysts in SEC filings, press releases, and the SPA; (ii) Zappala was Aspen's CFO when she made these statements; and (iii) the statements were false when made and Aspen's financials had to be restated. These allegations, without more, do not support a strong inference of scienter that is at least as compelling as competing non-culpable inferences. The Complaint, in fact, suggests an immediately apparent non-culpable explanation for Zappala's alleged failure to monitor the financial statements and discover the accounting fraud: As the CFO of a multi-national corporation with 2200 employees, hundreds

of millions of dollars in annual revenues, and sales offices in over 30 cities worldwide, Zappala plausibly could have been unaware that certain sales executives were making illicit side deals, or improperly booking sales either prematurely or belatedly.

In sum, Plaintiffs have alleged no facts from which a sufficiently strong inference of her scienter may be inferred.

*Evans' Scienter*

Evans protests that the Complaint fails "to plead particularized facts explaining the role that Mr. Evans played in the alleged fraud." (Evans Mem. at 10.)  With respect to the seven quarterly periods for which the Complaint alleges fraud relating to specific transactions, Evans argues that the Complaint does not allege that he was involved in the accounting for those transactions and does not allege any "facts concerning the extent to which Mr. Evans was involved, if at all, in other aspects of these transactions, such as the negotiation or drafting of the agreements " (Id. at 12.)   Similarly, with respect to the six quarters for which the Complaint simply alleges that Aspen made false statements about its revenues for those periods, Evans asserts that the Complaint merely "repeat[s], over and over again, the same laundry list of conclusory accounting fraud allegations, without specifying any examples of such wrongdoing during those quarters." (Id.)

66

Evans is correct that the Complaint is silent as to what role, if any, he actually played in the allegedly illicit transactions that gave rise to the issuance of false financial results and is silent as to whether Evans participated in the improper accounting for any of the quarterly periods discussed in the Complaint. Nevertheless, the Complaint's failure to link Evans directly to any side agreements or other fraudulent transactions, and the Complaint's equal failure to identify Evans' role in the improper accounting during the periods at issue do not counsel a finding that Plaintiffs have failed to adequately plead a claim for securities fraud under Section 10(b) and Rule 10b-5. "To state a cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996). Thus, Plaintiffs need only plead that Evans made the statements at issue or that the statements are attributable to him; that those statements were false; and that Evans knew or should have known the statements were false when they were made. Plaintiffs are not required to allege that Evans participated in the underlying scheme that generated the false statements. Accordingly, the fact that the Complaint does not link Evans to the illicit

transactions or to the improper accounting does not require dismissal of the claim against him.

Plaintiffs' failure to implicate Evans in the underlying fraud, however, seriously hampers their attempts to plead his scienter. As noted, Plaintiffs have not alleged that Evans played any role in any of the improperly booked transactions that are described in the Complaint. There is no mention in the Complaint that Evans took part in negotiating any of the illicit side deals or that Evans participated in the actual accounting of the revenue that was derived from those transactions. Like Zappala, Evans cannot be deemed to have knowledge of the accounting fraud simply by virtue of his high level position in the company: the mere fact that Evans was Aspen's founder, Chairman, and CEO simply is not enough to allege that he had scienter. Similarly, the fact that Aspen's financial results were restated, while sufficient to show the falsity of the statements, is not sufficient to support a strong inference of Evans' scienter. As stated above, the magnitude and nature of the restatements in this case were not so great as to suggest that Aspen's high-ranking executives were confronted with "red flags." In addition, as with Zappala, the Complaint does not allege that Evans possessed any facts that were contrary to the false financial statements that were issued by Aspen.

The Complaint does contain a single allegation, stated in the account of one of the two confidential informants, that supports an inference, albeit a weak one, that Evans was aware of the accounting fraud. Specifically, according to the account provided in the Class Action Complaint (and quoted in the present Complaint) by CI 2, Aspen's former director of business development for the company's polymer business, "both defendants Evans and McQuillin euphemistically referred to this practice [of improperly accounting for Aspen's earnings] as keeping revenues 'in the freezer.'" Compl. ¶ 43. The Complaint does not allege, however, when or where CI 2 heard Evans make this alleged statement.[15]

The dispositive question is: Does the allegation that CI 2 heard Evans refer to keeping revenues "in the freezer" support an inference of Evans' scienter that is at least as strong as any competing, non-culpable inferences? Evans does not

_____

[15]It should also be noted that, contrary to Plaintiffs' assertion in their opposition brief, the Complaint does not allege that Evans "referred to Aspen's method [of improper accounting]"of 'cooking the books.'" (Pl. Mem. at 23.) Although Plaintiffs cite to several paragraphs in the Complaint which purportedly allege that Evans referred to "cooking the books" and/or keeping revenues "in the freezer," only paragraph 43 refers to the alleged fact that CI 2 heard Evans refer to keeping revenues "in the freezer." None of the paragraphs allege that Evans ever used the phrase "cooking the books." Apart from paragraph 43, the other paragraphs cited by Plaintiffs simply reiterate the phrase "keep[ing] revenues 'in the freezer'" as a general characterization of the alleged improper accounting that transpired in several of the quarterly periods.

suggest any non-culpable explanation for the alleged statement. Rather, Evans – along with McQuillin – argues that Plaintiffs have failed to establish the reliability of the confidential informants whose accounts are reported in the Complaint. Evans contends that the Complaint fails to allege that the informants had any connection to Aspen's accounting department or that the informants would have known the details of Aspen's accounting. As discussed earlier, however, for purposes of alleging scienter, Plaintiffs do not need to show that the confidential informants were knowledgeable about Aspen's accounting; rather, Plaintiffs are required only to allege adequately that the informants were in a position to hear remarks or observe conduct on the part of the Individual Defendants that support a strong inference that the defendants knew about or recklessly disregarded the accounting fraud.

As stated, to satisfy pleading requirements, confidential sources need only be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak, 216 F.3d at 314. Here, the Complaint fails to allege facts that support a probability that CI 2 would have been in a position to hear Evans, the company's CEO, make remarks about keeping revenue "in the freezer." Although the Complaint alleges that CI 2 was a former director of

business development for Aspen's polymer operations, there are no allegations of fact regarding any interactions between Evans and CI 2 that make it probable that CI 2 would have heard Evans' remark.  CI 2 alleges only in the most general fashion that Evans spoke of keeping revenues in the freezer in connection with Aspen's practice of "improperly manag[ing] reported earnings." Compl. ¶ 43.  There are no allegations that CI 2 attended one or more meetings at which Evans was present, that CI 2 reported to Evans on any occasion or held a position that entailed regular or even sporadic contact with Evans or Evans' immediate subordinates, or that CI 2 was involved with Evans in any particular transactions or ever discussed any transactions with Evans.

Although a plaintiff, in pleading scienter, is not required to "plead dates, times and places with absolute precision . . . ", <u>Int'l Motor Sports Group, Inc. v. Gordon</u>, No. 98 Civ. 5611, 1999 U.S. Dist. LEXIS 12610,, 1999 WL 619633, at *3 (S.D.N.Y. Aug. 16, 1999), "speculation and conclusory allegations will not suffice." <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 169 (2d Cir. 2000).  "Allegations of scienter and falsity will be sufficient where the sources of the information and the information itself are described in detail."  <u>In re Flag Telecom Holdings, LTD.</u>, 308 F. Supp. 2d 249, 259-60 (S.D.N.Y. 2004) (quoting <u>In re WorldCom, Inc. Sec. Litig.</u>, 294 F. Supp. 2d 392,

2003 U.S. Dist. LEXIS 8245, at *64 (S.D.N.Y. 2003)). Here, not only does the Complaint fail to identify CI 2 (the source of information) with sufficient particularity to support the inference that he probably heard what he claims to have heard, but the statement ascribed to Evans (the information itself) is also too vaguely described. Apart from the highly general mention of "sales meetings," there is no hint about the context in which Evans made the alleged remarks. There is no indication when or where these "sales meetings" took place or even whether they took place during a time when the alleged accounting fraud occurred. Further, CI 2's single allegation bundles Evans together with McQuillin: "CI 2 stated that <u>both defendants</u> Evans and McQuillin euphemistically referred to" Aspen's accounting improprieties as "keeping revenues 'in the freezer.'" Compl. ¶ 43 (emphasis added). The "clumping" together of Evans with McQuillin further weakens the inference of Evans' scienter. <u>See Primavera Familienstiftung v. Askin</u>, 173 F.R.D. 115, 125 (S.D.N.Y. 1997) ("A fraud claim may not rely upon vague allegations of conduct that clump individuals together.").

To allow a suit for securities fraud to go forward against Evans on the sole basis of CI 2's single, wholly general allegation that Evans, in the amorphous context of unidentified sales meetings, spoke about keeping revenues "in the freezer" would not give Evans adequate notice of Plaintiff's claims

against him.  <u>See</u> <u>Novak</u>, 216 F.3d at 314 ("The primary purpose of

Rule 9(b) is to afford defendant fair notice of the plaintiff's

claim and the factual ground upon which it is based.") (quoting

<u>Ross v. Bolton</u>, 904 F.2d 819, 823 (2d Cir. 1990)).  The Complaint

thus fails to allege facts that support a sufficiently strong

inference that Evans knew or should have known that the

statements at issue were false when they were made.

*(IV)  Count II: Control Person Liability Under Section 20(a)*

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any
> person liable under any provision of this chapter or of
> any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such
> controlled person is liable, unless the controlling
> person acted in good faith and did not directly or
> indirectly induce the act or acts constituting the
> violation or cause of action.

15 U.S.C. § 78t(a).[16]  Control is defined in 17 C.F.R. § 240.12b-2

as "the power to direct or cause the direction of the management

and policies of a person, whether through the ownership of voting

securities, by contract, or otherwise."

To establish "controlling persons" liability under

Section 20(a), a plaintiff must allege: "(1) a primary violation

[of the Exchange Act] by a controlled person; (2) control of the

primary violator by the defendant; and (3) that the controlling

---

[16]The term "person" means "a natural person, company,
government, or political subdivision, agency, or instrumentality
of a government." 15 U.S.C. § 78c(a)(9).

person was in some meaningful sense a culpable participant in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998).

"Allegations of control are not averments of fraud and therefore need not be pleaded with particularity. Thus, at the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard and a short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required." In re Group Sec. Litig., No. 06 Civ. 5853 (SAS), 2007 U.S. Dist. LEXIS 81565, at *31-32 (S.D.N.Y. Nov. 1, 2007) (internal quotation marks, citations, and alterations omitted).

Because Plaintiffs have failed to establish a primary violation of Section 10(b) and Rule 10b-5 against Zappala and Evans, due to inadequate pleading of scienter, Plaintiffs' Section 20(a) claim against them must be dismissed as well. See Goplen v. 51job, Inc., 453 F. Supp. 2d at 775.

Because Plaintiffs have adequately pleaded their Section 10(b) claim against McQuillin, the "primary violation" element of section 20(a) is satisfied. See In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003) ("If the plaintiff has adequately pleaded a Section 10(b) claim, the first

or primary violation element of a Section 20(a) claim is sufficiently pled."). In addition, Plaintiffs have successfully pleaded that McQuillin is a controlling person who meaningfully participated in the fraud under Section 20(a). The Complaint alleges that by virtue of his "high-level position[]", his "ownership and contractual rights", "participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements" issued by Aspen, McQuillin (and his co-defendants) "had the power to influence and control and did influence . . . the decision-making of the Company, including the content and dissemination of" the allegedly false statements. Compl. ¶ 159. The Complaint also alleges that the "individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the" alleged securities fraud. Id. ¶ 160. Almost identical allegations have been held to be sufficient to satisfy Rule 8's liberal pleading standard and adequately allege control. See Catton v. Defense Tech. Sys., Inc., 457 F. Supp. 2d 374, 385 (S.D.N.Y. 2006) (allegations of control were sufficient to give defendants fair notice of the claim that they acted as control persons where the plaintiffs alleged, inter alia, that "[b]y virtue of their high level and controlling positions within the Company, participation in and/or

awareness of the Company's actual performance, these defendants had the requisite power to directly or indirectly control or influence specific corporate policy").

Thus, the Complaint adequately pleads a "controlling person" claim against McQuillin.

*(V) Count V:  Conspiracy/Aiding & Abetting Common Law Fraud*

To allege conspiracy to commit fraud, a plaintiff must allege an unlawful agreement to commit fraud, defendant's intentional participation in furtherance of the plan or purpose, and resulting damages. <u>Kashi v. Gratsos</u>, 790 F.2d 1050, 1055 (2d Cir. 1986).  However, a plaintiff may not "reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim." <u>Aetna Casualty & Surety Co. v. Aniero Concrete Co., Inc.</u>, 404 F.3d 566, 591 (2d Cir. 2005).  "[W]here the acts underlying a claim of conspiracy are the same as those underlying other claims alleged in the complaint, the conspiracy claim is dismissed as duplicative." <u>Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.</u>, No. 99 Civ. 9623 (RWS), 2007 U.S. Dist. LEXIS 27001, at *77 (S.D.N.Y. April 2, 2007).

Plaintiffs have not adequately alleged that either Zappala or Evans intentionally participated to further the alleged fraudulent scheme, and thus Count V must be dismissed with respect to them.  With respect to McQuillin, the Complaint does not sufficiently allege that McQuillin participated with

76

others to commit the accounting fraud. Rather, as discussed, the Complaint alleges facts to show that McQuillin was aware of the accounting improprieties in three transactions and was actively involved in negotiating an illicit side deal in one of those transactions (the Yukos transaction). There are no allegations, however, that McQuillin conspired with others to commit the fraud. Further, the conclusory claim for conspiracy simply states that "Defendants, in combination with others at Aspen, substantially assisted in carrying out a plan . . . to falsify Aspen's financial outlook to artificially inflate Aspen's share price" by making "false statements of material fact" and engaging "in acts and practices which operated as a fraud upon the Plaintiffs in this action . . . to maintain artificially high market prices for Aspen common stock . . . ." Compl. ¶ 174. Plaintiffs do not allege that McQuillin committed any overt acts in support of the conspiracy that are distinct from the acts he committed to perpetrate the alleged underlying fraud. Thus, because Plaintiffs' conspiracy claim against McQuillin is "factually duplicative of the other allegations in the complaint," <u>JHW Greentree Capital, L.P.</u>, No. 05 Civ. 2985, 2005 U.S. Dist. LEXIS 27156, at *33 (S.D.N.Y. Nov. 10, 2005), the conspiracy claim must be dismissed against McQuillin.

In addition, Count V cannot stand against McQuillin under a theory of aiding and abetting. "The purpose of an aiding

and abetting claim is to draw in defendants who would not be liable on the main fraud claim, but who are alleged to have actual knowledge of the fraud and substantially assisted it." Sachs v. Adeli, 2006 N.Y. Misc. LEXIS 2615, at *27 (N.Y. Misc. 2006). Here, as discussed above, McQuillin is sufficiently alleged to be liable for Plaintiffs' main fraud claims. Thus, because McQuillin is alleged to be liable as a principal, rather than an aider and abetter, the claim for aiding and abetting must be dismissed.

In sum, the claim for conspiracy and/or aiding and abetting must be dismissed against all three Individual Defendants.

*(VI) The Cross Claims*

In its Counterclaim, Aspen seeks damages from Plaintiffs Sim and Clave on the ground that the expense incurred by the company for restating its financials could have been avoided but for Sim's and Clave's fraudulent conduct and willful breach of fiduciary duty in failing to alert the company about and turn over information relating to the illicit Yukos deal. Plaintiffs' Cross Claims seek contribution on the counterclaim from the Individual Defendants, on the theory that the defendants' own fraudulent conduct caused Aspen to incur the expense of restatement. The Cross Claims incorporate and rely on

the allegations of the Complaint in pleading fraud and breach of fiduciary duty.

The Individuals Defendants have moved, pursuant to Rule 12(b)(6), to dismiss Plaintiffs' Cross Claims on the grounds that (A) under applicable Delaware law, Plaintiffs are alleged to be intentional tortfeasors who may not assert claims for contribution and (B) the Cross Claims are based on the allegations of fraud in the Complaint and fail for the same reason that the Complaint failed to plead fraud with particularity against each of the Individual Defendants.

*(A) Delaware Law*

The parties do not dispute that, under the internal affairs doctrine, which provides that issues relating to the internal affairs of a corporation are governed by the law of the company's state of incorporation, Delaware law governs the claims for breach of fiduciary duty and fraud that are asserted against the Individual Defendants in the cross claims.

The defendants concede that there is no Delaware case that expressly holds that a cross claimant is barred from seeking contribution on an underlying claim of breach of fiduciary duty. Defendants argue, however, that under Delaware law, contribution claims are not available for any willful or intentional tort, including a willful or intentional breach of fiduciary duty. Defendants rely primarily on <u>Eastbridge v. Thomas</u>, 1987 Del.

Super. LEXIS 1108 (Del. Super. Ct. 1987), which is the most recent Delaware state case to address the issue of an alleged intentional tortfeasor's right to assert a claim for contribution against an alleged joint tortfeasor. In Eastbridge, the plaintiff was a bar patron who was hit on the head with a beer bottle by a fellow customer after the two had been drinking for some time. Plaintiff sued the bar and the customer who assaulted him. The defendant customer cross claimed for contribution against the bar on the ground that the bar proximately caused the assault by its breach of its duty to control its customers. The customer's cross claim was dismissed. The court stated that "where the act complained of is an intentional tort[,] no contribution or indemnification will lie." Id. at *2. Similarly, the defendants cite a case from the district of Delaware, Alten v. Ellin & Tucker, Chartered, 854 F. Supp. 283, 289 n.5 (D. Del. 1994) for its application of Eastridge in holding that a party cannot seek indemnity for "actions [that] go beyond negligence."

Here, the defendants argue that Plaintiffs' Cross Claims must be dismissed because the underlying conduct of the Plaintiffs as alleged in Aspen's Counterclaim comprises fraud and intentional breach of fiduciary duty, in other words intentional torts. Thus, the Individual Defendants argue, the plaintiffs, as alleged intentional tortfeasors, are barred from seeking contribution.

Plaintiffs counter that they are entitled to seek recovery from the Individual Defendants under Delaware's Uniform Contribution Among Tortfeasors Law (the "UCATL"), 10 Del. C. 6306(b)(1), which permits a party to "cross-claim against a coparty any claim that the coparty is or may be liable to the cross-claimant for all or part of a claim." Plaintiffs contend that the Individual Defendants are liable to Aspen for the expense of restatement because they committed the accounting fraud that led to the restatement and are thus "necessary parties" to Aspen's counterclaims. (Pl. Mem. Opp. Mot. to Dismiss Cross Claims, at 4.) Second, Plaintiffs contend that Delaware law permits the right of contribution among joint tortfeasors that are jointly and severally liable under the UCATL, section 6302(a). Plaintiffs cite <u>McLean v. Alexander</u>, 449 F. Supp. 1251, 1267 (D. Del. 1978), for the proposition that an intentional tortfeasor <u>may</u> seek contribution under Delaware's Tortfeasor Law. Further, Plaintiffs cite several Delaware state cases for the proposition that "Delaware law also permits contribution on Plaintiff's Cross-Claims for breach of fiduciary duty," and note that the defendants cite no contrary authority.

Plaintiffs' arguments are unavailing. First, UCATL section 6306(b)(1) does not help Plaintiffs. The statute provides only that a party may assert a cross claim against a "coparty." Here, Plaintiffs are not coparties with the

Individual Defendants.  Aspen has asserted claims against only the plaintiffs, not against the Individual Defendants. Section 6306(b)(1) therefore is inapposite.

Second, section 6302(a) of the UCATL is also of no use to Plaintiffs.  While section 6302(a) provides for contribution among "joint tortfeasors,"[17] it does not specifically address whether intentional tortfeasors are included.  Although the District of Delaware, in McLean, held that under section 6302(a), a non-settling defendant who was found liable for securities fraud was entitled to seek contribution from settling joint tortfeasors, the defendants correctly note that the Delaware state court's decision in Eastridge is both more recent than McLean, and as a state court decision, provides more appropriate guidance in deciding this unsettled question of state law. See Disimone v. Phillips, 461 F. 3d 181, 188-89 (2d Cir. 2006) ("We have long recognized the state court's superior ability to determine unsettled questions of state law.") (internal quotation marks and citations omitted).  Further, the holding in Eastridge was cited favorably in Alten, 854 F. Supp. at 283, a District of Delaware decision that was issued in 1994, sixteen years after McLean.  The Alten court noted that the "Delaware Supreme Court

---

[17]Delaware law defines "joint tortfeasors" as "2 or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." 10 Del. C. § 6301.

has not specifically addressed" whether an alleged intentional tortfeasor was barred from seeking indemnity, looked to the holding in <u>Eastridge</u> to predict how Delaware's highest court would rule if confronted with the issue, and concluded that "this Court predicts that the Delaware Supreme Court would bar a party whose actions go beyond negligence from an indemnity action implied-in-contract." <u>Id.</u> at 289 n.5.

As the defendants correctly observe, it is a tenet of common tort law that "courts will not aid one who has deliberately done harm." Restat. (2d) Torts § 886A(3), cmt. j. The claims for which Plaintiffs seek contribution stem entirely from allegations of Plaintiffs' intentionally wrongful conduct. Sim and Clave are alleged to have intentionally withheld information about the Yukos transaction from their employer and used the undisclosed information for their benefit by attempting to extort Aspen's Board of Directors into furnishing cash for its disclosure. Whether styled as fraud or breach of fiduciary duty, this is intentional and willful conduct. Construing Delaware's contribution law in light of the state court's holding in <u>Eastridge</u> and the well-settled common law prohibition against permitting a tortfeasor to seek contribution on alleged intentionally tortious conduct, I find that Plaintiffs are barred from seeking contribution from the Individual defendants on Aspen's Counterclaim.

*(B) Cross Claims are Inadequately Pleaded Against Zappala and Evans*

Even if Delaware law did not bar Plaintiffs' Cross Claims, the Cross Claims fail adequately to state claims against Zappala and Evans. The Cross Claims refer to and incorporate by reference the Complaint. As discussed at length, the Complaint fails adequately to plead fraud against Evans and Zappala. The Cross Claims also fail adequately to plead breach of fiduciary duty against Zappala and Evans. Apart from referencing the Complaint, which itself does not allege any breach of fiduciary duty against any of the defendants, the Cross Claims merely allege that the Individual Defendants owed a fiduciary duty to Aspen and that, if the defendants had not breached that duty, Aspen would not have incurred the expense of restatement. This is plainly insufficient to allege a breach of fiduciary duty.

*(VII) Leave to Replead*

Plaintiffs request that, in the event that the Court dismisses their claims for failure to state fraud claims with sufficient particularity under Rule 9(b), they be granted leave to amend the Complaint. Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to replead should be "freely given when justice so requires." Fed. R. Civ. P. 15(a). Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend. Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986). Although leave to replead may be denied if repleading would be

futile, see Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir. 1995), there is no indication that repleading would prove futile in this case. Plaintiffs have not had a prior opportunity to amend the Complaint, and facts may be available to Plaintiffs from developing related cases, including the criminal prosecution of McQuillin and the pending SEC case against all three Individual Defendants, that could assist Plaintiffs in crafting an amended complaint that cures the pleading deficiencies identified herein. See In re Refco Capital Mkts., No. 06 Civ. 643, 2007 U.S. Dist. LEXIS 68082, at *41 (S.D.N.Y. Sept. 13, 2007) (granting leave to replead in part because "developments in related cases may allow all parties to benefit from repleading"). Accordingly, Plaintiffs are granted leave to replead some of their claims.

Plaintiffs' federal securities claims against Zappala and Evans, however, are time-barred and must be dismissed with prejudice. In addition, because Plaintiffs seek contribution as alleged intentional tortfeasors, they are barred as a matter of law from asserting claims for contribution. Thus, any amendment to the Cross Claims would be futile and, accordingly, the Cross Claims must be dismissed with prejudice.


**CONCLUSION**


85

_____Evans' and Zappala's motions to dismiss the Complaint are GRANTED. The federal securities fraud claims (Counts I and II) are time-barred and dismissed with prejudice. The remaining claims against Evans and Zappala are dismissed without prejudice.

McQuillin's motion to dismiss is DENIED IN PART and GRANTED IN PART. Plaintiffs have successfully alleged claims for securities fraud against McQuillin for the issuance of false statements relating to the following three of the thirteen fiscal periods that are described in the Complaint: the second quarter of fiscal year 2000 (relating to the Union Carbide transaction); the third quarter of fiscal year 2001 (relating to the PSC transaction); and the fourth quarter fiscal year 2001 (relating to the Yukos transaction). The Complaint, however, fails adequately to plead fraud against McQuillin with respect to financial statements that do not incorporate or reflect data from the three above-mentioned quarterly periods.

The Individual Defendants' motions to dismiss Plaintiffs' Cross Claims are GRANTED. The Cross Claims are dismissed with prejudice.

Plaintiffs are granted leave to replead with respect to claims and allegations that have been dismissed without prejudice.

Plaintiffs are directed to advise the Court by April 11, 2008, as to whether they intend to file an amended complaint. If so, the parties are directed to meet and confer regarding a schedule for the filing of an amended complaint and subsequent motions to dismiss, and submit a stipulated schedule, or competing proposed schedules, to the Court by April 25, 2008.

**SO ORDERED**

DATED:     New York, New York
           March / 8 , 2008

                           John F. Keenan
                           ─────────────────────
                           JOHN F. KEENAN
                    United States District Judge