UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
380544 CANADA, INC., WAYNE SIM, and      :
SALVADOR CLAVÉ,                          :
                Plaintiffs,         :
                                    :
        v.                       :     **OPINION & ORDER**
                                 :     07 Civ. 1204 (JFK)
ASPEN TECHNOLOGY, INC., DAVID L.         :
McQUILLIN, LAWRENCE B. EVANS, and        :
LISA ZAPPALA,                            :
                Defendants.         :
----------------------------------------X

APPEARANCES:

        For the Plaintiffs:
            BERNSTEIN LEIBHARD, LLP
            10 East 40th Street
            New York, New York 10016
                Of Counsel: Eric Chaffin, Esq.
                            Roopal P. Luhana, Esq.

        For Defendant Lawrence Evans:
            FOLEY HOAG, LLP
            World Trade Center West
            155 Seaport Boulevard
            Boston, Massachusetts 02109
                Of Counsel: Nicholas Theodorou, Esq.
                            Brandon F. White, Esq.
                            Patrick J. Vallely, Esq.

**JOHN F. KEENAN, United States District Judge:**

Defendant Lawrence Evans ("Evans") moves to dismiss the amended complaint of Plaintiffs 380544 Canada, Inc., Wayne Sim ("Sim"), and Salvador Clavé ("Clavé"). Plaintiffs bring this action against Aspen Technology, Inc. ("Aspen"), and former Aspen officers Evans, David McQuillin ("McQuillin"), and Lisa Zappala ("Zappala"), alleging fraud in connection with a securities purchase agreement (the "SPA") under which Plaintiffs purchased approximately $6.8 million of Aspen's stock. Evans is the only defendant to move to dismiss the amended complaint. For the reasons discussed below, the motion is denied in part and granted in part.

## I.   STATEMENT OF FACTS

The Court assumes familiarity with its earlier opinion in this case, which provides detailed background on the parties and their claims. 380544 Canada, Inc. v. Aspen Tech., Inc., 544 F. Supp. 2d 199 (S.D.N.Y. 2008). Below, the Court discusses only those facts relevant to the instant motion.

### A.  Dismissal of the Initial Complaint

Plaintiffs filed their initial complaint on February 15, 2007, asserting the following claims against Evans: (1) violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, (2) violation of Section 20(a) of the

2

Exchange Act, (3) common law fraud, (4) common law fraudulent inducement, and (5) conspiracy to commit and/or aiding and abetting common law fraud.  Plaintiffs predicated their claims on four categories of allegedly fraudulent statements: (1) statements that Evans made at meetings leading up to the SPA (the "Pre-SPA Statements"), (2) the SPA itself, (3) Aspen's SEC filings, and (4) various Aspen press releases.  The Court refers to these statements collectively as the "Fraudulent Statements."

In an order dated March 18, 2008, the Court, inter alia, granted Evans's motion to dismiss the federal securities claims with prejudice and the common law fraud claims with leave to replead. 380544 Canada, Inc., 544 F. Supp. 2d 199.  The Court's analysis of Plaintiffs' common law fraud claim is relevant to the instant motion and thus bears close examination.

The Court framed the dispositive questions on Plaintiffs' common law fraud claims as follows:  "(i) [whether] the Complaint adequately pleads that the false statements are attributable to [Evans] and (ii) [whether] the Complaint alleges facts that give rise to a sufficiently strong inference of scienter for [Evans]." Id. at 217.  In answering the first question, the Court considered the four categories of Fraudulent Statements separately and found as follows:  First, the initial complaint failed to plead the Pre-SPA Statements with sufficient

3

particularity since it attributed the statements to Defendants as a group. "Clumping" Defendants together in this way violates the particularity standards of Rule 9(b) of the Federal Rules of Civil Procedure. Id. at 218. Second, the initial complaint sufficiently pled the statements in the SPA itself and Aspen's SEC filings, and these were attributable to Evans under the group pleading doctrine. Id. at 218-19. Third, the initial complaint sufficiently pled the statements in the press releases, and these were attributable to Evans as either direct quotes or, to the extent the releases summarized Aspen's finances, under the group pleading doctrine. Id. at 219. Notably, regarding the falsity of the press releases, the Court wrote,

> To the extent that the Complaint alleges that the 'press releases issued during the [thirteen quarters] were false [because] they reported, discussed, or analyzed figures that subsequently were restated as well as any financial statistics derived from restated figures,' such statements are adequately pleaded to be false. Thus, Plaintiffs have adequately pleaded the falsity of statements in the press releases that report, discuss, or analyze Aspen's false financial results with respect to [Evans]. The Court need not determine, however, whether each of Evans's quoted remarks are actually false, because, as discussed below, the Complaint fails adequately to plead Evans's scienter.

Id. at 219 n.12 (quoting In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005)).

The Court next turned to the second dispositive question, namely, whether Plaintiffs alleged facts giving rise to a strong inference of scienter for Evans.   The initial complaint contained only one allegation that supported an inference that Evans consciously misbehaved or acted recklessly.   Specifically, the initial complaint quoted a confidential informant who had worked at Aspen and who had heard "both defendants Evans and McQuillin euphemistically refer[] to [the] practice [of improperly accounting for Aspen's earnings] as keeping revenues 'in the freezer.'"   <u>Id.</u> at 229.   This lone allegation was insufficient to support a strong inference of scienter.   <u>Id.</u> at 230.

For these reasons, the Court granted Evans's motion to dismiss the common law fraud claims, but gave Plaintiffs leave to replead.

## B. Amended Complaint

On May 2, 2008, Plaintiffs filed an amended complaint reasserting against Evans claims for common law fraud, fraudulent inducement, conspiracy to commit common law fraud, and aiding and abetting common law fraud.   The most relevant portions of the amended complaint to this motion are its allegations concerning (1) the Pre-SPA Statements, (2) statements contained in the SPA, (3) statements contained in

5

Aspen's SEC filings, (4) statements Evans made in various Aspen press releases, and (5) Evans's scienter.

### 1.  The Pre-SPA Statements

The amended complaint alleges that Evans made three fraudulent Pre-SPA Statements:

> (1)  "At the July 10, 2001 Boston meeting with Sim and Clavé, Evans misrepresented Aspen's financials, including its past and projected revenues and long term revenue commitments from customers." (Am. Comp. ¶ 26.)
>
> (2)  "At the March 21-22, 2002 Boston meeting with Sim and Clavé (Clavé was present for the March 21 meeting and Sim was present for both meetings), McQuillin and Evans confirmed again the misrepresentations that McQuillin made at the March 14 meeting [sic]." (Id. ¶ 29.)
>
> (3)  "At the April 8, 2002 Boston meeting with Sim, McQuillin, Evans and Zappala misrepresented the combined performance of Aspen and Hyprotech by relying on Aspen's recognized revenues for quarters later restated and relying on alleged long-term revenue commitments from customers that were in fact contingent." (Id. ¶ 30.)

## 2. The SPA

The amended complaint alleges that the SPA contained three provisions that fraudulently misrepresented Aspen's compliance with generally accepted accounting principles ("GAAP"):

(1) SPA Article 3.1(n): "Internal Accounting Controls. The Company and the Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that . . . transactions are recorded as necessary to permit preparation of financial statements <u>in conformity with generally accepted accounting principles</u>." (<u>Id.</u> ¶ 33.)

(2) SPA Article 3.1(h): "[Aspen's SEC filings and financial statements were] prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved." (<u>Id.</u>)

(3) SPA Article 3.1(i): "Since the date of the latest audited financial statements included within the SEC Reports, (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) the Company has not

7

incurred any material liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business, (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP." (Id. ¶ 285.)

### 3. The SEC Filings

The amended complaint alleges that all of Aspen's SEC filings covering thirteen fiscal quarters – from the fiscal fourth quarter of 1999 to the fiscal fourth quarter of 2002 – were materially false and misleading. This includes Aspen's Form 10-Q quarterly reports and Form 10-K annual reports for these periods, as well as three registration statements and prospectuses that Aspen issued in connection with the public sale of its stock to fund the purchase of other companies. The amended complaint alleges that all of these filings incorporated Aspen's false financial statements.

### 4. The Press Releases

The amended complaint alleges that direct quotes from Evans in numerous press releases fraudulently misrepresented Aspen's performance during certain fiscal periods. (Id. ¶¶ 67, 68, 88, 94, 121, 157, 163, 187, 195, 200, 203, 233, 252.) For example, an August 7, 2001, press release quoted Evans as stating,

"During   the   [the   fiscal   quarter   ended   June   30, 2001] . . . we closed [a] significant multimillion dollar transaction[] with . . . Yukos, a large Russian oil company." (Id. ¶ 187.)   The amended complaint alleges that the Yukos transaction was not actually closed until the following quarter and that Aspen prematurely recognized this revenue by backdating the agreement.   A number of Evans's direct quotes are far less specific, such as his statement in an August 5, 1999, press release:   "AspenTech achieved a number of important operational goals in the [fiscal fourth quarter ended June 30, 1999], along with improved execution and financial results in line with our expectations." (Id. ¶ 67.)

The amended complaint also alleges that these press releases falsely and inaccurately summarized Aspen's financial data in their introductory paragraphs and in financial tables at the end of each release.

### 5.  Evans's Scienter

The amended complaint alleges that Evans knew or should have known that the Fraudulent Statements were false since he was a direct participant in the fraud. (Id. ¶ 41.)   The amended complaint bases this allegation on Evans's involvement in seven transactions:   (a) the Lyonell-Equistar transaction, (b) the Union Carbide transaction, (c) the Logica UK, Ltd., transaction,

(d) the first IBM transaction, (e) the Yukos transaction, (f) the second IBM transaction, and (g) the PSC transaction. Generally, the amended complaint alleges that, in each transaction, Evans was aware of practices, such as entering side agreements or backdating agreements, that made Aspen's accounting improper, thus creating a strong inference that he had the requisite scienter when he made the Fraudulent Statements. The details of each transaction as alleged in the amended complaint are discussed below.

### a. Lyondell-Equistar Transaction

Aspen improperly recognized a total of $9.9 million of revenue in the fiscal quarters ended June 30 and September 30, 1999, that arose out of a transaction with Lyondell Chemical Company, Equistar Chemicals, and other Houston-based chemical companies (collectively, "Lyondell-Equistar"). (Id. ¶ 43.) The revenue was improperly recognized since Aspen had promised the companies, in a side agreement known as the Joint Development Agreement, that it would deliver an undetermined amount of software in the future at no additional cost. (Id.)

According to the amended complaint, a series of communications reveals that Evans was aware of the side agreement. On or about December 13, 1998, an Aspen salesperson involved in negotiations with the Lyondell-Equistar group sent

10

an e-mail to Zappala with the subject line "Special Letter."
The salesperson wrote,

> I need to put together a letter from Larry
> [Evans] that says that as long as the customer
> stays on support that they will continue to get
> all of the AspenTech [software] products. . . .
> As we develop or buy new products it would go [to
> the customer]. . . . [I]n lieu of putting this in
> the contract it will be a side letter. . . .
> Basically, this letter would give them the "all
> we ever will be commitment" in an acceptable
> communication from AspenTech.

(Id. ¶ 44.) In an e-mail to Zappala dated February 12, 1999,
that had the subject line "The Equistar Project is at a Highly
Critical Stage –we Need Everybody's Support," Evans wrote,

> [I]t is absolutely critical that we get our
> [software] implementation installed and running
> at [a Lyondell-Equistar site] by April 1[.]
> Failure is not an option here.  We have to be
> successful.  In many ways we have bet the company
> on the success of this pilot at [the Lyondell-
> Equistar site] and we have made important
> commitments to Equistar.  Our honor is at stake.

11

> You can imagine the field day our competitors
> would have if this doesn't work.

(<u>Id.</u> ¶ 45.)

In June 1999, Aspen drafted an agreement known as the "Special Option Product Support Agreement" (the "Support Agreement") that, in an early version, would have compelled Aspen to supply Lyondell-Equistar with certain future products free of charge. On June 29, 1999, an in-house counsel at Aspen e-mailed the Support Agreement to Lyondell-Equistar. (<u>Id.</u> ¶ 47.) He also attached to the e-mail a draft letter from Evans to Lyondell-Equistar dated June 30, 1999, which read, in relevant part, "Please accept this letter as my commitment to you that, if we acquire or develop products in the product families which we license to our customers in our normal course of business, we will provide the new technology in addition to our existing technology." (<u>Id.</u> ¶ 49.)  After reviewing the Support Agreement, however, Aspen's outside auditor, Arthur Andersen, objected to what it interpreted as the "promise of future products." (<u>Id.</u> ¶ 52.)  This objectionable term was removed from the version of the Support Agreement that Aspen and Lyondell-Equistar ultimately executed.

On June 30, 1999, the day Aspen executed the main software license agreement and Support Agreement with Lyondell-Equistar,

Evans sent a letter to Lyondell-Equistar. The letter was similar to the draft letter attached to the June 29, 1999, e-mail, except it no longer carried a promise of future products. (Id. ¶ 60.)

On or about July 2, 1999, after executing the agreements, Evans forwarded an e-mail to Zappala that he had sent to Aspen's board of directors and general counsel in which he had written, "I wanted to let you know that we made the quarter[.] We only need about $2-3 million of the Lyondell-Equistar deal to make this quarter's numbers, so we will have a nice 'freezer' going into Q1." (Id. ¶ 61.)

In early July, subsequent to the execution of the software license agreement and Support Agreement, Aspen's general counsel drafted a new agreement, the Joint Development Agreement. (Id. ¶ 54.) The Joint Development Agreement incorporated, in substance, the provision that Arthur Andersen found objectionable in the early version of the Support Agreement, namely, the promise of future software at no additional cost. (Id.) That agreement was executed in August 1999. (Id. ¶ 55.)

### b. Union Carbide Transaction

In or around December 1999, Aspen entered into a software licensing agreement with Union Carbide Corporation and then improperly delayed recognizing revenue from the transaction.

(Id. ¶ 40.)   In a press release dated December 7, 1999, Aspen announced the deal and stated, "A portion of the license revenue is recognizable by Aspen Tech in the present quarter ending December 31, 1999, with the remainder to be recognized in subsequent quarters." (Id. ¶ 77.)   The amended complaint does not specifically allege that Evans had any involvement in the Union Carbide transaction.[1]

### c.  The Logica UK Ltd. Transaction

In the fiscal quarter ended December 31, 2000, Aspen improperly recognized $1.75 million of revenue paid by Logica UK Ltd. ("Logica") pursuant to a license agreement. (Id. ¶ 96.) The revenue was improperly recognized because a side agreement existed in which Aspen promised Logica certain future service revenue in exchange for Logica's agreeing to the license transaction. (Id. ¶¶ 96, 120.)

The amended complaint alleges that a series of e-mails indicates that Evans was aware of this side agreement.  On December 17, 2000, an Aspen salesman sent an e-mail on which Evans was copied that referred to the Logica transaction as a "'trade' between the License and Services." (Id. ¶ 101.)   On

---

[1] In fact, Evans's name does not appear once in the amended complaint's section on the Union Carbide Corporation Transaction. (See Am. Compl. ¶¶ 77-83.)

December 19, 2000, Evans was copied on an e-mail sent by McQuillin to an Aspen salesman that read,

> [W]e appreciate the creativity of the [regional] Sales and Partner teams in trying to get Q2 license revenue from Logica. Certainly, Q2 revenue is important to the company . . . . However, there are . . . reasons why we cannot and will not "guarantee" services to Logica[.] A guarantee means a financial obligation to AspenTech and that means netting that obligation out of the license agreement – even if the "guarantee" is made in a separate document like a [memorandum of understanding]. This would mean a NEGATIVE revenue event in Q2 . . . $7.5m service obligation -$m license agreement = ($5.5m)[.] We know of no other company guaranteeing services for partners – certainly they prime the pump by bringing their partners business, as we should, but not guaranteeing services.

(Id. ¶ 102.) Nonetheless, on December 30, 2000, a managing director at Aspen signed a memorandum of understanding with Logica that rendered Logica's payments under the main licensing

agreement contingent upon Aspen's providing Logica with a minimum amount of services revenue. (<u>Id.</u> ¶ 108.)

On January 6, 2001, Evans sent an e-mail to McQuillin that attached a document called "Sales Action Plan."  In that document, Evans wrote,

> Manage the Q2 Close and Explanation . . . Don't take . . . Logica –[it's] not revenue, we're still negotiating.  Explain what happened and what it means. . . . Need to Understand . . . Why we fell short in Q2 . . . Why we didn't anticipate it and take corrective action sooner.

(<u>Id.</u> ¶ 112.)  On March 22, 2001, an Aspen mid-level manager sent an e-mail on which Evans was copied that read, in pertinent part,

> We must fulfill our obligation to provide Logica with $2.5M of services on an annual basis over a three year period, totaling $7.5M. . . . Per our conversation with Lisa Zappala this morning, in order to help Logica's cash flow, [Aspen will] give them the ability to invoice us in advance for twelve (12) weeks of consulting time . . . if it helps Logica get the cash to pay our invoices.

(<u>Id.</u> ¶ 113.)

16

### d.  The First IBM Transaction

Aspen improperly recognized $2.8 million in software license revenue in the fiscal quarter ended December 31, 2000, on a sale to IBM since (1) the agreement was signed in January 2001 but backdated to December 2000 and (2) IBM's payment was contingent on Aspen finding buyers to whom IBM could resell Aspen's software. (Id. ¶ 128.)  The amended complaint alleges that Evans knew Aspen improperly recognized this revenue in December 2000 since (1) he was personally involved in negotiating the transaction through mid-January 2001 (i.e., after the revenue had been prematurely recognized), and (2) he was aware that the transaction depended on Aspen finding buyers to whom IBM could resell Aspen's software.

In support of the first allegation, the amended complaint cites a series of communications demonstrating that Evans was aware that the IBM transaction was still being negotiated through mid-January.  On or about January 5 or 6, Evans participated on a conference call on which an Aspen salesman stated that the IBM transaction was not yet complete. (Id. ¶ 134.)  On January 6, 2001, Evans wrote to McQuillin in an e-mail (the same January 6, 2001, e-mail referenced in the Logica transaction), "Don't take . . . IBM -[it's] not revenue, we're still negotiating." (Id. ¶ 135.)  Evans also wrote that he

intended to assist Zappala in finalizing "Q2 revenue" and developing an "explanation for what happened in Q2." (<u>Id.</u>)  On or about January 7, 2001, an IBM official called Evans to inform him that IBM did not intend to enter the proposed agreement with Aspen.  On or about January 8, 2001, Evans called Aspen's vice president for strategic relationships, asked him whether Aspen and IBM were still negotiating, and learned that negotiations were indeed continuing.  On or about January 9, 2001, McQuillin sent an e-mail to Evans that attached a "call script" for a call Evans was to make to an IBM official.  The call script stated, among other things, that the "goal [was] to complete the transaction by end of day tomorrow" and that Aspen "ha[s] a license document drafted and ready for signature which is the document [Aspen] need[s] for revenue recognition." (<u>Id.</u> ¶ 140.) That same day, Evans made a phone call to an IBM official to continue negotiations. (<u>Id.</u> ¶ 141.)  IBM executed the agreement on January 15, 2001, and, at the request of an Aspen salesman, dated the agreement December 29, 2000. (<u>Id.</u> ¶ 144.)  Evans also received e-mails in March and April 2001 that suggested that aspects of the IBM transaction were still up in the air even at that point. (<u>Id.</u> ¶¶ 146, 149.)

In support of the second allegation – that Evans was aware that IBM's payment was contingent on Aspen finding end-users to

whom IBM could resell Aspen's software – the amended complaint cites two phone calls made before the transaction was finalized.   Around Christmas 2000, Evans contacted an IBM employee and told him that Aspen would arrange for end-users to purchase the Aspen software. (Id. ¶ 132.)  Evans assured the employee that, if IBM were unable to resell some of the software, Aspen would arrange financing for the transaction. (Id.)  Then, on a January 13, 2001, call, Evans spoke with an IBM general manager in the United Kingdom and stated that Aspen would book software sales through IBM so that IBM could reach the license revenue figure discussed in the proposed software license agreement. (Id. ¶ 143.)  Evans further stated that Aspen would finance any shortfall IBM suffered. (Id.)

### e.  The Yukos Transaction

Aspen improperly recognized $4.3 million in license revenue in the fiscal quarter ended June 30, 2001, from a transaction with Yukos Corp. ("Yukos") that involved backdating and a side agreement.[2]  According to the amended complaint, two e-mails show that Evans knew the transaction was backdated to June 2001.  The

---

[2] There are no allegations in the amended complaint suggesting that Evans was aware of a side agreement with Yukos.  At oral argument, the Court asked Plaintiffs' counsel to point to specific allegations in the amended complaint supporting this conclusion. (Oral Argument Tr. 31:18-20.)  In response, Plaintiffs' counsel directed the Court to allegations relating to the separate issue of backdating. (Id. at 31:21-32:10.)

first, from McQuillin on June 27, 2001, stated that the "final scope and price [of the Yukos transaction] will be finalized on July 4th," but that the agreement would nonetheless be signed "with a June 30th agreement date." (Id. ¶ 168.)  The second, from McQuillin on July 5, 2001, which instructed Evans to "destroy after reading," stated, in part, "As a quarterly drive software company, our business model requires that we book significant software license revenue . . . . By [Yukos] committing to the software license agreement [by July 10, 2001] . . . we can recognize the revenue for our fiscal year ending June 30, 2001." (Id. ¶ 169.)

### f.  The Second IBM Transaction

Aspen improperly recognized $1.7 million in software license revenue in the fiscal quarter ended March 30, 2002, from a second transaction with IBM where a side agreement was in place.  The amended complaint alleges that Evans knew that this transaction was contingent on AGIP's (an Aspen customer) agreeing to repurchase the Aspen software from IBM.  This allegation is based in part on a March 21, 2002, e-mail from McQuillin to Evans which read,

> As we are going for a Corporate deal with [AGIP],
> rather than a single refinery, the timeline to
> close this deal will push from March 30 to mid-

> April.   We   want   this   deal   for   our   March   30
>
> quarter   and   would   like   IBM   to   pre-purchase   the
>
> software   license   now.   In   return   we   will   give   IBM
>
> a   $500K   commission   .   .   .   .   Since   this   would   be   a
>
> simple   pre-purchase   for   a   specific   named   client
>
> the   paperwork   is   straightforward   and   has   already
>
> been   prepared.

(Id. ¶ 209.)   One   day   later,   on   March   22,   2002,   McQuillin   again

wrote   Evans:   "In   our   [anticipated]   License   Agreement   [with   IBM]

it   is   already   stated   that   the   license   are   [sic]   for   AGIP   or   for

any   other   customer   we   agree   on."   (Id. ¶ 210.)   Aspen   and   IBM,

represented   by   a   general   manager   (the   "IBM   GM"),   entered   into

the   main   software   license   agreement   on   or   about   March   28,   2002.

(Id. ¶ 211.)   Aspen   reported   the   revenue   from   this   transaction

on   its   Form   10-Q   for   the   fiscal   quarter   ended   March   31,   2002.

(Id. ¶ 231.)

   After   Aspen   reported   revenue   for   the   quarter   ended   March

31,   2002,   Evans   received   additional   e-mails   regarding   the   status

of   the   second   IBM   transaction.   On   or   about   May   24,   2002,   an

Aspen   official   sent   an   e-mail   to   Evans   that   read,

> I   have   been   working   on   the   following   deals
> to   make   sure   we   get   payment   by   [end]   of
> quarter   .   .   .   AGIP.   AGIP   has   committed   to   one
> half   of   the   deal   (900K)[.]   We   still   have   the
> issue   of   [the   IBM   GM's]   paying   us   because   he
> claims   that   there   was   an   understanding   between

> him and us that he had to have cash before he
> paid us.  So, we are looking to see if IBM
> finance can get him the cash so he can pay us[.]
> [We] are looking at three . . . deals that IBM
> will finance[.]  This would allow [the IBM GM] to
> carry the finance charge but get us the cash and
> then get the AGIP cash by Sept.

(Id. ¶ 216.)  On or about September 16, 2002, Zappala wrote in an e-mail to Evans that "[w]e have reached a critical milestone here . . . .  [I]t looks now like we do not have a firm payment obligation from IBM[.]" (Id. ¶ 223.)  Evans received more e-mails in September, October, and December 2002, regarding the status of the second IBM transaction.  This culminated in an e-mail on December 1, 2002, from an Aspen salesman to Evans and others:  "Bottom line, we do not have what we need from IBM at this point to avert a write off of the license deal for [AGIP]. . . . Obviously we want to preserve this revenue, but time is running out." (Id. ¶ 230.)

### g.  The PSC Transaction

Aspen improperly recognized $1.9 million of revenue in the fiscal quarter ended June 30, 2002, from a transaction with the Petroleum Services Company ("PSC") because Aspen entered into side agreements with PSC promising additional future products and agreeing to reimburse PSC for certain agent fees. (Id. ¶ 240.)  There are no specific allegations in the amended

22

complaint that Evans was involved in negotiating or was even aware of the side agreement with PSC.[3]

## II.  DISCUSSION

Evans argues that the amended complaint should be dismissed with prejudice since (1) Plaintiffs fail to plead the Pre-SPA Statements and the direct quotes in the press releases with the requisite particularity, (2) Plaintiffs fail to allege facts raising a strong inference of Evans's scienter, and (3) Plaintiffs fail to state a claim for conspiracy to commit fraud or aiding and abetting fraud.

### A.  Legal Standard on Motion to Dismiss

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept the factual allegations of the complaint as true. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).  The court, however, is not required to accept as true conclusory allegations or "a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

---

[3] The amended complaint alleges in conclusory fashion that Evans was "personally involved in this transaction and the accounting of it as reflected in the emails and agreements discussed above." (Id. ¶ 253.)  A review of the allegations regarding the referenced emails and agreements – in which Evans's name does not appear once – does not support this claim. (See id. ¶¶ 240-49.)

The issue on a 12(b)(6) motion to dismiss is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claim. <u>Bernheim</u>, 79 F.3d at 321. A court should "read the complaint generously, and draw all inferences in favor of the pleader." <u>Cosmas v. Hassett</u>, 886 F.2d 8, 11 (2d Cir. 1989). On a motion to dismiss a complaint under Rule 12(b)(6), the district court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." <u>Geisler v. Petrocelli</u>, 616 F.2d 636, 639 (2d Cir. 1980).

Recently, in <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955 (2007), the Supreme Court clarified what a complaint must do to survive a Rule 12(b)(6) motion. The Court held that the oft-cited standard – "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" – "is best forgotten." <u>Id.</u> at 1969. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do." Id. at 1964-65 (citations and internal quotation marks omitted).  This standard does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Id. at 1974.  In other words, in their complaint, "plaintiffs [must] nudge[] their claims across the line from conceivable to plausible." Id. at 1974.  Although Twombly concerned an antitrust claim, it has been applied to common law fraud claims, among others. See, e.g., Gotham Holdings, LP v. Health Grades, Inc., 534 F. Supp. 2d 442, 444 (S.D.N.Y. 2008).

## B.  Pleading of the Misrepresentations

Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened pleading requirement on claims of fraud:  "In allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  "To state a claim with the required particularity, a complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks omitted).  "Rule

25

9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits." DiVittorio v. Equidyne Extractive Indus., 822 F.2d 1242, 1247 (2d Cir. 1987).

### 1.  The Pre-SPA Statements

The amended complaint does not plead the Pre-SPA Statements with the requisite particularity. According to the amended complaint, Evans "misrepresented . . . Aspen's financials" at the July 10, 2001, meeting (Am. Compl. ¶ 26) and then "confirmed" those misrepresentations at the March 21-22, 2002, meetings (id. ¶ 29). These allegations fail to specify the actual statements at issue or provide any sense of their content and fail to explain why the statements are fraudulent. In short, they are too vague to give Evans fair notice of the factual basis for Plaintiffs' claims.

The amended complaint alleges that, at the April 8, 2002, meeting, "McQuillin, Evans, and Zappala misrepresented the combined performance of Aspen and Hyprotech by relying on Aspen's recognized revenues for quarters later restated and relying on alleged long-term revenue commitments from customers that were in fact contingent." (Id. ¶ 30.) This allegation is

less vague than those regarding the first two meetings since it specifically links the misrepresentations to the restated revenue figures; however, by attributing the misrepresentations to three defendants, the amended complaint fails to link each individual defendant to a specific fraudulent statement in any meaningful way. See Leemon v. Burns, 175 F. Supp. 2d 551, 556 (S.D.N.Y. 2001) ("[A] complaint alleging fraud against multiple defendants must state the allegations specifically attributable to each individual defendant."); Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000) (dismissing complaint where it did "not differentiate in any way between defendants," or "attempt to link any of the defendants with the alleged fraudulent statements."). Therefore, Plaintiffs fail to plead the Pre-SPA Statements with the requisite particularity.

## 2. The Press Release Statements

Evans contends that the amended complaint fails to explain how or why his direct quotes in the press releases are fraudulent. Plaintiffs' response is that "because each of Evans' statements was accompanied by Aspen's false revenue earnings that now have been restated by Aspen, it is unnecessary to examine each statement independently." (Pls.' Br. 6-7.) As the parties' dispute suggests, there are actually two categories of statements in the press releases: (1) Evans's direct quotes

27

(the "Direct Quotes") and (2) the financial data summarized in the introductory paragraphs and presented in detailed financial tables at the end of each release (the "Financial Data"). Both categories of statements are attributable to Evans,[4] but, to date, the Court has ruled that only the falsity of the Financial Data is pled with sufficient particularity.[5] Therefore, to the extent Plaintiffs predicate their claims on the falsity of the Direct Quotes, the Court must assess each quote individually to

_____

[4] The Court reached this holding in its opinion dismissing the initial complaint. 380544 Canada, Inc. v. Aspen Tech., Inc., 544 F. Supp. 2d 199, 219 (S.D.N.Y. 2008). The Court found that the Direct Quotes were attributable to Evans as just that, direct quotes, while the Financial Data was attributable to him under the group pleading doctrine. Id. at 218 ("The group pleading doctrine allows plaintiffs to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.'" (quoting Polar, 108 F. Supp. 2d at 237. The Court's prior holding and analysis are fully applicable here since the allegations regarding the press releases in the amended complaint are substantially similar and in some cases identical to those in the initial complaint.

[5] Again, the Court reached this holding in its opinion dismissing the initial complaint. 380544 Canada, 544 F. Supp. 2d at 219 ("To the extent that the Complaint alleges that the 'press releases issued during the [thirteen quarters] were false [because] they reported, discussed, or analyzed figures that subsequently were restated as well as any financial statistics derived from restated figures,' such statements are adequately pleaded to be false." (quoting In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005))). In that opinion, the Court explicitly declined to consider the falsity of the Direct Quotes as moot. Id. at 219 ("The Court need not determine, however, whether each of Evans' quoted remarks are actually false, because, as discussed below, the Complaint fails adequately to plead Evans' scienter.").

determine whether the amended complaint adequately pleads its falsity.  The Court waits to conduct this analysis until assessing Evans's scienter since, as will become clear, the amended complaint alleges facts creating a strong inference of scienter for only two of the Direct Quotes.  The falsity of the others is moot.

### C.  Scienter

Evans argues that the amended complaint fails to allege particular facts raising a strong inference of scienter. "[A]llegations of scienter . . . are not subjected to the more exacting consideration applied to the other components of fraud." Breard v. Sachnoff & Weaver, Ltd., 941 F.2d 142, 143 (2d Cir. 1991) (internal quotation marks omitted).  "Although it is true that Rule 9(b) . . . provides that malice, intent, knowledge, and other condition of mind of a person may be averred generally, it is well established that a plaintiff must still allege facts that give rise to a strong inference of fraudulent intent." DiVittorio, 822 F.2d at 1247 (internal quotation marks omitted); accord IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1057 (2d Cir. 1993) ("[C]onclusory allegations of scienter are sufficient "if supported by facts giving rise to a 'strong inference' of fraudulent intent.").

The Supreme Court has stated that, in the context of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), to qualify as "strong," "an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504-05 (2007).  Although Tellabs is not controlling (the instant case does not concern fraud under the PSLRA but rather common law fraud), it is persuasive. See Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 451 (S.D.N.Y. 2007) (calling the "Supreme Court's explanation of how competing inferences should be weighed" persuasive authority in assessing the pleading of a common law fraud claim).

A plaintiff can establish a strong inference of scienter "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Kalnit v. Eichler, 264 F.3d 131, 138-39 (2d Cir. 2001).  "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Id. at 142.

"To survive dismissal under the 'conscious misbehavior' theory, [plaintiffs] must show that they alleged reckless conduct by the [defendant], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Honeyman v. Hoyt, 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks omitted).

Plaintiffs argue that the allegations in the amended complaint related to Evans's involvement in seven business transactions create a strong inference of Evans's scienter. Generally, Plaintiffs argue that these allegations strongly suggest that Evans was aware that Aspen improperly accounted for revenue from these transactions when the Fraudulent Statements were made.

### 1. The Lyondell-Equistar Transaction

According to the amended complaint, Aspen improperly recognized revenue from the Lyondell-Equistar transaction because, under the terms of a side agreement known as the Joint Development Agreement, Aspen promised to deliver additional software in the future at no additional cost. The amended complaint fails to allege facts suggesting that Evans was aware

of the Joint Development Agreement and, therefore, fails to raise a strong inference of scienter.

Plaintiffs argue that two allegations in the amended complaint support a strong inference of Evans's scienter: (1) the series of communications regarding Evans's June 30, 1999, letter to Lyondell-Equistar and (2) Evans's e-mail to Aspen's board in which he wrote that Aspen would have "a nice 'freezer' going into Q1," (Am. Compl. ¶ 61).  Plaintiffs' argument is unconvincing.  The June 30, 1999, letter that Evans sent to Equistar-Lyondell contained no reference or allusion to the Joint Development Agreement, i.e., the improper agreement. Instead, the letter referred to the Support Agreement that Arthur Andersen, Aspen's outside auditors, expressly approved. Plaintiffs urge the Court to infer scienter nonetheless since an earlier draft of the letter was attached to an e-mail from an Aspen in-house attorney to Lyondell-Equistar that also attached the earlier, objectionable version of the Support Agreement. This is a meritless argument based on guilt by associated attachments.  Evans offers a compelling rebuttal in his reply brief: "Plaintiffs fail to articulate how a draft letter, which Plaintiffs do not allege Mr. Evans ever drafted, read, signed or sent, could implicate Mr. Evans in the alleged underlying fraud." (Def.'s Reply Br. 6.)

32

Evans's "freezer" remark in no way suggests he was aware of the Joint Development Agreement.   Interestingly, Plaintiffs do not appear to offer it to this end, but instead offer it to show that Evans was aware that Aspen improperly recognized revenue from the Lyondell-Equistar transaction over two fiscal quarters; however nothing in the amended complaint suggests that such a practice was improper.   According to the amended complaint, the software licensing agreement required Aspen to send products to Lyondell-Equistar in two shipments, one on June 30, 1999, and a second on July 15, 1999. (Am. Compl. ¶ 58.)   The amended complaint also alleges that GAAP permits revenue to be recognized only after, among other things, "delivery has occurred." (Id. ¶ 262.)   Therefore, according to the amended complaint's allegations, revenue arising from the second shipment, which was delivered in a different fiscal quarter than the first, was properly deferred or kept in the "freezer."

Therefore, the amended complaint's allegations regarding the Lyondell-Equistar transaction fail to raise a strong inference of scienter.

## 2.  The Union Carbide Transaction

The amended complaint is devoid of any specific allegations that Evans was involved in the Union Carbide transaction. Plaintiffs do not dispute this, but argue that Evans's status as

"the founder and highest ranking official at Aspen" means he "had unequivocal access to information" indicating that Aspen's SEC filings for that period were false. (Pls.' Br. 12.)   The Court rejected this exact argument in its opinion dismissing the initial complaint. 380544 Canada, Inc., 544 F. Supp. 2d at 222 ("[A]llegations regarding a defendant's managerial status are insufficient to support a strong inference of scienter."); see also In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865, 1998 U.S. Dist. LEXIS 8061, at *6 (S.D.N.Y. June 1, 1998) ("[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook.").   The Court again rejects this argument.   Therefore, the amended complaint's allegations regarding the Union Carbide transaction do not raise a strong inference of Evans's scienter.

### 3. The Logica Transaction

According to the amended complaint, Aspen improperly recognized revenue from the Logica transaction because Aspen and Logica had a side agreement.[6]   The amended complaint alleges

---

[6] The Court agrees with Evans that the amended complaint does not allege that revenue from the Logica transaction was improperly recognized because negotiations were still ongoing at the time. (Def. Lawrence B. Evans' Reply to Pls.' Opp'n to the Mot. to Dismiss the Am. Compl. 9.)   In the introductory paragraph of a

facts creating a strong inference that Evans knew about this side agreement beginning March 22, 2001. Plaintiffs argue that Evans was on notice as early as December 17, 2000, when he received an e-mail from an Aspen salesman that referred to the transaction as a "trade" between licenses and services, suggesting that no real revenue was being created. (Am. Compl. ¶ 101.) But even if this e-mail gave Evans the impression that a side agreement was in place, McQuillin's December 19, 2000, reply e-mail, in which he expressly rejected the "trade" concept, would have dispelled the notion. (Id. ¶ 102.)

Evans was not on notice until March 22, 2001 – months after the transaction closed – when he received an e-mail from an Aspen mid-level manager reporting that Aspen had to "fulfill our obligation to provide Logica with $2.5M of services on an annual basis over a three year period, totaling $7.5M." (Id. ¶ 113.) This e-mail confirmed that a trade of licenses for services had taken place. McQuillin's December 19, 2000, e-mail had told Evans that such a trade "would mean a NEGATIVE revenue event in

---

section entitled "Logica UK Ltd. Transaction," the amended complaint offers only one reason why the revenue was improperly recognized: "The revenue should not have been recognized because there was a side agreement to the contract which provided that Logica was not obligated to pay Aspen unless Aspen provided Logica with a minimum amount of software implementation services revenue." (Id. ¶ 96.) Thus, the Court considers irrelevant to Evans's scienter his instruction to McQuillin that Aspen should not take the Logica revenue because "we're still negotiating." (Id. ¶ 112.)

Q2 . . . $7.5m services obligation -$2m license agreement = ($5.5m)[.]" (Id. ¶ 102.)   Read together, these two e-mails informed Evans that Aspen had incurred $7.5 million in service obligations to Logica, thus making the Logica transaction a negative revenue event.   Since Aspen had reported positive revenues of $1.75 million from the transaction in its Form 10-Q for the quarter ended December 31, 2000, and in its January 24, 2001, press release (id. ¶¶ 120-21), the improper accounting of the Logica transaction "was either known to the defendant or so obvious that the defendant must have been aware of it." Honeyman, 220 F.3d at 39.

The timing of Evans's scienter is important, however. Given that it was not until receiving the March 22, 2001, e-mail that Evans had knowledge of the improper side agreement, Evans lacked scienter for all of the Fraudulent Statements related to the accounting of the Logica transaction made before March 22, 2001. See In re PXRE Group, Ltd. Sec. Litig., No. 06 Civ. 3410, 2009 U.S. Dist. LEXIS 19139 (S.D.N.Y. Mar. 4, 2009) ("[T]o establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made." (emphasis added)).   Therefore, the allegations related to the Logica transaction fail to plead

36

scienter for the Form 10-Q filed February 14, 2001, and for the Direct Quote and Financial Data in the January 24, 2001, press release. These allegations do adequately establish, however, that Evans had scienter with regards to any SEC filings after March 22, 2001, that reflect or incorporate the Logica revenue as well as for the provisions in the SPA asserting that Aspen was in compliance with GAAP.[7]

### 4. The First IBM Transaction

According to the amended complaint, Aspen improperly recognized revenue from the first IBM transaction because (1) the transaction was backdated to December 2000 and (2) a side agreement existed. The amended complaint pleads sufficient facts alleging that Evans was aware of the backdating. It cites numerous e-mails demonstrating that Evans knew that Aspen was still in negotiations with IBM through at least mid-January 2001. It also cites a January 6, 2001, e-mail demonstrating that Evans knew the revenue should not be recognized while the negotiations continued. In that e-mail, Evans explicitly instructed McQuillin as follows: "Don't take . . . IBM –[it's]

---

[7] In its opinion dismissing the initial complaint, the Court ruled that statements in the SPA are attributable to Evans under the group pleading doctrine. 380544 Canada, 544 F. Supp. 2d at 218; see also Dresner v. Utility.com, Inc., 371 F. Supp. 2d 476, 495 (S.D.N.Y. 2005) (holding that allegedly false statements made in a merger agreement, pursuant to which plaintiff purchased defendant company's stock, could be attributed to individual defendants who were corporate insiders).

not revenue, we're still negotiating." (Am. Compl. ¶ 135.)
Nonetheless, Aspen recognized $2.75 million in license revenue
from the first IBM transaction in the quarter ended December 31,
2000, filed a Form 10-Q in February 2001 reflecting this
revenue, and summarized the revenue in its January 24, 2001,
press release. (Id. ¶¶ 156-57.)

Evans argues that the amended complaint does not allege
that he knew backdating the agreement was improper and therefore
fails to raise a strong inference of scienter. This argument
relies on (1) a January 9, 2001, e-mail from McQuillin to Evans
that Evans characterizes as an assurance that the backdating was
proper (id. ¶ 140) and (2) Evans's lack of an accounting
background. The paragraph in the amended complaint discussing
the so-called assurance from McQuillin reads as follows:

> On or about January 9, 2001, McQuillin sent
> an e-mail to Evans and N.C., the Aspen Vice-
> President for Strategic Relationships, which
> included a "call script" for a telephone call
> which Evans was to make to K.S., an IBM official.
> Among other things, the "call script" stated that
> Evans was to note that he had "been working
> personally . . . over the past 6 months on
> various activities kicking off [the Aspen-IBM]
> alliance for the process industries." In
> addition, the "call script" stated that Evans was
> to "very briefly review where [Aspen and IBM
> were] at in [the] process to complete the deal
> [they had] been working on . . . over the past
> several days." The "call script" also stated that
> Evans was to note that, under the proposed deal's
> terms, "there is a $3M license commitment to
> AspenTech in return for which [Aspen] will give

38

> IBM . . . right of first refusal on . . .
> services work in defined accounts[.]" The "call
> script" also stated that Evans was to note that
> IBM's "commission rate would be doubled from 5%
> to 10% for up to $10M in license revenue sold by
> the alliance." The "call script" also
> indicated that Evans was to discuss "the projects
> that . . . would most likely work off the $3M
> payment in the next 90-120 days[.]" The "call
> script" also indicated that Evans was to note
> that the "goal [was] to complete the transaction
> by end of day tomorrow" and that "[Aspen] ha[s] a
> license document drafted and ready for signature
> which is the document [Aspen] need[s] for revenue
> recognition."

(Id. ¶ 140 (omissions in original).) Nothing in this e-mail can

be characterized as an assurance that backdating the transaction

was proper. Regarding Evans's lack of an accounting background,

his instruction to McQuillin not to take the IBM revenue while

negotiations continued and his statement, in the same e-mail,

that he would help Zappala finalize revenue for the quarter

strongly suggest he had enough accounting acumen to understand

that the backdating was improper. Thus, the amended complaint

adequately pleads Evans's scienter for the SEC filings that

reflect or incorporate the revenue from the first IBM

transaction, for the Financial Data in the January 24, 2001,

press release, and for the SPA.[8]

---

[8] Since the allegations regarding the backdating establishes
Evans's scienter for all of the Fraudulent Statements related to
the First IBM transaction, the Court need not consider whether
the amended complaint pleads sufficient facts alleging that
Evans was also aware of the side agreement.

At this point, it is appropriate to consider whether the amended complaint adequately pleads the falsity of the Direct Quote in the January 24, 2001, press release.  That release quoted Evans as saying, "We were pleased to see continued strong license revenue growth this quarter across a broad base of business." (Id. ¶ 157.)  This statement is not false if, after discounting the IBM revenue, Aspen still experienced continued strong license growth that quarter.  According to the amended complaint, the first IBM transaction improperly accounted for $2.75 million of $40.6 million in total license revenue for the quarter ended December 31, 2000. (Id. ¶¶ 94, 156.)  If the IBM revenue is discounted, Aspen's true total license revenue from the quarter is $37.85 million.  In the previous quarter, Aspen had reported license revenues of $32.6 million. (Id. ¶ 88.) When revenue grows from $32.6 million to $37.85, such growth can accurately be called strong.  Therefore, the amended complaint fails to plead the falsity of the Direct Quote in the January 24, 2001, press release.

### 5.  The Yukos Transaction

According to the amended complaint, Aspen improperly recognized revenue from the Yukos transaction because "(i) Yukos signed the software license agreement in July 2001 but dated it

in June 2001 . . . and (ii) McQuillin entered into a side agreement with Yukos creating contingencies to Yukos's payment obligations." (Id. ¶ 166.)  The amended complaint pleads facts strongly suggesting that Evans was aware of the backdating. First and foremost is the allegation that, in a June 27, 2001, e-mail to Evans, McQuillin wrote that he wanted Yukos to finalize the software license agreement on July 4, 2001, with a June 30, 2001, agreement date. (Id. ¶ 168.)  In an e-mail to Evans on July 5, 2001, McQuillin confirmed his plans to backdate the agreement while altering the signing date slightly: "By [Yukos] committing to the software license agreement [by July 10, 2001] . . . we can recognize the revenue for our fiscal year ending June 30, 2001." (Id. ¶ 169.)  The agreement was ultimately executed in mid-July 2001, but the revenue was nonetheless recognized in the quarter ended June 30, 2001. (Id. ¶¶ 172, 185.)

Evans again argues that the amended complaint fails to allege that he knew the backdating was improper.  He relies on (1) the July 5, 2001, e-mail from McQuillin, which Evans characterizes as an assurance that backdating the revenue was proper and (2) his lack of an accounting background.  As Plaintiffs note, however, McQuillin tellingly prefaced the July 5, 2001, e-mail with the words, "Please destroy after reading,"

making its power to assure highly suspect. (<u>Id.</u> ¶ 169.)  As for
Evans's lack of an accounting background, the Court held above
that the amended complaint's allegations strongly suggest that
Evans had a sufficient understanding of accounting to know that
the backdating was improper.  Thus, the allegations related to
the Yukos transaction adequately plead Evans's scienter for the
SEC filings that reflect or incorporate the Yukos revenue, for
the Financial Data in the August 7, 2001, press release, and for
the SPA.

At this point, the Court considers the falsity of the
Direct Quote in the August 7, 2001, press release.  The release
quotes Evans as follows:  "We are pleased to have exceeded
expectations for both revenues and profitability this quarter in
what remains a very difficult environment[.]  During the quarter
. . . we closed [a] significant multimillion dollar
transaction[] with . . . Yukos, a large Russian oil company."
As detailed above, the amended complaint adequately alleges that
the Yukos transaction did not close during the quarter and that
Evans was aware of this fact.  Therefore, the amended complaint
has adequately pled that this statement is fraudulent.

### 6.  The Second IBM Transaction

According to the amended complaint, Aspen improperly
recognized revenue from the second IBM transaction because "(i)

IBM only intended to pay Aspen if an end-user was committed to purchase the software and (ii) it was expected that Aspen would devote significant efforts to have an end-user re-purchase the software." (Am. Compl. ¶ 204.)   The amended complaint pleads facts creating a strong inference that Evans was aware of these contingencies, but not until September 16, 2002, well after Aspen had issued the Form 10-Q and press release covering that fiscal quarter.  On March 21 and 22, 2002, Evans received two e-mails that referred to the second IBM transaction as a "pre-purchase," meaning, as the second e-mail explained, "it is already stated that the licenses are for [Aspen customer] [AGIP] or for any other customer we agree on."  However, neither e-mail put Evans on notice that the payment from IBM was contingent on Aspen's lining up AGIP or another customer for IBM or that Aspen would "devote significant efforts" to securing such a customer. It was not until Evans received an e-mail from Zappala on September 16, 2002, that he was made aware that, because of these contingencies, Aspen did "not have a firm payment obligation from IBM." (Id. ¶ 223.)  By that point, Aspen had already filed the Form 10-Q for the fiscal quarter ended March 31, 2002, (on May 15, 2002) and issued a press release summarizing the revenue (on April 25, 2002). (Id. ¶¶ 231, 233.)

Therefore, the amended complaint's allegations regarding the second IBM transaction fail to create a strong inference of Evans's scienter for the Form 10-Q for the fiscal quarter ended March 31, 2002, and for the April 25, 2002, press release. These allegations do support an inference of scienter for any SEC filing post-dating September 16, 2002, that reflects or incorporates the revenue from the second IBM transaction as well as for the SPA itself.

### 7. The PSC Transaction

According to the amended complaint, Aspen improperly recognized revenue from the PSC transaction because there were side agreements in place that promised PSC additional future products and that promised to reimburse PSC for certain agent fees. (Id. ¶ 240.) The amended complaint makes no allegations suggesting that Evans was aware of this side deal. Plaintiffs argue that Evans's knowledge of Aspen's improper accounting in other transactions implies that he knew or should have known about the improper accounting in the PSC transaction. The Court rejects this argument. Evans's knowledge of other accounting improprieties has no bearing on whether he knew of the side agreement in the PSC transaction. Therefore, the amended complaint's allegations regarding the PSC transaction fail to create a strong inference of scienter.

44

In sum, the amended complaint adequately pleads a common law fraud claim to the extent that the claim is predicated on

(a)   the Financial Data in the January 24, 2001, press release;

(b)   the Financial Data and Evans's Direct Quote in the August 7, 2001, press release;

(c)   SEC filings post-dating March 22, 2001, that reflect or incorporate revenue from the Logica transaction;

(d)   SEC filings that reflect or incorporate revenue from the first IBM transaction;

(e)   SEC filings that reflect or incorporate revenue from the Yukos transaction;

(f)   SEC filings post-dating September 16, 2002, that reflect or incorporate revenue from the second IBM transaction; and

(g)   The SPA, to the extent it reflects or incorporates revenue from the Logica, Yukos, and first and second IBM transactions, or provides that Aspen's financial statements and SEC filings were prepared in conformity with GAAP.

### D.   Fraudulent Inducement

The pleading requirements for common law fraud and fraudulent inducement are identical. See JHW Greentree Capital, L.P. v. Whittier Trust Co., No. 05 Civ. 2985, 2006 U.S. Dist. LEXIS 22400, at *21-22 (S.D.N.Y. April 24, 2006). Therefore, the analysis of Plaintiffs' common law fraud claim applies fully to Plaintiffs' fraudulent inducement claim: the fraudulent inducement claim is adequately pled to the extent it is based on the Fraudulent Statements discussed in the previous paragraph.

### E.  Aiding and Abetting

To state a claim for aiding and abetting fraud, a plaintiff must allege the following elements: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." Unicreditor Italiano Spa v. J.P. Morgan Chase Bank, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003). "As in the context of pleading a primary fraud violation, pleading knowledge for purposes of an aiding and abetting claim requires allegations of facts that give rise to a 'strong inference' of actual knowledge." Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007). "The purpose of an aiding and abetting claim is to draw in defendants who would not be liable on the main fraud claim, but who are alleged to have actual knowledge of the fraud and

substantially assisted it." <u>Sachs v. Adeli</u>, No. 603930/2003, 2006 N.Y. Misc. LEXIS 2615, at *27 (N.Y. Misc. 2006).

Plaintiffs' aiding and abetting claims against Evans must be dismissed. As already discussed, the amended complaint fails to allege facts creating a strong inference that Evans had knowledge of the fraud related to the Lyondell-Equistar, Union Carbide, and PSC transactions as well as the fraud related to the Logica transaction prior to March 22, 2001, and the fraud related to the second IBM transaction prior to September 9, 2002. Therefore, Evans cannot be held liable as an abettor to the fraud related to these transactions. The amended complaint sufficiently alleges that Evans was a principal actor in the remaining fraud at issue, namely the fraud related to the first IBM and Yukos transactions as well as the fraud related to the Logica transaction beginning March 22, 2001, and the second IBM transaction beginning September 9, 2002. Since the purpose of aiding and abetting liability is to draw in defendants who are not liable as principals of the fraud, Evans cannot be held liable as an abettor to the fraud related to these transactions. <u>See 380544 Canada</u>, 544 F. Supp. 2d at 232 ("[B]ecause McQuillin is alleged to be liable as a principal, rather than an aider and abettor, the claim for aiding and abetting must be dismissed."); <u>see also Sachs</u>, 2006 N.Y. Misc. LEXIS 2615, at *27.

### F.  Conspiracy

To state a claim for conspiracy to commit fraud, a plaintiff must allege "(1) an agreement among two or more parties, (2) a common objective, (3) acts in furtherance of the objective, and (4) knowledge." Diamond State Ins. Co. v. Worldwide Weather Trading LLC, No. 02 Civ. 2900, 2002 WL 31819217, at *4 (S.D.N.Y. Dec. 16, 2002).  A plaintiff may not "reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 591 (2d Cir. 2005); accord Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc., No. 99 Civ. 9623, 2007 U.S. Dist. LEXIS 27001 (S.D.N.Y. Apr. 2, 2007) ("[W]here the acts underlying a claim of conspiracy are the same as those underlying other claims alleged in the complaint, the conspiracy claim is dismissed as duplicative."); see also Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank, 755 F.2d 239, 251 (2d Cir. 1985) ("Count 7 added no new allegations to those of counts 1-6 except to reiterate that [defendants] had conspired to commit the acts heretofore described . . . [and therefore] Count 7 was properly dismissed . . . as duplicative . . . .").

Plaintiffs' conspiracy count against Evans offers no new allegations beyond those alleged in support of Plaintiffs'

common law fraud claim. (Am. Compl. ¶¶ 305-06.)  It is therefore
dismissed as duplicative.

### G.  Dismissal with Prejudice

"Complaints dismissed under Rule 9(b) are almost always
dismissed with leave to amend." Luce v. Edelstein, 802 F.2d 49,
56 (2d Cir. 1986) (internal quotation marks omitted).  However,
"it is proper to deny leave to replead where there is no merit
in the proposed amendments or amendment would be futile." Hunt
v. Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 728
(2d Cir. 1998).  Where leave to replead is denied, "plaintiffs
have usually already had one opportunity to plead fraud with
greater specificity." Luce, 802 F.2d at 56; accord ATSI
Commc'ns, Inc. v. Shaar Fund, Ltd., 357 F. Supp. 2d 712, 720
(S.D.N.Y. 2005) ("As plaintiff has already had an opportunity to
amend, dismissal is with prejudice.").

To the extent the Court dismisses Plaintiffs' claims, it
does so with prejudice.  Plaintiffs have already had one chance
to amend their complaint.  The Court's opinion dismissing the
initial complaint notified Plaintiffs that they failed to plead
certain claims with the requisite particularity and that they
failed to raise a strong inference of Evans's scienter.  Despite
this notice, in their amended complaint, Plaintiffs again fail
to plead certain claims with the requisite particularity and

again fail to raise a strong inference of Evans's scienter, at least in regards to a number of the Fraudulent Statements.  This demonstrates that permitting Plaintiffs to replead would be futile.

### Conclusion

Evans's motion to dismiss is denied in part and granted in part.  The motion is denied with respect to Plaintiffs' common law fraud and fraudulent inducement claims, but only insofar as they are predicated on

(a)     the Financial Data in the January 24, 2001, press release;

(b)     the Financial Data and Evans's Direct Quote in the August 7, 2001, press release;

(c)     SEC filings post-dating March 22, 2001, that reflect or incorporate revenue from the Logica transaction;

(d)     SEC filings that reflect or incorporate revenue from the first IBM transaction;

(e)     SEC filings that reflect or incorporate revenue from the Yukos transaction;

(f)     SEC filings post-dating September 16, 2002, that reflect or incorporate revenue from the second IBM transaction; and

(g)     The  SPA,  to  the  extent  it  reflects  or
        incorporates  revenue  from  the  Logica,  Yukos,  and
        first  and  second  IBM  transactions,  or  provides
        that  Aspen's  financial  statements  and  SEC  filings
        were  prepared  in  conformity  with  GAAP.

Evans's  motion  to  dismiss  is  granted  with  respect  to  all  other
claims.   Those  claims  are  dismissed  with  prejudice.

SO ORDERED.

Dated:    New York, New York
          May  4  ,  2009

                                    _____
                                         JOHN F. KEENAN
                                    United States District Judge

51